# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| RAJESH M. SHAH, Individually and On Behalf of All Others Similarly Situated,<br><br>                     Plaintiff,<br><br>       v.<br><br>ZIMMER BIOMET HOLDINGS, INC., CHRISTOPHER B. BEGLEY, BETSY J. BERNARD, PAUL M. BISARO, GAIL K. BOUDREAUX, TONY W. COLLINS, DAVID C. DVORAK, MICHAEL J. FARRELL, DANIEL P. FLORIN, LARRY GLASSCOCK, ROBERT A. HAGEMANN, ARTHUR J. HIGGINS, ROBERT J. MARSHALL JR., MICHAEL W. MICHELSON, CECIL B. PICKETT, PH.D., JEFFREY K. RHODES, GOLDMAN, SACHS & CO., and J.P. MORGAN SECURITIES LLC,<br><br>                 Defendants. | Case No.: 3:16-cv-00815-PPS-MGG<br><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ...................................................................... 1

II.    INTRODUCTION ........................................................................................... 3

III.   JURISDICTION AND VENUE .................................................................... 11

IV.    PARTIES ...................................................................................................... 11

    A.    Plaintiffs ............................................................................................. 11

    B.    Corporate Defendant ........................................................................... 12

    C.    Officer Defendants .............................................................................. 12

    D.    Securities Act Defendants ................................................................... 14

        1.    Director Defendants ................................................................ 15

        2.    Underwriter Defendants .......................................................... 18

V.     RELEVANT NON-PARTIES ....................................................................... 20

VI.    BACKGROUND AND RELEVANT EVENTS PRIOR TO THE CLASS PERIOD ..... 21

    A.    The 2015 Merger: a Marriage of Two Crosstown Rivals ..................... 21

    B.    ZBH's Products and Facilities Are Strictly Regulated By the FDA ..................... 23

VII.   SUMMARY OF THE ACTION ................................................................... 25

    A.    Organic Revenue Growth was the Most Important Metric to ZBH's Stock Price ........................................................................................... 25

        1.    Organic Growth Rate Underperforms Market/Industry in 2015 .............. 27

        2.    Organic Growth Starts to Reaccelerate in Q1 2016 ................................. 29

    B.    During the Class Period, ZBH Falsely Declares that the Company has Reached an "Inflection Point" and that Revenue Growth Will Reaccelerate to Market Level in the Second Half of 2016 ....................................................................... 30

    C.    The Truth Begins to Emerge When ZBH's Q3'16 Results Blindside Investors .. 35

1.  The October 31, 2016, Partial Disclosure ...................................................... 35

2.  The November 8, 2016, Partial Disclosure ................................................ 36

D.  Since June 2016, ZBH Corporate Management Knew that an FDA Inspection of the North Campus was Imminent and Knew About the Precise "Systemic Issues" Plaguing the North Campus' Quality Management System that were Cited by the FDA Inspectors ................................................................................................. 39

1.  Important Information About the Types and Frequency of FDA Quality System Investigation ................................................................................. 40

2.  ZBH Knew at the Start of the Class Period that an Inspection of the North Campus Was About to Imminently Occur Around June 30, 2016 or Soon Thereafter ........................................................................................... 44

3.  ZBH Admits that ZBH "Corporate Management" Knew About the "Systemic" Quality and Compliance Issues at the North Campus Because of Corporate Audit Reports Issued on March 31, April 13, and June 7, 2016 .......................................................................................................... 45

4.  Analysts Confirm that the 14 Observations in the 58 Page November 2016 FDA-483 were Serious and Highly Concerning ....................................... 53

5.  Former ZBH Employees Confirm that ZBH Waited Until the September 2016 Inspection to take Serious Remedial Actions, Which Devastated the Output at the North Campus .................................................................... 57

6.  ZBH's Post-Class Period Disclosures Revealed that the North Campus Required $300 Million of Remediation Costs and that the Resulting Supply Shortages of Key Products Would Continue Into the Second Half of 2017 ................................................................................................... 62

E.  Defendants Knew that ZBH Lacked Timely Visibility of Inventory, the Ability to Forecast Demand, and "Key Foundational Elements of the Supply Chain" such as Integrated Demand and Production Planning Tools .............................................. 65

VIII.  VIOLATIONS OF THE EXCHANGE ACT ................................................................. 73

A.  ZBH and the Officer Defendants' Material Misstatements and Omissions in Violation of the Exchange Act ............................................................................ 74

1.  The June 7, 2016 Statement ................................................................... 74

2.  The June 2016 SPO Materials.................................................................. 79

3.   The July 28, 2016 Statements ................................................... 95

4.   The August 8, 2016 Quarterly Report on Form 10-Q ........................... 104

5.   The August 2016 SPO Materials ............................................ 112

6.   The September 7, 2016 Wells Fargo Securities Healthcare Conference ........................................................ 116

7.   The September 12, 2016 Morgan Stanley Global Healthcare Conference ........................................................ 121

8.   The October 31, 2016 Statements ............................................ 129

B.   Additional Allegations Regarding the Officer Defendants' Scienter ................ 131

C.   Additional Allegations Regarding Loss Causation ............................. 139

D.   Presumption of Reliance ................................................... 140

IX.   VIOLATIONS OF THE SECURITIES ACT ................................................ 142

X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ............................................... 147

XI.   CLASS ACTION ALLEGATIONS ......................................................... 148

XII.   CLAIMS FOR RELIEF ............................................................... 149

XIII.   PRAYER FOR RELIEF ............................................................. 163

XIV.   JURY TRIAL DEMANDED ......................................................... 164

## <u>TABLE OF DEFINED TERMS</u>

"2015 10-K" refer to ZBH's Annual Report on Form 10-K for the year ended December 31, 2015 filed on February 29, 2016.

"2016 10-K" refers to ZBH's Annual Report on Form 10-K for the year ended December 31, 2016 filed on March 1, 2017.

"August 2016 Offering" refers to the August 9, 2016 public offering of 7,440,675 shares of ZBH common stock by ZBH and certain ZBH investors, consisting of affiliates of KKR, and TPG.

"August 2016 SPO" refers to the August 2016 Offering.

"August 2016 SPO Materials" refers to the August Final Prospectus together with the Registration Statement and the August Preliminary Prospectus.

"August Final Prospectus" refers to the Final Prospectus Supplement filed with the SEC on August 11, 2016.

"August Preliminary Prospectus" refers to the Preliminary Prospectus Supplement filed with the SEC on August 9, 2016

"CAPA" refers to Corrective and Preventative Action.

"cGMP" refers to Current Good Manufacturing Processes as set out in the FDCA.

"Class" refers to all persons and entities that purchased or acquired ZBH's common stock or options during the Class Period, and who were damaged thereby, and also including persons or entities that: (i) purchased ZBH common stock pursuant and/or traceable to the June 2016 Offering; and/or (iii) purchased ZBH common stock pursuant and/or traceable to the August 2016 Offering.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

"Class Period" is June 7, 2016, to November 7, 2016.

"Company" refers to ZBH.

"December 2016 Letter" refers to ZBH's December 21, 2016 response to the November FDA-483.

"Director Defendants" refers to Defendants Glasscock, Begley, Bernard, Bisaro, Boudreaux, Farrell, Hagemann, Higgins, Michelson, Pickett, and Rhodes.

"Exchange Act" refers to the Securities and Exchange Act of 1934.

"FDA" refers to the United States Food and Drug Administration.

"FDA Inspection Guide" refers to the FDA's Guide to Inspections of Quality Systems.

"FDA Manual" refers to the FDA's Compliance Program Guidance Manual (Inspection of Medical Device Manufacturers).

"FDCA" refers to the Federal Food, Drug, and Cosmetic Act.

"FOIA" refers to the Freedom of Information Act.

"July 28th Call" refers to the July 28, 2016 conference call ZBH held with investors, analysts, and the public, to discuss the Company's Q2 2016 financial results.

"June 2014 FDA-483" refers to the FDA-483 issued to Legacy Biomet as a result of the June 2014 Inspection.

"June 2014 Inspection" refers to the FDA's inspection of Warsaw North between June 16, 2014 and June 30, 2014.

"June 2016 Offering" refers to the June 13, 2016 public offering of 11,116,533 shares of ZBH common stock by ZBH and certain ZBH investors, consisting of    affiliates    of   KKR, Goldman Sachs, and   TPG.

"June 2016 SPO" refers to the June 2016 Offering.

"June Preliminary Prospectus" refers to the Preliminary Prospectus Supplement filed with the SEC on June 13, 2016.

"June Prospectus" refers to the Final Prospectus Supplement filed with the SEC on June 15, 2016.

"June 2016 Offering Materials" refers to the June Prospectus together with the Registration Statement and the June Preliminary Prospectus.

"Lead Plaintiffs" refers to Rajesh M. Shah, Matt Brierley and Eric Levy.

"Legacy Biomet" refers to Biomet, Inc.

"Legacy Zimmer" refers to Zimmer Holdings, Inc.

"North Campus" or "Warsaw North" refers to primary Legacy Biomet facility is located at 56 E. Bell Dr., Warsaw, Indiana.

"November 2016 FDA-483" refers to the FDA-483 issued to ZBH's as a result of the inspections at Warsaw North from September 12, 2016 to November 22, 2016.

"Officer Defendants" refers to Defendants Dvorak, Florin, Marshall, and Collins.

"Plaintiffs" refers to Rajesh M. Shah, Matt Brierley, Eric Levy, and Plaintiff UFCW Local 1500.

"PMA" refers to premarket approvals.

"P&PC" refers to Production and Process Controls.

"Q1'16 10-Q" refers to the ZBH Quarterly Report on Form 10-Q for the quarter ended March 31, 2016 filed May 10, 2016.

"Q2'16 10-Q" refers to the ZBH Quarterly Report on Form 10-Q for quarter ended June 30, 2016 filed August 8, 2016.

"QMS" refers to Quality Management System.

"QSIT" refers to Quality System Inspection Technique.

"Registration Statement" refers to the Form S-3 ZBH filed with the SEC on February 4, 2016 .

"Securities Act" refers to the Securities Act of 1933.

"Securities Act Defendants" refers to Director Defendants, Underwriter Defendants, and Defendants Dvorak, Florin, and Collins.

"Underwriter Defendants" refers to Defendants J.P. Morgan LLC and Goldman Sachs.

"Warsaw North" or "North Campus" refers to primary Legacy Biomet facility is located at 56 E. Bell Dr., Warsaw, Indiana.

"West Campus" refers to the primary Legacy Zimmer facility is located at 1800 W. Center St, Warsaw, Indiana.

"ZBH" refers to the merged company Zimmer Biomet Holdings, Inc.

## I.      PRELIMINARY STATEMENT

1.      Lead Plaintiffs Rajesh M. Shah, Matt Brierley and Eric Levy ("Lead Plaintiffs"), along with Plaintiff UFCW Local 1500 ("UFCW 1500") (collectively, "Plaintiffs"), by and through their attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Zimmer Biomet Holdings, Inc., ("ZBH" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by ZBH; (c) interviews of former ZBH employees; (d) review of materials received from the United States Food and Drug Administration ("FDA") in response to freedom of information requests; (e) review of reports issued by industry and securities analysts; and (f) review of other publicly available information concerning ZBH.

2.      This is a class action on behalf of persons or entities that purchased or acquired ZBH's securities, including common stock and options, between June 7, 2016, and November 7, 2016, inclusive (the "Class Period"), including persons or entities that purchased or otherwise acquired ZBH common stock pursuant or traceable to the Company's secondary public offerings on or around June 13, 2016 (the "June 2016 Offering") and on or around August 9, 2016 (the "August 2016 Offering"), and were damaged thereby (the "Class").

3.      ZBH designs, manufactures and markets orthopaedic reconstructive products; sports medicine, biologics, extremities and trauma products; spine, bone healing, craniomaxillofacial and thoracic products; dental implants; and related surgical products. ZBH's products and solutions treat bones, joints or supporting soft tissues.

4.      ZBH was the product of a merger between competitors Zimmer Holdings, Inc. ("Legacy Zimmer") and Biomet, Inc. ("Legacy Biomet") that closed in June of 2015 (the "Merger").    At the time, both companies were major medical device manufacturers headquartered in Warsaw, Indiana.

5.      Legacy Biomet had been private-equity owned by affiliates of KKR, Blackstone, TPG, and Goldman Sachs.  In connection with the Merger, those private equity funds received approximately 16% of the combined company.

6.      During the Class Period, the private equity funds affiliated with Goldman Sachs, TPG and KKR sold their remaining holdings of ZBH common stock in underwritten public offerings.  In the June 2016 Offering, the affiliates of KKR, TPG, and Goldman Sachs sold approximately $1.2 billion of their stock to the public.  Shortly thereafter, the affiliates of TPG and KKR sold nearly $1 billion of ZBH common stock in the August 2016 Offering.

7.      In this Complaint, Plaintiffs assert two different sets of claims on behalf of purchasers of ZBH's securities during the Class Period.  Count I and II assert securities fraud claims under Section 10(b) and Section 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5, against the Company and certain senior executives (defined below at ¶¶43-46).  Counts III through VIII assert strict-liability and negligence claims under the Securities Act of 1933 ("Securities Act") against those defendants who are statutorily responsible under Sections 11, 12(a)(2) and 15 of the Securities Act for materially untrue statements and misleading omissions made in connection with the June 2016 Offering and the August 2016 Offering.

## II.    INTRODUCTION[1]

8.      This case concerns material misstatements and omissions regarding ZBH's compliance with FDA quality manufacturing regulations, the integration of the primary manufacturing facilities and quality systems of Legacy Zimmer and Legacy Biomet, and ZBH's ability to continue accelerating its organic revenue growth rate in the second half of 2016.

9.      Before and during the Class Period, ZBH's organic revenue growth rate was one of the most important metrics to ZBH's stock price and was closely followed by investors and securities analysts.  When Legacy Zimmer announced that it was acquiring cross-town rival Legacy Biomet in April 2014, increased growth was the key selling point for combining the second and fourth largest providers of orthopedic products.   In particular, the complimentary sales channels were expected to generate cross-selling opportunities that would accelerate organic revenue growth well above market levels.   However, the growth rate decelerated dramatically below market level after the Merger, causing much concern among investors in the fall of 2015.

10.     In early 2016 and throughout the Class Period, ZBH and its executives aggressively insisted that the successful integration of the commercial operations in Q4'15, had provided ZBH with the ability to capture the benefits of cross-selling opportunities and exceed market level growth in the second half of 2016 and into 2017.  Literally up until the third to last day of Q3'16 (*i.e.*, on September 28, 2016), ZBH and its executives were meeting with analysts and investors and expressing confidence in continued revenue acceleration.

11.     While touting accelerating revenue and the substantial synergies from the Merger, ZBH and its officers omitted disastrous information that they had learned of in the first half of

---

[1] Unless otherwise noted, all emphasis is added.

2016 about the existing regulatory environment at the primary Legacy Biomet manufacturing facility in Warsaw, Indiana, known as the "North Campus."

12.     Specially, in a post-Class Period letter to the FDA on December 21, 2016, ZBH admitted that following the closing of the Merger, corporate audits were conducted in the beginning of 2016 and audit reports were issued on March 31, April 13, and June 7, 2016, which had "alerted" ZBH's "corporate management" to  what ZBH admitted were "systemic issues" with respect to the North Campus.  ZBH admitted that the findings were not minor nor technical, but rather involved, "self-identified major compliance-related issues in areas such as design controls, sterile packaging, complaint handling, nonconforming material, and CAPAs."  As set forth in greater detail herein, the foregoing "major-compliance-related issues" cover a wide-range of the primary components to a quality management system.

13.     ZBH, and its officers, and its Board of Directors were nearly all seasoned veterans of the medical device industry and well versed in FDA quality regulations, compliance, and the risks associated with not complying with FDA regulations.  Accordingly, ZBH and its senior officers and directors understood the significance of the information uncovered by the corporate audit reports.

14.     Given the experience of its officers and directors, ZBH was well aware that as a manufacturer of class III devices, the Company's manufacturing facilities are subject to mandatory biennial inspections by law.  Unfortunately for ZBH, the prior inspection of the North Campus had ended on June 30, 2014, and resulted in the FDA issuing a Form 483.  Given the 2016 corporate audit reports were issued between March 31 and June 7, 2016, ZBH was faced with a huge problem because the FDA was due to arrive for an inspection of the North Campus by June 30, 2016, or soon thereafter.  The logical inference is that because ZBH, its officers, and

directors, knew that the North Campus was due for an inspection (especially after the FDA cited at least two issues in the June 2014 inspection), the corporate audits were conducted in anticipation of the FDA insepction.

15.     The magnitude and scope of the "systemic" issues that ZBH had learned of made it impossible for ZBH to remediate or address the issues by June 30, 2016, nor at any time in 2016 for that matter because, ultimately, the issues at the North  Campus would require upwards of $300 million and a year of extensive remediation work.  Indeed, the issues in the reports were so significant that ZBH's CEO had to approve the level of funding.

16.     ZBH had another problem.  ZBH had promised investors and analysts that the Company would return to above market growth rates in the second half of 2016.  The products produced and distributed at the North Campus included some of Legacy Biomet's most important products.   As ZBH's CEO later admitted, the products were some of the most important and provided ZBH some of its most competitive opportunities and were "strategically relevant" to accelerating revenue.  If ZBH took meaningful steps to address the issues, it would severely impact the Company's ability to generate sufficient supply to support cross-selling activities needed to accelerate revenue growth.  As set forth in more detail herein, a former employee who worked in the North Campus said new procedures later put in place included more documentation than the prior Legacy Biomet procedures and that it took longer to produce because of the paperwork, even indicating that additional processes (documentation) cut production by one-third.

17.     If ZBH instituted prompt action, it would have substantially disrupted production and made it impossible for the Company to make good on its promised accelerated revenue growth in the second half of 2016.  ZBH ignored the systemic issues with the quality system and

did not take prompt remedial action.  A former employee at the North Campus, indicated that ZBH was waiting until November 2016 to convert to Zimmer policies and procedures over a six to eight month process.  This same former employee noted that after the FDA inspection commenced, the poly bearing clean room was then completely shut down and production was mostly shut down for approximately six weeks to conduct this conversion.   Clearly, given the later disruption when forced to take necessary remediation, if ZBH had undertaken a prompt response, it would have been impossible for them to meet their revenue guidance for the second half of 2016.

18.     Despite knowing of "systemic" issues with the North Campus quality system that had not been remediated, ZBH continued manufacturing and distributing products from the North Campus.  Shockingly, when ZBH announced its Q2'16 financial results on July 28, 2016, ZBH boldly told investors that accelerating revenue growth in Q2'16 marked an "inflection point" and the Company *increased its organic revenue growth projection for the second half of 2016*.  What investors were not told was that ZBH had only been able to increase its revenue projections because the FDA had not shown up between June 30, 2016 (as ZBH reasonably would have been expected) and July 28, 2016.  Moreover, ZBH did not disclose that its guidance was effectively based on the assumption (and hope) that the FDA would not timely conduct an inspection as ZBH reasonably expected that they would.  Also, investors were not told that in July 2016 (*i.e.*, at the same time that *ZBH was publicly upping its revenue growth rate guidance* for the second half of 2016), *ZBH's CEO was secretly approving remediation funding* of an undisclosed amount to address the "systemic issues" with the North Campus quality system at a time when ZBH knew or reasonably expected that a routine FDA inspection was imminently about to occur.

19.     To investors, Q3'16 and the second half of 2016 looked incredibly bright for ZBH.  In September 2016, ZBH and its officers continued to express confidence throughout the last month of Q3'16 as they participated in a number of conferences and roadshows where they met with investors and analysts.  An analyst report issued the  second  to last day of Q3'16 characterized the meetings with ZBH management a day earlier "as quite positive and [the analyst was] comfortable that ZBH is on the path to meeting its stated goal of 4% plus top-line growth going forward."

20.     When ZBH reported its Q3'16 financial results on October 31, 2016, the Company shocked investors and analysts by reporting decelerating revenue growth in Q3'16 and lowering its revenue growth guidance for Q4'16.  During a conference call, management was peppered with questions from incredulous analysts who could not understand how they did not see this coming (and how they had been so positive in the waning days of Q3'16).

21.     During a conference call that day, ZBH's officers blamed the Q3'16 "variable sales performances" on "unanticipated supply constraints, related to our transitioning supply chain infrastructure."

> ***Variable commercial performances by our sales teams were in part caused by unanticipated supply constraints, related to our transitioning supply chain infrastructure.*** This resulted in shortfalls of needed implants and additional instrument sets, to fully exploit sales opportunities in key product categories.
>
> In response to this challenge, we've accelerated work to enhance certain aspects of our supply chain infrastructure as we harmonize and optimize our sourcing, manufacturing and quality management systems.

22.     ZBH disclosed that the Legacy Zimmer and Legacy Bioment supply chains, demand forecasting, and production planning, had not been integrated and executives lacked timely visibility of inventory and lacked the ability to forecast demand, which prevented the officers from knowing that ZBH had burned through its safety stock of important products,

which had inexplicably gone undetected by ZBH's officers.  Analysts questioned the explanation but also expressed dismay about the admitted lack of visibility

23.     Defendants' disclosures on October 31, 2016, the Company's decelerated Q3'16 revenue growth rate, and its lowered Q4'16 organic revenue growth rate, partially disclosed the truth about the misrepresentations and omissions during the Class Period about, among others, ZBH's ability to accelerate revenue growth in the second half of 2016 and about ZBH's compliance with FDA quality regulations.  On this news, shares of ZBH plummeted by $17.15 per share, or nearly 14%, to close on October 31, 2016 at $105.40 per share.

24.     However, the October 31, 2016, disclosures were themselves materially misleading because the disclosures did omitted meaningful context for investors  to understand what had actually occurred.

25.     A few days later on November 8, 2016, an analyst issued a report that further partially revealed the truth about the prior misrepresentations and omissions during the Class Period:

> . . . Based on our recent conversations with industry contacts, we believe at least part of the reason for the unanticipated product supply issues discussed during ZBH's 3Q16 earnings call is **related to manufacturing problems at Biomet's Warsaw, Indiana, operations**.
>
> ***
>
> **. . . According to our industry contacts, the FDA inspected Biomet's Warsaw manufacturing operations over a roughly six-week period recently as part of a routine review. Following the FDA inspection, we have heard some Biomet product lines manufactured in Warsaw have been shut down from operations and cannot be shipped to the field. We believe this could be at least part of the explanation for ZBH's unanticipated product supply issues for certain Biomet hip implants.**

26.     On this news, shares of ZBH fell $2.62 per share, or 2.51%, to close on November 8, 2016 at $101.83 per share.

27.     ZBH was in a difficult spot because it had only provided a partial explanation for what had occurred.  In response, ZBH issued a statement that admitted that these issues had already been factored into the lowered guidance ZBH announced on October 31, 2016 (even though this explanation was not provided to investors on October 31, 2016) and further explained:

> … In addition, as discussed on the third quarter earnings conference call, the Company has also accelerated work to enhance certain aspects of its supply chain infrastructure as it harmonizes and optimizes its sourcing, manufacturing and quality management systems.  ***While these ongoing efforts have in instances led to certain product shipment delays, including product manufactured at the legacy Biomet operation in Warsaw, Indiana,*** the Company is making excellent progress in addressing the issues and many of the shipment delays are already resolved and the impacted product has been released for commercial distribution. The Company expects to return to full shipping capacity with the impacted products over the next few weeks.

28.     As ZBH would later admit in the Company's letter to the FDA on December 21, 2016, the FDA had commenced an inspection on September 12, 2016, of the North Campus. ZBH concedes that it was aware early in the inspection of the severity of the issues being cited by the FDA meant that the Company was going to receive a Form 483: "Rather than wait for the issuance of the FDA 483 to plan and take action, we immediately took steps to correct and improve various aspects of the North Campus quality management system." *See* ¶162.

29.     Finally, in the letter to the FDA on December 21, 2016, provides a crucial fact that ZBH had hidden from investors on the October 31, 2016, conference call discussing the ZBH's Q3'16 earnings.  In the December 21, 2016, Letter to the FDA, the Company admits that on the second to last day of Q3'16 (*i.e.*, September 29, 2016), it was forced to implement a "Product ship hold … to stop shipments of ***all final product cleaned, sterile packed, and sterilized at the Warsaw North Campus***."   As explained below in ¶163, a former North Campus employee understood that ZBH executives actually made the decision to shut down production in

the poly bearing department instead of waiting for the FDA to order it and explained that it would have looked worse to have to announce that the FDA shut down production.

30.     Subsequently, on November 22, 2016, the inspection finally concluded and the Company received an extensive 58 page Form 483.  In mid-December 2016, various research analyst obtained a redacted copy from the FDA via a freedom of information request.  Between December 14 and 16, 2016, multiple analysts issued reports after having their own regulatory consultants review the document.  These all expressed disbelief at the scope and seriousness of the issues raised therein and indicating that it was one of the worst they had ever seen.

31.     However, in the December 21, 2016, ZBH conceded that it had known of a number of specific issues raised by inspectors, throughout the Class Period, admitting that:

> After the merger was closed, Zimmer Biomet Corporate directed corporate quality audits to be performed at the North Campus in the first half of 2016.  ***These audits self-identified major compliance-related issues in areas such as design controls, sterile packaging, complaint handling, nonconforming material, and CAPAs.***  A remediation program with approved funding [redacted] was established in July 2016  to address the systemic issues at the North Campus.  ***This program self-identified CAPAs related to 7 of the 483 observations and 6 of the discussion points prior to the start of the inspection***.

32.     In the weeks and months that followed, ZBH disclosed further supply shortages and that the ongoing remediation work, which had continued into Q1'17, would continue to impact supply shortages at least through Q2'17.  Moreover, ZBH revealed that the remediation costs through 2018 would be upwards of $300 million.

33.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

### III.     JURISDICTION AND VENUE

34.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), as well as Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

35.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

36.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this Judicial District.

37.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### IV.     PARTIES

#### A.     Plaintiffs

38.     Lead Plaintiff Rajesh M. Shah, as set forth in the certification previously filed with the Court, incorporated by reference herein, purchased ZBH common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or

misleading statements and/or material omissions alleged herein.

39.     Lead Plaintiff Matt Brierly as set forth in the certification previously filed with the Court, incorporated by reference herein, purchased ZBH common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

40.     Lead Plaintiff Eric Levy as set forth in the certification previously filed with the Court, incorporated by reference herein, purchased ZBH options during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

41.     Plaintiff UFCW 1500, as set forth in the attached certification, incorporated by reference herein, purchased Zimmer common stock during the Class Period (including Zimmer common stock purchased from one of the underwriters in connection with the secondary offerings on or around June 13, 2016 and August 9, 2016), and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**B.     Corporate Defendant**

42.     Defendant ZBH is a Delaware Corporation headquartered in Warsaw, Indiana. ZBH's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "ZBH."

**C.     Officer Defendants**

43.     Defendant David C. Dvorak ("Dvorak") was, at all relevant times, Chief Executive Officer ("CEO"), President, and a director of ZBH.   Dvorak also signed or authorized the signing of the Company's Registration Statement (defined below in ¶¶234, 286) in

connection with the June 2016 Offering and the August 2016 Offering.  Dvorak was a member

of the Integration Steering Committee ("ISC") in connection with the Merger.  Dvorak

previously served in various capacities as Legacy Zimmer's Group President, Global Businesses,

Chief Legal Officer, Executive Vice President, Corporate Services, Chief Counsel and Secretary,

Chief Compliance Officer, and Senior Vice President, Corporate Affairs and General Counsel.

Before, Dvorak served as Senior Vice President, General Counsel and Corporate Secretary of

STERIS Corporation.  Dvorak formerly practiced corporate law, focusing on mergers and

acquisitions and on securities law.

44.     Defendant Daniel P. Florin ("Florin") was, at all relevant times, ZBH's Chief

Financial Officer ("CFO").  Florin was also a member of the ISC in connection with the Merger.

Florin signed or authorized the signing of the Company's Registration Statement, as well as

ZBH's Quarterly Report on Form 10-Q for Q2'16 .  Florin served as Senior Vice President and

CFO of Legacy Biomet from June 2007 to June 2015.  Prior to joining Legacy Biomet, Florin

served as Vice President and Corporate Controller of Boston Scientific Corporation from 2001

through May 2007, after serving in financial leadership positions within Boston Scientific

Corporation.  Florin also worked for C.R. Bard from October 1990 through June 1995.

45.     Defendant Robert J. Marshall Jr. ("Marshall") was, at all relevant times, ZBH's

Vice President of Investor Relations and Treasurer.  At times relevant hereto, Marshall

frequently represented the Company at analyst conferences, often with Defendants Dvorak and

Florin.  Defendant Marshall also frequently participated, along with Defendants Dvorak and

Florin, in non-deal roadshows with securities analysts (from major brokerage firms) and

investors, including on at least two occasions at in September 2016.

46.     Defendant Tony W. Collins ("Collins") was, at all relevant times, Vice President,

Corporate Controller and Chief Accounting Officer (Principal Accounting Officer) of ZBH. Collins also signed or authorized the signing of the Registration Statement and ZBH's Quarterly Report on Form 10-Q for Q2'16.  Collins previously served as Vice President, Finance for the Global Reconstructive Division and Global Operations organization.  Collins joined Legacy Zimmer in 2010 as Vice President, Finance for the Global Reconstructive Division and U.S. Commercial organization. From 1997 to 2007, he was employed at Guidant Corporation and Boston Scientific Corporation, where he held a number of positions, including Finance Director and CFO of the Guidant Japan organization, Global Director of Operations Finance and Director of Strategic Planning.

47.     Defendants Dvorak, Florin, Marshall, and Collins (collectively the "Officer Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Zimmer's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Officer Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Officer Defendants are liable for the false statements pleaded herein.

**D.     Securities Act Defendants**

48.     Plaintiffs in this action bring claims under both the Securities Act and the Exchange Act.  The Securities Act imposes strict liability for untrue statements or omissions of material fact in a registration statement used to offer securities.  Strict liability is imposed on, among others, the issuer, signatories of the registration statement, the directors of the company issuing the securities, and the underwriters of the offering.  Claims under the Securities Act generally do not require a showing of fraud, scienter, reliance, or causation.  In addition to Defendants Dvorak, Florin, and Collins, Plaintiffs name the following Defendants as defendants in this action for Plaintiffs' claims under the Securities Act in connection with their involvement in the June 2016 Offering and/or the August 2016 Offering.

### 1.     Director Defendants

49.     Defendant Larry Glasscock ("Glasscock") was, at all relevant times, Chairman of ZBH's Board of Directors and a member of the Audit Committee.  Defendant Glasscock signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Glasscock was Chairman of WellPoint, Inc. from 2005 until 2010 and President and CEO of WellPoint, Inc. from 2004 to 2007.  Glasscock served as President and CEO of Anthem, Inc. from 2001 to 2004, and Chairman from 2003 to 2004.

50.     Defendant Christopher B. Begley ("Begley"), was at all relevant times, a director of Zimmer, a member of the Audit Committee, and signed or authorized the signing of the Company's Registration Statement.  Begley was Executive Chairman of the Board of Hospira, Inc. from May 2007 until January 2012, and CEO from 2004 to March 2011.  Begley served in various positions with Abbott Laboratories between 1986 and 2004, most recently as Senior Vice President of Abbott's Hospital Products division.

51.     Defendant Betsy J. Bernard ("Bernard"), was at all relevant times, a director of

Zimmer, and signed or authorized the signing of ZBH's Registration Statement.  Bernard was President of AT&T Corp. from October 2002 until December 2003.  From April 2001 to October 2002, Bernard was Chief Executive Officer of AT&T Consumer.  Prior to joining AT&T, Bernard held senior executive positions with Qwest Communications International Inc., US WEST, Inc., AVIRNEX Communications Group and Pacific Bell.

52.     Defendant Paul M. Bisaro ("Bisaro"), was at all relevant times, a director of Zimmer, and signed or authorized the signing of the Company's Registration Statement.  Bisarro has been Executive Chairman of Allergan plc (formerly Actavis plc) since July 2014.  Bisaro served in various roles as Chairman, President, CEO, and director of Actavis between 2007 and 2014.  Bisaro served as President, Chief Operating Officer and a member of the board of directors of Barr Pharmaceuticals, Inc. from 1999 to 2007, and General Counsel from 1992 to 1999.

53.     Defendant Gail K. Boudreaux ("Boudreaux), was at all relevant times, a director of ZBH, member of the Audit Committee, and signed or authorized the signing of the Company's Registration Statement.  Boudreaux has been CEO and Founder at GKB Global Health, LLC since 2015.  Boudreaux served as CFO of UnitedHealthcare from 2011 to 2014 and Executive Vice President of UnitedHealth Group from 2008 to 2015.  From 2005 to 2008, Boudreaux served as Executive Vice President, External Operations for Health Care Services Corporation, and prior to that served as President of Blue Cross and Blue Shield of Illinois. Before joining HCSC, Boudreaux held various positions at Aetna.

54.     Defendant Michael J. Farrell ("Farrell), was at all relevant times, a director of ZBH, and signed or authorized the signing of the Company's Registration Statement.  Farrell has been CEO of ResMed Inc. since 2013, and was President since 2011.  Farrell was Senior Vice

President of the global business unit for sleep apnea therapeutic and diagnostic devices from 2007 to 2011, and before that held various senior roles in marketing and business development. Before joining ResMed in September 2000, Farrell worked in management consulting, biotechnology, chemicals and metals manufacturing at Arthur D. Little, Genzyme Corporation, The Dow Chemical Company and BHP Billiton.

55.     Defendant Robert A. Hagemann ("Hagemann"), was at all relevant times, a director of ZBH, member of the Audit Committee, and signed or authorized the signing of the Company's Registration Statement.  Hagemann held various positions at Quest Diagnostics Incorporated and a subsidiary of its former parent company, Corning Incorporated, including Senior Vice President and CFO  from 1992 until 2013.

56.     Defendant Arthur J. Higgins ("Higgins"), was at all relevant times, a director of Zimmer, and signed or authorized the signing of the Company's Registration Statement.  Higgins has been President, CEO and a member of the board of directors of Depomed, Inc. since March 2017.  He was a Consultant with the Blackstone Group since 2010.   Higgins served as Chairman of the Board of Management of Bayer HealthCare AG from 2006 to 2010 and Chairman of the Bayer HealthCare Executive Committee from 2004 to 2010.  Prior to joining Bayer HealthCare, Higgins served as Chairman, President and CEO of Enzon Pharmaceuticals, Inc. from 2001 to 2004.  Prior to that, Higgins spent 14 years with Abbott Laboratories, most recently as President of the Pharmaceutical Products Division from 1998 to 2001.

57.     Defendant Michael W. Michelson ("Michelson"), was at all relevant times, a director of ZBH, and signed or authorized the signing of the Company's Registration Statement. Michelson has been a Member of KKR Management LLC, a private equity investment manager and the general partner of Kohlberg Kravis Roberts & Co. L.P. ("KKR & Co. L.P." or "KKR"),

since October 2009, and has worked for various KKR entities since 1981.  Michelson started his professional career at Latham & Watkins where he was involved in a broad corporate practice while specializing in management buyouts.  Michelson was a director of Legacy Biomet prior to the merger with Legacy Zimmer.  Michelson was designated for nomination ZBH's Board by certain affiliates of each of KKR, and certain affiliates of TPG Global, LLC and Goldman Sachs & Co., pursuant to a stockholders agreement in connection with the merger.

58.     Defendant Cecil B. Pickett, Ph.D. ("Pickett"), was at all relevant times, a director of ZBH, and signed or authorized the signing of the Company's Registration Statement.  Pickett was President of Research and Development and a member of the board of directors of Biogen Idec Inc. from 2006 until 2009.  Prior to joining Biogen Idec, Pickett held several senior R&D positions, including Corporate Senior Vice President of Schering-Plough Corp. and President of Schering-Plough Research Institute, as well as, several senior R&D positions at Merck & Co.

59.     Defendant Jeffrey K. Rhodes ("Rhodes"), was at all relevant times, a director of ZBH, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Rhodes is a partner at TPG Capital, L.P. and a leader of the firm's investment activities in the healthcare services, pharmaceutical and medical device sectors.  Prior to joining TPG Capital, L.P. in 2005, Rhodes was with McKinsey & Company and Article27 LTD, a start-up software company.  Rhodes was a director of Legacy Biomet prior to the merger with Legacy Zimmer.  Rhodes was designated for nomination to ZBH's Board by certain affiliates of each of KKR, TPG Global, LLC and Goldman Sachs & Co. pursuant to the stockholders agreement.

60.     Defendants Glasscock, Begley, Bernard, Bisaro, Boudreaux, Farrell, Hagemann, Higgins, Michelson, Pickett, and Rhodes, are herein referred to as the "Director Defendants."

## 2.     Underwriter Defendants

61.     The following investment banks were underwriters of ZBH's June 2016 Offering and August 2016 Offering, which were conducted pursuant to the Registration Statement, June 2016 SPO Offering Materials (defined below in ¶235) and the August 2016 SPO Offering Materials (defined below in ¶287), which contained materially untrue and misleading statements and omitted material facts required to be stated therein.

62.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan LLC") served as an underwriter of the Company's secondary offerings on June 14, 2016 and August 9, 2016.  In the June 14, 2016 offering, J.P. Morgan agreed to purchase 5,558,266 shares of Zimmer, exclusive of the over-allotment option.  In the August 9, 2016 offering, J.P. Morgan agreed to purchase 3,720,337 shares of Zimmer, exclusive of the over-allotment option.  J.P. Morgan LLC received millions of dollars in compensation in connection with serving as an underwriter for the June 2016 Offering and the August 2016 Offering.

63.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") served as an underwriter of the Company's secondary offerings on June 14, 2016 and August 9, 2016.   In the June 2016 Offering, Goldman Sachs agreed to purchase 5,558,267 shares of ZBH, exclusive of the over-allotment option.  In the August 2016 Offering, Goldman Sachs agreed to purchase 3,720,338 shares of Zimmer, exclusive of the over-allotment option.  Defendant Goldman Sachs received millions of dollars in compensation in connection with serving as an underwriter for the June 2016 Offering and the August 2016 Offering.

64.     Defendants J.P. Morgan LLC and Goldman Sachs are referred to herein as the "Underwriter Defendants."   As underwriters of the June 2016 Offering and August 2016 Offering, the Underwriter Defendants were responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by referencing into the June 2016

Offering Materials and the August 2016 Offering Materials.

## V.    RELEVANT NON-PARTIES

65.     Confidential Witness ("CW") 1 ("CW1") was a Production Supervisor at the North Campus since it was Legacy Biomet and served in that position in the poly bearing department for the last five years of his employment at the Company.  CW1 left his position at the Company after the Class Period.  CW1 reported to a Production Manager that oversaw CW1's department and all of the other Production Supervisors, who according to CW1, reported to Director Robert Gunner.  As a Production Supervisor in the poly bearing department, CW1 was responsible for managing the employees on his shift, which included monitoring employee attendance, reviews, and counseling employees on performance.   CW1's production area included a manufacturing area, as well as a "clean room" where products were sterilized and packaged.

66.     CW2 was a former Senior Manufacturing Engineer II at the Legacy Zimmer West Campus throughout the Class Period.  CW2 originally started with Legacy Zimmer soon after the merger was announced.  CW2 held the position of Senior Manufacturing Engineer II in the Advanced Manufacturing department where he was part of a team looking at improvement opportunities in numerous areas such as headcount, efficiency and quality; CW2 said the managers directed the group on where to focus to find improvement opportunities.  CW2 was later part of the Continuous Improvement team and reported to Anthony Carra (who reported to the Plant Manager for the West Campus) and later Sean Ferguson (after Carra was moved to a different position at the North Campus).  CW2 indicated that the Plant Manager reported SVP Barney, who reported to Defendant Dvorak.

67.     CW3 was a Project Manager at the Company during the Class Period until July

2016 and had been with Legacy Biomet since before the merger.  After the merger, CW3 started a new role as a Project Manager in sourcing.  CW3 reported to VP of Logistics Howard Levy and then for a short time, reported to Greg Rands, and then reported to Director of Production Dustin Arney.  According to CW3, Arney reported to Levy, who reported to SVP Robin Barney.  CW3 believed that Barney reported directly to Defendant Dvorak.  During the relevant time, CW3 worked at the Legacy Zimmer West Campus where CW3 was responsible for leading transfer projects either from other ZBH sites or vendors to other ZBH sites.

## VI.   BACKGROUND AND RELEVANT EVENTS PRIOR TO THE CLASS PERIOD

68.   ZBH is a global leader in musculoskeletal healthcare.  The Company designs, manufactures and markets orthopaedic reconstructive products; sports medicine, biologics, extremities and trauma products; spine, bone healing, craniomaxillofacial and thoracic products; dental implants; and related surgical products.  ZBH's products and solutions treat bones, joints or supporting soft tissues.

### A.   The 2015 Merger: a Marriage of Two Crosstown Rivals

69.   The predecessor to Legacy Zimmer was founded in Warsaw, Indiana, in 1927.  In 1972, the company was acquired by Bristol-Myers and in 2001 Legacy Zimmer became a publicly-traded company  after being spun off by Bristol-Myers Squibb.

70.   In 1977, a former Legacy Zimmer employee  and others started Legacy Biomet, also in Warsaw, Indiana. Legacy Biomet went public in 1982 and in 2007 was purchased for $11.3 billion by a private equity consortium (that included affiliates of Blackstone Group, KKR, TPG, and Goldman Sachs Group Inc.) that invested more than $5 billion in the 2007 takeover.

71.   On April 24, 2014, Legacy Zimmer announced that it was acquiring competitor Legacy Biomet for $10.35 billion in cash and an aggregate amount of Legacy Zimmer shares

valued at approximately $3 billion, with the Legacy Biomet shareholders owning approximately 16% of the combined company upon closing.  The transaction was expected to close in the first quarter of 2015.

72.     At the time, Legacy Zimmer was the second largest provider of orthopedic products and Legacy Biomet was the fourth.  It was perceived that the merged entity would be a leader in the $45 billion musculoskeletal healthcare market with combined revenues of approximately $7.8 billion in 2013.

73.     Shareholders were told to anticipate $135 million of synergies in the first year and approximately $270 million in revenue and operating synergies by the third year post-closing. Legacy Zimmer claimed that it expected to achieve a majority of synergies through disciplined expense management, advanced manufacturing and streamlined logistics.

74.     Legacy Zimmer emphasized that the combination would leverage the two companies' complementary sales channels and that the generation of cross-selling opportunities was one of the most important sources of synergies from the proposed combination.

75.     Of critical importance, investors were promised that after the commercial/sales channels were integrated, investors would see the benefits from cross-selling in the form of above market-level revenue growth.  For example, during a April 24, 2014, conference call regarding the proposed transaction and Q1'14 earnings results, the then CFO told investors that the combined business would initially see revenue growth in line with the market/industry level[2] and then exceed market/industry level after the commercial integration was completed:

> . . . These operating synergies take into account anticipated effects of the transaction on revenues.  ***Considering the cross-selling opportunities together with potential disruption as the two companies are integrated, we expect revenues to grow in line with the market in the short term post-combination.***

---

[2] As noted below (*see* fn.7), market/industry level growth was deemed to be 3%.

*And when the integration is complete, we would expect all categories to be growing ahead of their respective markets* given the breadth of scale and the global reach of the combined sales channel.

76.     The closing of the merger was delayed by regulatory agencies and after the closing date was pushed out several times, the merger finally closed on June 24, 2015.

77.     Following the merger, both companies' facilities remained opened and responsible for manufacturing their respective products.  ZBH's 2016 10-K (filed March 1, 2017) states that its primary research and development facility is located in Warsaw and approximately 2,600 of the 8,700 employees in the United States are located at Warsaw production facilities.

78.     The primary Legacy Zimmer facility is located at 1800 W. Center St, Warsaw, Indiana, and commonly referred to as the "West Campus."

79.     The primary Legacy Biomet facility is located at 56 E. Bell Dr., Warsaw, Indiana, and commonly referred to as the "North Campus."  Legacy Biomet's flagship hips, knees, sports medicine, trauma, and the comprehensive shoulder are manufactured at the facility.  As Defendant Dvorak described in April 2017, "some of these *key brands* that come out of that [Warsaw North] facility provide [ZBH] with some of [the Company's] *best competitive opportunities*, so they're *a very important set of brands and strategically relevant to the acceleration of the top line*."

**B.     ZBH's Products and Facilities Are Strictly Regulated By the FDA**

80.      ZBH manufactures medical devices, including Class II and Class III devices. During the Class Period, the Company manufactured Class II and Class III devices at the North Campus, including products such as the Oxford Partial Knee and Juggerknot sports medicine devices.  Class III devices are generally considered the highest risk category of devices and are

subject to the highest level of regulatory control.

81.     ZBH's products are subject to extensive regulation by the FDA because they are "medical devices" under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 321(h).  As stated in ZBH's 2015 Annual Report, the FDA "has enacted regulations that control all aspects of the development, manufacture, advertising, promotion and post-market surveillance of medical products, including medical devices."

82.     The FDCA provides that a medical device must be manufactured, packed, stored, and installed in conformity with Current Good Manufacturing Processes ("cGMP") to ensure its safety and effectiveness.   21 U.S.C. § 360j(f).   The statutory good manufacturing practice requirement is set out in the quality system ("QS") regulation for devices, 21 C.F.R. Part 820.  A device that has been manufactured, packed, stored, or installed in violation of this requirement is deemed to be adulterated.  21 U.S.C. § 351(h).  The introduction or delivery for introduction into interstate commerce of an adulterated article of device is a violation of the FDCA.  21 U.S.C. § 331(a).

83.     FDA regulations explicitly make senior company management responsible for ensuring adherence to cGMP.  When evaluating quality controls, FDA inspectors are required to evaluate, among other things, "whether management with executive responsibility ensures that an adequate and effective quality system has been established and maintained."  FDA Guide To Inspections Of Quality Systems, at 18.  The FDA treats management responsibility for adherence to cGMP as a very serious matter; when the FDA concludes that management is not providing sufficient oversight of the procedures used in a manufacturing facility, it may impose a requirement that top officers personally sign off on every procedure used in the facility.  If the procedures and quality control systems are not adequate, are ineffective, and/or are not being

maintained, then a company's executive management is not upholding its responsibilities under the FDCA.

84.     ZBH, like other medical device manufacturers, is subject to periodic inspections by the FDA to ensure compliance with the FDCA and other applicable laws and regulations.[3]  If a FDA inspection identifies "objectionable conditions" – *i.e.*, conditions that may constitute violations of the FDCA and related implementing regulations – the FDA issues a Form FDA-483 (or "FDA-483") directed to company management.   According to the FDA, FDA-483s are reserved for "significant" conditions that indicate that a device has been or is being manufactured in a manner that may be injurious to health and at the conclusion of an inspection, FDA-483s are "presented and discussed with the company's senior management."[4]  The FDA's investigators are trained to ensure that each observation noted on a FDA-483 is clear, specific and significant.

## VII.    SUMMARY OF THE ACTION

### A.    Organic Revenue Growth was the Most Important Metric to ZBH's Stock Price

85.     This section summarizes ZBH's pre-Class Period decelerating organic revenue growth, which provides crucial context to ZBH's representations during the Class Period about the Company's ability to return to and exceed market/industry level organic revenue growth (which was generally deemed to be approximately 3%).[5]

86.     At the time of the merger, shareholders were conditioned to live with stagnant organic revenue until the commercial integration was completed when the benefits of cross-selling opportunities would then drive above market level organic revenue growth.   However,

---

[3] A more thorough overview of FDA inspections is provided below in §VII.D.1.

[4] *See* FDA Form 483 Frequently Asked Questions at https://www.fda.gov/iceci/inspections/ucm256377.htm

[5] *See infra* §VII.B (summary of ZBH and the Officer Defendants' Class Period statements).

there was a notable deceleration of organic revenue growth following the merger, which caused a dramatic amount of concern around growth rates in the fall of 2015.

87.     Before and during the Class Period, ZBH's ability to return to and exceed market level growth was the primary focus of investors and research analysts.   During the public investor conference calls and analyst conferences, Defendants Dvorak, Florin and Marshall would constantly be asked about this topic and they routinely acknowledged that driving increasing organic revenue growth was one of ZBH's primary focuses.

88.     For example, at a conference on March 16, 2016, an analyst moderating a discussion with Defendant Florin polled the audience and the clear consensus was that organic revenue growth was the primary concern/focus among investors:

> I want to ask the audience another question here. This is kind of an open-ended question about Zimmer performance, and it is just, ***what area is important for the Company to improve on to drive better stock price performance?*** Is it organic revenue growth, gross margins, operating margins, earnings growth or cash flow growth? And then we can dovetail into some of these other topics.
>
> ***So it looks like, by far, organic revenue growth is the winner*** …[6]

89.     To increase the Company's stock price, ZBH had to increase ZBH's organic growth rate back above market level.  Before and during the Class Period, ZBH repeatedly told investors that the Company would return to market level growth rates in the second half of 2016 and then exit the year at or above market growth rates (*i.e.*, 3%).[7]

---

[6] In response, Defendant Florin stated, "***The management team is very focused on driving organic growth and to the point that our incentives are weighted towards driving organic revenue growth.*** So we understand the import of that. We are focused on it and feel really bullish about our opportunity to drive that acceleration."

[7] ZBH, investors, and analysts understood that market/industry level growth was approximately 3%.  For example, during a January 28, 2016 conference call to discuss the Company's Q4'15 financial results, an analyst asked: "And then just to clarify your view of market growth and getting to market growth in the back half of the [2016] year, is that 2.5%, 3%?"  Defendant Dvorak confirmed, "I think about that market growth rate in round numbers of 3%."

**1.      Organic Growth Rate Underperforms Market/Industry in 2015**

90.      The Company's organic revenue growth rate declined leading up to the close of the merger.  When the merger closed on June 24, 2015, ZBH management lowered its 2015 top-line guidance to 1.5 to 2.0%, versus its previously stated guidance of 1.5 to 2.5%.

91.      When ZBH held its first post-merger earnings conference call on July 30, 2015, Defendant Dvorak reiterated that investors should still expect accelerated revenue growth into 2016. He explained that the Company expected to complete the integration of its commercial operations by the end of 2015, which would allow the Company to benefit from cross-selling opportunities:

> . . . *Zimmer Biomet is in an excellent position to accelerate top-line growth over the course of our global integration, principally through a host of cross-selling opportunities between our two legacy portfolios*.
>
> Our integration teams have already achieved key milestones in support of these commercial opportunities, including the implementation of critical sales infrastructure, and the completion of initial-product trainings, which have supported our ability to begin deploying specialized commercial teams in key product categories and geographies.
>
> We expect to substantially complete our commercial integration by the end of this year, including the appointment of just over 2,000 specialized sales representatives, concentrating in non-large, joint-sales opportunities, a number that we aim to further expand significantly throughout this decade. Our vision is to build the most highly specialized and effective musculoskeletal commercial team in the industry. Consistent with that goal, we have selected sales leaders with proven track records and designed compensation plans that reward growth.
>
> *We expect to begin realizing the benefits of our integrated sales channel, as well as these commercial opportunities, in the form of sequentially-accelerating revenue growth as we exit 2015 and progress through 2016.*

92.      On the July 30, 2015 conference call,  Defendant Dvorak indicated his confidence was in part because the delay in closing the Merger had provided extra time to develop detailed integration plans.  Dvorak claimed this had allowed ZBH management "to put in place all of the

infrastructure necessary to facilitate the cross-sell opportunities" and they "had some opportunities to pre-build inventory in key product categories. . . ."

93.     Doubts about ZBH's ability to reaccelerate its top line growth was dragging down ZBH's stock price in late 2015.  For example, an October 2, 2015 J.P. Morgan report noted:

> ***ZBH trades at a notable discount to the group … as the Street wrestles with a top-line that decelerated into the Biomet and the prospect of revenue dis-synergies and low-single-digit (1-2%) top-line growth in the back half of the year.*** Our view is that the post-close sales disruption is likely to play out longer than just 1-2 quarters and that ***it's likely Zimmer we'll see 2-3 years of below end market growth, suggesting 1-2% may in fact be the new norm***…

94.     Things got worse before they got better.  When ZBH reported its Q3'15 results, the Company lowered its revenue guidance for 2015, indicating that full year 2015 organic growth was only expected to be 1 to 1.5% compared to its previous guidance of 1.5 to 2.0%.  Nevertheless, on the Q3'15 earnings conference call on October 29, 2015, Defendant Florin reiterated, "We will be working towards achievement of market growth rates, as we progress through 2016."  Defendant Dvorak stated, "we expect to substantially complete all commercial integration efforts by the end of this year," and expect "[s]equential improvement throughout 2016."

95.     In early 2016, the Company claimed to have nearly completed the crucial step of integrating its commercial operations.  For example, at the January 12, 2016 J.P. Morgan Healthcare Conference, Defendant Dvorak discussed the integration, claiming "that process is ***substantially complete*** … And we are in a great position as a consequence of that to start running the offense that the combined company possesses in 2016."  Defendant Dvorak also stated: "As some of those revenue dyssynergies ***are countered by the sales cross-sell opportunities, then you are going to normalize back to something that resembles a market growth rate***."

96.    Nevertheless, analysts remained doubtful.  For example, a January 12, 2016 J.P. Morgan report, noted "a high probability in the next 3 years that Zimmer grows below market, as it works through the naturally disruptive process of consolidating overlapping product lines and sales organizations."

97.    On January 28, 2016, Zimmer reported its financial results for Q4'15 and FY'15, which reflected further *deceleration*.[8]  During a conference call held on the same day to discuss the Q4'15 results, Defendant Dvorak stated: "During the fourth quarter, we substantially completed the integration of our global commercial organizations. …Based upon our significant progress, we're confident in our ability to drive sequential revenue improvement as we progress through 2016."

98.    On the January 28, 2016 Q4 2015 conference call, a skeptical Morgan Stanley analyst asked, "Can you drill down this early and 2016, obviously, what are the factors that give you the confidence in that earnings visibility 2016?"  Defendant Dvorak replied, "What gives us confidence is really the integration and synergy program and the progress that we continue to make and the clearer line of sight that we have to the synergy opportunity as we progress through 2016."

## 2.    Organic Growth Starts to Reaccelerate in Q1 2016

99.    On April 28, 2016, Zimmer released better than expected financial results for Q1 2016, notably reporting that revenue growth had accelerated to 1.2%.  Furthermore, in announcing its Q1 2016 results, ZBH raised its prior 2016 guidance for growth of 1.5-2.5% to 2.0-3.0%.

---

[8]  A J.P. Morgan report issued that day noted that the results "were below the Street [expectations] as *organic growth of just 0.5% was disappointing* given the easing of y/y comps."

100.    While the increased organic growth was extremely positive news, analysts and investors were still questioning whether acceleration of the organic growth rate back to market/industry rates would continue in 2016.   Defendants Dvorak expressed continued confidence in returning to market/industry growth rates, citing the Company's detailed integration plans and ZBH's ability to benefit from cross selling opportunities.

101.    For example, when answering a question, Defendant Dvorak emphasized the planning that had occurred and indicated that the Company was ordering more inventory to be in a position to benefit from cross-selling opportunities: "I think to your question, you end up with the best visibility one can have in planning those top line opportunities, and now we're in a stage where we're executing . . . We're upping production, we're ordering more instruments."

102.    The reaction to Company's accelerating organic revenue growth rate was positive. A report issued by J.P. Morgan on April 29, 2016, report noted the Company "appears to be turning the corner and has started to recover from some of the early integration challenges in 2015."   A William Blair analyst report issued a day earlier noted that the price of the Company's "shares are up about 20% in the last two months."

103.    As the first half of 2016 progressed, ZBH continued to tout its increasing organic growth rate and cited the ability to drive further growth from cross-selling opportunities made possible after successfully integrating its commercial operations.

**B.      During the Class Period, ZBH Falsely Declares that the Company has Reached an "Inflection Point" and that Revenue Growth Will Reaccelerate to Market Level in the Second Half of 2016**

104.    During the Class Period, the Officer Defendants failed to disclose material adverse facts that made it nearly impossible for ZBH to continue accelerating revenue growth in the second half of 2016.   Among others, ZBH failed to disclose that it was manufacturing and

distributing key products/brands from the Legacy Biomet North Campus – including products Defendant Dvorak later admitted had been "strategically relevant" to ZBH's ability to accelerate revenue – despite the fact that: (i) "systemic" issues with the North Campus' quality system had not been adequately remediated and (ii) an FDA inspection of the facility was imminent, which would result in grave consequences when the FDA learned that ZBH was continuing to distribute the products anyway.  If ZBH had taken the necessary remediation efforts when the Company learned of the issues, it would have caused substantial disruptions to the manufacturing/distribution of products at the North Campus and ZBH would not have had sufficient supply of key products to meet its revenue guidance.

105.    Additionally, the ZBH later admitted that it had not yet integrated the Legacy Zimmer and Legacy Biomet supply chains, demand forecasting, or production planning systems; as a result, ZBH corporate management did not have visibility into global inventory nor the ability to adequately plan or forecast necessary to capture the cross-selling opportunities that investors were told would produce the revenue growth acceleration in the second half of 2016.

106.    At the start of the Class Period, on June 7, 2016, ZBH announced a major acquisition of LDR and confidently reiterated its organic revenue growth guidance for 2016. Given the task of yet another integration, analysts understandably asked whether there would be any impact on ZBH's ability to accelerate its organic revenue growth in 2016.  Defendant Dvorak proclaimed that they remained "highly confident and we are reiterating guidance for the year."  Defendant Dvorak added, "I think you ought to interpret this announcement as being confidence, in the state of the integration, the progress that we've made on the Biomet side."

107.    The reacceleration of ZBH's organic revenue growth rates and the Officer Defendants' confidence had pushed ZBH's stock price back to the record levels reached in early

2015.  On June 13, 2016, the KKR, Goldman Sachs, and TPG private equity funds that had backed Legacy Biomet, took advantage and unloaded nearly $1.3 billion of their stock in an underwritten public offering.  In the offering – which was underwritten by Defendant Goldman Sachs – the Goldman Sachs affiliated private equity funds sold all of their remaining ZBH common stock.

108.    When ZBH reported its financial results for Q2'16 on July 28, 2016, the Company again delivered better than expected results and notably reported that organic revenue had grown by 2.7%.  The 2.7% was incredibly strong in comparison to the 1.2% ZBH reported for Q1 2016 and the approximately 1.6% consensus expectation among analysts for Q2 2016.

109.     The Company also reiterated its organic revenue growth rate expectations for the second half of 2016, which according to a J.P. Morgan analyst report issued that day, was one of the most important metrics to investors: "Management tightened the bottom end for organic sales and EPS guidance.  Full year organic growth pro forma for Biomet, *the metric most investors are focused on for ZBH*, is now expected to increase 2.5-3.0%, up from previous guidance for +2.0-3.0%."

110.    During a July 28, 2016, conference call to discuss the Company's Q2'16 financial results, Defendant Dvorak declared that ZBH had reached "an important inflection point:"

> Our Company has reached *an important inflection point, having successfully reestablished top-line momentum by beginning to capture the promise of the attractive cross-selling opportunities inherent in our merger*, in addition to successfully delivering on our synergy commitments.
>
> ***
>
> Consistent with this progress, *Zimmer Biomet generated solid revenue acceleration in the second quarter, again above the top end of our expectations, further validating our strategies to achieve above-market revenue growth by the close of 2016.* Our steady advance towards this goal demonstrates the increasing productivity and focused execution of our commercial organization and for the

balance of the year, will continue to exploit the opportunities presented by our differentiated musculoskeletal portfolio.

111.   With the Company's stock at all-time highs, on August 9, 2016, the TPG and KKR private equity funds sold their remaining holdings of ZBH stock in an underwritten public offering for proceeds of nearly $1 billion.

112.   In September 2016, the final month of Q3'16, ZBH and Defendants Dvorak, Florin and Marshall exuded confidence in ZBH's ability to continue accelerating revenue growth in the second half of 2016 and into 2017.  For example, at an analyst conference on September 12, 2016, Defendant Florin noted that "we are confident we're going to get back to at or above market growth rate as we exit this year."

113.   On September 14, 2016 (approximately two and a half weeks prior to the end of Q3'16), RBC Capital Markets issued an analyst report entitled, "Management Remains Confident in Sales Acceleration and Synergy Targets."  As noted in the report, RBC had "hosted a non-deal roadshow with ZBH's senior management team, including [Defendant] Dvorak, [Defendant] Florin, and [Defendant] Marshall" and the takeaway from the meeting was that "Management remains confident that revenues will accelerate in 2H16 and into 2017 while Biomet cost savings will drive double-digit EPS growth."  Specifically, the report noted:

. . . Management had an opportunity to address several "Hot Topics" impacting the company and the industry. Below are our takeaways from the road show. ***Overall, we came away confident in the company's outlook and we reiterate our Outperform rating. ZBH remains our favorite idea for value investors.***

**Hot Topic No. 1: 2016 guidance**

**Organic top-line growth should continue accelerating in 2H16, and management is confident that it will exit 2016 at or above market growth rates**

***Recall that on the company's 2Q16 earnings call, management raised 2016 revenue guidance by $135M at the midpoint to $7.68B to $7.715B. This now***

*represents a 3.0–3.5% growth rate on an adjusted proforma constant currency basis, with stronger growth expected in 2017.* ZBH management's current 2016 revenue guidance assumes constant currency day-rate growth of 2.5–3.5% y/y in 3Q16 and 3.5–4.5% in 4Q16, pointing to expectations for a continued acceleration in top-line organic growth in 2H16. Recall that ZBH grew its top line organically on a same-day selling basis by 2.5% in 2Q16, 1.2% in 1Q16, and 0.5% in 4Q15 . . . *and we expect ZBH's top-line momentum to continue into 2H16 as the company returns to more market rates of growth (defined as growth in the ~3–4% range). Additionally, management emphasized that its forecast for sales acceleration in 2016 will be led by cross-selling,* while 2017 growth will be led by 2016 pipeline launches . . . We sense that management remains very comfortable with sales and EPS guidance.

**Hot Topic No. 2: Outlook in 2017 and beyond**

**We are very comfortable with consensus top- and bottom-line estimates for 2017**

114.     Similarly, on September 29, 2016 (the second to last day of Q3'16), Piper Jaffray issued an analyst report entitled, "Travel with Mgmt; Pathway to 4%+ Top-Line & 10% EPS Growth Seems Reasonable."  Therein the analyst report noted:

> Yesterday, we hosted investor meetings with the company's CEO, CFO, and VP of Treasury and IR. *We would characterize the meetings as quite positive and are comfortable that ZBH is on the path to meeting its stated goal of 4% plus top-line growth going forward, driven by steady performance in a number of businesses (large joints)* and share gains in trauma and spine …
> ***
> Yesterday, we hosted investor meetings with Zimmer-Biomet's CEO [Defendant] Dvorak, CFO [Defendant] Florin, and VP of Treasury and IR [Defendant] Marshall. *Given how late it is in the quarter, the meetings were entirely focused on the future of the company and its ability to reach its stated goals of 4% plus top-line growth in the coming years, which would be slightly ahead of overall market growth rates in the categories where it participates.*

115.     The analyst reports issued in the waning days/hours of Q3'16 were an extremely positive sign for investors, especially considering the reports echoed the same bullish positive statements at various conferences during the first two weeks of September 2016.  When ZBH's fiscal third quarter (*i.e.*, Q3'16) closed on September 30, 2016, there was little for investors and analysts to be concerned about given the confidence ZBH management had displayed.

C. **The Truth Begins to Emerge When ZBH's Q3'16 Results Blindside Investors**

116.     Beginning on October 31, 2016, and at the end of the Class Period on November 8, 2016, the true facts concerning undisclosed "systemic" issues with the quality system at the North Campus, the prospect of FDA regulatory action arising from the deficient processes at the North Campus, and the need for time consuming and costly remediation work were partially revealed to investors.  The revelations also included the materializations of the risks that had been concealed from investors – a sharp deceleration of revenue in Q3'16 and lowered Q4'16 revenue growth guidance as a result of supply shortages caused by a product hold instituted at the North Campus on the second to last day of Q3'16  and other production disruptions caused by an FDA inspection and remediation work on the North Campus' quality systems.  Indeed, it was foreseeable that by continuing to manufacture products at the North Campus – while fully aware of "systemic" issues with the North Campus quality system and that an FDA inspection of the facility was imminent – ZBH would ultimately experience a disruption to the production and supply of key products as a result of the remediation work necessary to adequately address known "systemic" issues.

117.     As ZBH ultimately disclosed, its Q3'16 revenue growth unexpectedly declined because of supply shortages and the Company was reducing its revenue growth guidance for Q4'16 because remediation work at the North Campus was causing production and supply disruptions, which were negatively impacting the Company's ability to accelerate revenue.

1. **The October 31, 2016, Partial Disclosure**

118.     On October 31, 2016, ZBH announced its financial results for Q3'16 (which ended on September 30, 2016).  As described by a Suntrust analyst, the Company "blindsided investors" by reporting that organic sales growth declined to 1.6% and lowering its organic

revenue guidance for the fourth quarter and full year 2016 to reflect no improvement in 2016. ZBH lowered its full-year adjusted pro forma growth outlook from 2.5-3.0% to 1.65-1.90%.

119.    During an October 31, 2016 conference call to discuss the Q3'16 financial results, Defendant Dvorak claimed that the issue with the Company's Q3'16 performance and lowered guidance for Q4'16 related, in part, to "unanticipated supply constraints, related to our transitioning supply chain infrastructure" and also partially related to efforts to "harmonize and optimize [ZBH's] sourcing, manufacturing and quality management systems:"

> ***Variable commercial performances by our sales teams were in part caused by unanticipated supply constraints, related to our transitioning supply chain infrastructure.*** This resulted in shortfalls of needed implants and additional instrument sets, to fully exploit sales opportunities in key product categories.
>
> ***In response to this challenge, we've accelerated work to enhance certain aspects of our supply chain infrastructure as we harmonize and optimize our sourcing, manufacturing and quality management systems.*** Through these efforts, we expect to improve our demand fulfillment in the coming months.
>
> ***As a consequence of these supply constraints, we project fourth quarter sales results to be similar to those of the third quarter;*** …

120.    On this news, shares of ZBH fell $17.15 per share, or nearly 14%, to close on October 31, 2016 at $105.40 per share.

121.    Analysts were skeptical about how this issue had purportedly gone undetected. The Company's disclosures were particularly vexing to investors and analysts because ZBH management had been inexplicably bullish about Q3'16 revenue acceleration in their statements at industry conferences during September 2016 and in meetings with analysts through the third to last day of Q3'16 (*i.e.*, September 28, 2016).  *See* ¶114.

## 2.    The November 8, 2016, Partial Disclosure

122.    On November 8, 2016, Northcoast Research issued an analyst report entitled, "Downgrading to Neutral."  Therein, the report, in relevant part, stated:

*• We are downgrading ZBH from Buy to Neutral. Based on our recent conversations with industry contacts, we believe at least part of the reason for the unanticipated product supply issues discussed during ZBH's 3Q16 earnings call is related to manufacturing problems at Biomet's Warsaw, Indiana, operations. While we do not know the extent of the problem, we are now concerned ZBH's unanticipated product supply issues involve more than just long lead times from Persona knee instrument suppliers and the need to integrate supply systems for Zimmer and Biomet.*

*• According to our industry contacts, the FDA inspected Biomet's Warsaw manufacturing operations over a roughly six-week period recently as part of a routine review. Following the FDA inspection, we have heard some Biomet product lines manufactured in Warsaw have been shut down from operations and cannot be shipped to the field. We believe this could be at least part of the explanation for ZBH's unanticipated product supply issues for certain Biomet hip implants.* By contrast, we note ZBH claims its product supply issue in knee implants primarily reflects lead times for Persona knee instrumentation. *When we contacted ZBH, the company would not comment directly about the recent FDA inspection of Biomet's Warsaw manufacturing operations and whether it resulted in the inability to ship certain product lines to the field.* All the company would say is that its unanticipated product supply issues have more to do with lead times for Persona knee instruments.

*• According to our contacts, Robin Barney (ZBH's Senior Vice President, Global Operations and Logistics) resigned from the company on November 1. We have also heard several other senior-level employees in ZBH's quality and regulatory department were let go by the company recently. We believe the recent FDA inspection at Biomet's Warsaw manufacturing operations could be at least partially responsible for this turnover.*

• We worry potential remediation activities at Biomet's Warsaw manufacturing operations could delay the timing of new product launches in the company's hip and knee implant business. While we are encouraged by improving momentum in ZBH's S.E.T. business as well as in what further new product innovation and the expansion of specialty sales forces could mean for this division, we worry it could be overshadowed by increased concerns about how long it will take to return hips and knees to market growth levels.

**Conclusion**

*We were initially willing to give ZBH the benefit of the doubt regarding its explanation behind unanticipated product supply issues on its 3Q16 earnings call. However, following our conversations with industry contacts, we are concerned there is more to the story. Moreover, we worry future acknowledgement of manufacturing issues at Biomet's Warsaw operations (either by the company or in FDA Form 483 observations) could lead to*

*additional investor concern and limit upside potential for the stock. Given these concerns, we are downgrading ZBH to Neutral.*

123.    The November 8th report from Northcoast Research further partially revealed the issues with the North Campus and the reasons behind the Q3'16 results and lowered Q4'16 guidance.

124.    In response, the Company issued a statement that day entitled, "Zimmer Biomet Responsive Statement on Product Supply Matters."  Therein the Company stated:

> As was discussed in detail on the Company's third quarter earnings conference call on October 31, 2016, in the third quarter and continuing into the fourth quarter, Zimmer Biomet has seen increased demand for certain products, particularly related to cross-selling various offerings across the combined Zimmer Biomet portfolio.  The increased demand has impacted the Company's ability to effectively respond to this shifting product mix.  The Company is in the process of deploying new demand planning and production planning tools.  Upon full implementation, these integrated tools will better ensure the Company's ability to forecast and satisfy product demand in the future.

> *In addition, as discussed on the third quarter earnings conference call, the Company has also accelerated work to enhance certain aspects of its supply chain infrastructure as it harmonizes and optimizes its sourcing, manufacturing and quality management systems.  While these ongoing efforts have in instances led to certain product shipment delays, including product manufactured at the legacy Biomet operation in Warsaw, Indiana, the Company is making excellent progress in addressing the issues and many of the shipment delays are already resolved and the impacted product has been released for commercial distribution.  The Company expects to return to full shipping capacity with the impacted products over the next few weeks.*

> Importantly, *the above-described voluntary actions have not been prompted by any identified concern over patient safety or risk associated with any Zimmer Biomet product.*  The Company has not issued a recall of any of the products impacted by these voluntary operational enhancement actions.

> *On October 31, 2016, the Company issued updated sales and earnings guidance for full-year 2016, including specific guidance for the fourth quarter.  It is important to note that the anticipated full impact of the various supply chain issues and the related harmonization and optimization of sourcing, manufacturing and quality management systems mentioned above is already included in the Company's sales and earnings guidance update from October 31, 2016.*

125.     Also on November 8, 2016, the Company filed its Quarterly Report on Form 10-Q with the SEC for Q3'16.   Therein, the Company admitted that the deceleration of revenue growth in Q3'16 had in fact been (at least partially) caused by "operational process enhancements that have resulted in various shipment delays," *i.e.*, the issues with the North Campus:

> In 2016, we have continued to make progress in our commercial and operational integration of Biomet and other acquisitions across all geographies and functions. ***Despite this progress, revenues in the three month period ended September 30, 2016 were below our expectations due in part to some temporary disruption in product supply in certain Knee, Hip, Upper Extremities and Sports Medicine product lines related to several factors, including implementation of operational process enhancements that have resulted in various shipment delays***, and manufacturing forecasting constraints related to continued integration of our supply chain. . . .

126.     On this news, shares of ZBH fell $2.62 per share, or 2.51%, to close on November 8, 2016 at $101.83 per share.

**D.      Since June 2016, ZBH Corporate Management Knew that an FDA Inspection of the North Campus was Imminent and Knew About the Precise "Systemic Issues" Plaguing the North Campus' Quality Management System that were Cited by the FDA Inspectors**

127.     On September 12, 2016, three FDA investigators commenced an inspection (the "September 2016 Inspection") of the Legacy Biomet North Campus in Warsaw, Indiana (the "North Campus" or "Warsaw North").   The inspection concluded on November 22, 2016.   The inspection occurred on the following dates: September 12 – 16, 2016; September 19 – 23, 2016; September 26 – 30, 2016; October 11 – 14, 2016; November 15 – 18, 2016; and November 22, 2016.

128.     At the conclusion of the inspection on November 22, 2016, FDA investigators

issued a FDA-483 (the "November 2016 FDA-483")[9] to David J. Kunz, ZBH's Senior Vice President, Global Quality Assurance, and Clinical Affairs.  The 57 page FDA-483 included an extensive and detailed list of 14 observations, at least two of which were repeat observations from a prior inspection of that facility that had occurred between June 16 and 30, 2014.  During a closing meeting on November 22, 2016, the investigators also raised an extensive list of at least 15 discussion points relating to the inspection of the North Campus.

129.    As set forth below, even though the FDA did not commence the inspection until September 12, 2016, ZBH corporate management knew since June 2016 that an inspection of the North Campus was imminent and ZBH admitted that ZBH corporate management had known about the "systemic" issues with the North Campus' quality system since as late as June 7, 2016.

> **1.    Important Information About the Types and Frequency of FDA Quality System Investigation**

130.     All manufacturers of medical devices are subject to periodic inspections, including, inspections of their quality systems ("QS"), which are reviewed using the Quality System Inspection Technique ("QSIT").  The FDA's authority to inspect device manufacturers is provided for by 21 U.S.C. § 360(h)(1) ("Every establishment that is required to be registered with the Secretary under this section shall be subject to inspection pursuant to section 374 of this title.").

131.    ZBH manufacturers Class II and Class III devices and other devices at the North Campus.  Pursuant to 21 U.S.C. § 360(h)(2), *manufacturers of Class II and Class III devices such as ZBH should expect their facilities to be inspected every two years*:

---

[9] A copy of the November FDA-483 obtained from the FDA via a Freedom of Information Act ("FOIA") request is attached hereto as Exhibit A.  The copy of the November FDA-483 was partially redacted by the FDA's FOIA staff.

## (2) BIENNIAL INSPECTIONS FOR DEVICES

*Every establishment* described in paragraph (1), in any State, *that is engaged in the manufacture, propagation, compounding, or processing of a device or devices classified in class II or III shall be so inspected* by one or more officers or employees duly designated by the Secretary, or by persons accredited to conduct inspections under section 374(g) of this title, at least once in the 2-year period beginning with the date of registration of such establishment pursuant to this section *and at least once in every successive 2-year period thereafter.*

132.    The FDA's Guide to Inspections of Quality Systems (the "FDA Inspection Guide") provides for inspections to follow a "top-down" approach that relies on performing "subsystem" inspections.  As explained in the FDA Inspection Guide:

. . . [W]ith the "top-down" approach, *we are looking at the firm's "systems" for addressing quality before we actually look at specific quality problems.*  In the "top-down" approach, we "touch bottom" in each of the subsystems by sampling records, rather than working our way from records review backwards towards procedures.

*The "top-down" approach begins each subsystem review with an evaluation of whether the firm has addressed the basic requirements in that subsystem by defining and docu-menting appropriate procedures.*  This is followed by an analysis of whether the firm has implemented the require-ments of that subsystem.

133.    As per the FDA's Compliance Program Guidance Manual (Inspection of Medical Device Manufacturers) (the "FDA Manual"): the Quality System regulation can be grouped into seven subsystems; however, the following *four subsystems are considered major subsystems* and are the basic foundation of a firm's quality management system: (a) *Management Controls*; (b) *Design Controls*; (c) *Corrective and Preventive Actions* ("CAPA"); and (d) *Production and Process Controls* ("P&PC").  However, the FDA manual notes that MDR, Corrections and Removals, and Tracking requirements (where applicable) should be covered when covering the CAPA subsystem.  Also, the FDA Manual notes that three remaining subsystems (Facilities and Equipment Controls, Materials Controls and Document/Records/Change Controls) cut across a

firm's quality management system and are evaluated while covering the four major subsystems.

134.     The below chart reflects the major subsystems that comprise the quality management system:



135.     There are four general types of QS inspections conducted by FDA: (a) pre-approval inspections; (b) routine inspections; (c) compliance follow-up inspections; and (d) for cause inspections.

136.     Routine inspections are mandated by law every 2 years for class II and class III device manufacturers. *See* 21 U.S.C. § 360(h)(2).  These inspections follow a prescribed method known as Quality System Inspection Technique ("QSIT") and generally fall into two categories: (a) Level 1 or "Abbreviated" QSIT inspections; and (b) Level 2 or "Baseline" QSIT (comprehensive) inspections.

137.     Level 2 QSIT inspections entail a comprehensive review of the firm's quality system.   Specifically, the inspection covers all of the four major subsystems (Management Controls, Design Controls, CAPA and P&PC).  Level 2 inspections are conducted when a firm has never had a Level 2 inspection and are supposed to occur every six years thereafter.

138.     Level 1 or Abbreviated QSIT inspections cover only two of the major subsystems and occur after a firm has sufficiently passed a Level 2 inspection.  The inspections always cover

a review of the CAPA subsystem and either the (a) PP&C subsystem or (b) the Design Control subsystem.

139.    The FDA Manual also indicates that a Level 1 inspection should also cover the following: "***The adequacy of the correction(s), corrective action(s) or preventive action(s) related to any FDA 483 item(s) from the previous inspection should be covered,*** even if the entire subsystem will not be reviewed during the current Level 1 inspection."

140.    The FDA's customary practice is to provide five calendar days advanced notice prior to conducting pre-approval and routine inspections.

141.    According to FDA procedures, if an FDA inspector discovers "significant" deviations from cGMP during an inspection, he or she delivers a report on FDA-483 to senior management at the conclusion of the inspection. "The Form FDA 483 Inspectional Observations …is intended for use in notifying the inspected establishment's top management in writing of significant objectionable conditions, relating to products and/or processes, or other violations of the [FDCA] and related Acts …which were observed during the inspection."   FDA Investigations Operations Manual 2017 § 5.2.3.

142.    According to FDA Field Management Directive No. 120, "Inspectional Observations (FDA 483) are of critical importance to both the Agency and regulated industry." Inspectors are instructed that "Observations which are listed should be significant and correlate to regulated products or processes being inspected," and that "Observations of questionable significance should not be listed on the FDA 483."   The Directive also requires that copies of each FDA-483 be sent to "the top management official of the firm inspected."   Moreover, FDA investigators conduct exit or close out interviews at inspection sites with company personnel to ensure that senior management at the company has notice of the nature and seriousness of the

findings, ensure that the company understands the issues identified in the observations and confirm that the facts underlying the observations are correct and that relevant documentation has been collected (if the inspection is of a serious nature).   Thus, senior management of companies whose facilities are inspected by the FDA, such as ZBH, are immediately made aware of any problems at the conclusion of the on-site inspection process.

143.    A "repeat" or "recurring" observation listed on a FDA-483 occurs when, on two or more successive investigations, FDA investigators observe continuing problems with the same quality system(s).   Repeat observations often form the basis for a Warning Letter or other enforcement action by the FDA.

144.    A company will typically respond to the FDA-483 within fifteen days by providing the FDA with a detailed plan to remedy the deficiencies.   If the significant deviations from cGMP noted in a FDA-483 are not remedied, the FDA may then issue a "Warning Letter," which generally states that the company has made products that are adulterated or misbranded, violating the FDCA, and that the company has a very limited amount of time to address the problem(s) before the FDA takes further regulatory action against the firm, the adulterated product, and responsible individuals.

> **2.    ZBH Knew at the Start of the Class Period that an Inspection of the North Campus Was About to Imminently Occur Around June 30, 2016 or Soon Thereafter**

145.    Prior to the Class Period, the FDA had conducted an inspection of the North Campus was between June 16, 2014 and June 30, 2014 (the "June 2014 Inspection").   The June 2014 Inspection occurred approximately two months after the announcement of the proposed merger between Legacy Zimmer and Legacy Biomet in April 2014, and approximately one year before the merger closed at the end of June 2015.

146.    At the conclusion of the June 2014 Inspection, the FDA inspectors issued a FDA-483 to then Legacy Biomet (the "June 2014 FDA-483").  The June 2014 FDA-483 contained at least two observations, which included: (1) a process whose results cannot be fully verified by subsequent inspection and test has not been adequately validated according to established procedures; and (2) procedures for monitoring and control of process parameters for a validated process have not been adequately established.

147.    Given that routine inspections occur on a biennial basis, ZBH and the Officer Defendants (who were seasoned veterans of the medical device industry) were well aware and reasonably expected that an inspection of the North Campus was to occur by June 30, 2016, or soon thereafter.  Additionally, given the previously identified issues in the June 2014 FDA-483, the high-profile merger between Legacy Zimmer and Legacy Biomet, and that ZBH was manufacturing Class II and Class III devices at the North Campus, ZBH knew that an inspection of the North Campus would be a high priority for the FDA.

148.    ZBH also knew that an inspection would cover the prior observations from the June 2014 FDA-483 and ZBH's responsive actions.  As noted below, ZBH had not taken sufficient actions to address at least two observations from the prior June 2014 FDA-483.

**3.      ZBH Admits that ZBH "Corporate Management" Knew About the "Systemic" Quality and Compliance Issues at the North Campus Because of Corporate Audit Reports Issued on March 31, April 13, and June 7, 2016**

149.    The FDA commenced the September 2016 Inspection of the North Campus on September 12, 2016.  Based on the FDA's practice of providing 5 calendar days' notice, ZBH would have been informed of the inspection on or around September 7, 2016.  As ZBH corporate management knew would happen, the FDA uncovered substantial and serious gaps in the North Campus' regulatory compliance.

150.    The 58 page November 2016 FDA-483 contained the following 14 observations:

(1) A process whose results cannot be fully verified by subsequent inspection and test has not been adequately validated according to established procedures;

(2) Procedures to control environmental conditions have not been adequately established;

(3) Procedures have not been adequately established to control product that does not conform to specified requirements;

(4) Procedures for design control have not been established;

(5) Procedures for corrective and preventative action have not been adequately established;

(6) Process control procedures that describe any process controls necessary to ensure conformance to specifications have not been adequately established;

(7) Procedures for monitoring and control of process parameters for a validated process have not been adequately established;

(8) Procedures for receiving, reviewing, and evaluating complaints by a formally designated unit have not been adequately established;

(9) Procedures for acceptance activities have not been adequately established;

(10) Buildings are not of suitable design to perform necessary operations;

(11) Sampling plans are not based on valid statistical rationale;

(12) Procedures for rework of nonconforming product have not been adequately established;

(13) Procedures to ensure that all purchased or otherwise received product and services conform to specified requirements have not been adequately established; and

(14) Document control procedures have not been adequately established.

151.    The size and scope of the November 2016 FDA-483 demonstrate the seriousness

of the FDA's concerns.[10]  Many of the observations in the November 2016 FDA-483 related to safety, addressing sterilization issues and noted that various processes were not properly validated by those responsible for overseeing the processes.  Also, the November 2016 FDA-483 indicated that it impacted several of the Company's most important devices and products.[11]

152.    The November 2016 FDA-483 was so severe that ZBH had to request a special extension to file its response "[b]ased on the extent of the FDA-483 observations."  ZBH provided a written response on December 21, 2016 (the "December 2016 Letter")[12], which attached detailed responses to each observation in the November 2016 FDA-483 and to each of the 15 discussion points raised by the FDA investigators at the conclusion of the inspection.

153.    The December 2016 Letter admits multiple times, in detail, that the compliance and regulatory issues at the North Campus (i) had existed prior to and throughout the Class Period and (ii) were "systemic issues."  For example, ZBH indicated that "in addition to correcting the specific items listed in the FDA-483, we have taken and are continuing to take actions to address systemic issues" and that remediation programs had been established to address the "systemic issues."

---

[10]  For example, Observation 1, which was a repeat observation from the June 30, 2014 inspection, contained 9 categories of process violations and was 21 pages long.

[11]  The devices that were impacted, included, metal hip, extremities, knee, trauma, microfixation, and sports medicine devices.  The products impacted by the observations included, among others, Vanguard knees, Oxford knees, Taperloc hips, Arcos hips, Echo Hips, Comprehensive Primary Mini Shoulder Stem, and devices made of ultra-high molecular-weight polyethylene (UHMWPE).  For example: Observation 4 noted design issues with Vanguard, one of the Company's key product lines; Observation 7, a repeat observation from the June 16, 2014 to June 30, 2014 inspections, noted that the Company had a six month backlog of samples requiring testing, impacting the Oxford knee, one of the Company's key products; Observation 8 also impacted the Oxford knee; and Observation 9 impacted both hip and comprehensive shoulder products.

[12]  A copy of the December 2016 Letter obtained from the FDA via a FOIA request is attached hereto as Exhibit B, which has been partially redacted by the FDA's FOIA staff.

154.   ZBH admits that its "corporate management" *knew* of these "systemic issues" from corporate audits after the merger.   Specifically, ZBH admitted that "[u]ntil the Zimmer Biomet merger on June 24, 2015, North Campus had been operating independently and with indications that its quality system was in substantial compliance," but "[o]nce the merger was completed, *the new Zimmer Biomet corporate management team conducted audits,[13] learned of issues through the audits*, and promptly[14] initiated corrective actions."

155.   Specifically, ZBH admits that the "systemic issues" corporate management became aware of included: "*self-identified major compliance-related issues* in areas such as design controls, sterile packaging, complaint handling, nonconforming material, and CAPAs."

156.   ZBH also admits that these "systemic issues" were substantially the same issues as the issues identified by the FDA during the September 2016 Inspection:

> After the merger was closed, Zimmer Biomet Corporate directed corporate quality audits to be performed at the North Campus in the first half of 2016.   *These audits self-identified major compliance-related issues in areas such as design controls, sterile packaging, complaint handling, nonconforming material, and CAPAs.*   A remediation program with approved[15] funding [redacted] was established in July 2016  to address the systemic issues at the North Campus.  *This program self-identified CAPAs related to 7 of the 483 observations and 6 of the discussion points prior to the start of the inspection*. At the start of the

---

[13] While the December 2016 Letter indicates that they learned after the merger, ZBH more specifically admits that these audits were not performed until 2016.  Specifically, the letter states, "After the merger was closed, *Zimmer Biomet Corporate directed* corporate quality audits to be performed at the North Campus *in the first half of 2016*."

[14] As explained in more detail below, ZBH's self-serving description that it "promptly initiated corrective actions" is belied by its other admissions that: (i) the issues were raised by corporate audit reports issued on March 31, April 13, and June 7, 2016; (ii) ZBH did not establish a remediation program until sometime in July 2016; and (iii) the remediation was only "in the initial phase of execution" when the FDA inspection commenced on September 12, 2016, with "[r]emediation efforts [being] accelerated" thereafter.

[15] The information in the letter was redacted by the FDA's freedom of information staff.  Based on partially unredacted information on the page 3 of that letter ("Remediation funding for the North Campus of [redacted] was approved in [redacted] by the CEO"), Plaintiffs are informed and believe that the July 2016 funding was approved directly by the company's CEO.

FDA inspection, the remediation program was in the initial phase of execution. Remediation efforts were accelerated as additional issues were identified by FDA during the inspection. Rather than wait for the issuance of the FDA 483 to plan and take action, we immediately took steps to correct and improve various aspects of the North Campus quality management system. Immediate containment and investigation actions to date included the initiation of [redacted] product holds, [redacted] health hazard safety evaluations, and [redacted] interim control documents. [Redacted] were greatly expanded and will be covered under a master CAPA program called [redacted], discussed in Section 4.0 below.

157.    The December 2016 Letter also provides specific details about the dates, nature and findings of the three North Campus corporate audits that were conducted post-Merger in the first half of 2016. These audits included: (1) a "Corporate Complaints Process Audit" that resulted in a report being issued on March 31, 2016, and identified "6 major and 2 minor observations; (2) a "corporate Design Controls Audit" that resulted in a report being issued on April 13, 2016, and identified "4 critical and 15 major observations; and a Corporate General QMS[16] Audit" that resulted in a report being issued on June 7, 2016, and identified "15 major and 5 minor observations."

158.    Additionally, the December 2016 Letter admits in multiple instances that there was a fundamental issue with the "quality culture" at the North Campus. In addition to the substantial remediation steps and product holds instituted after the commencement of the September 2016 Inspection, ZBH took the drastic measure of implementing major top level management changes at the North Campus to "address the Quality Management System performance issues noted at the Warsaw North Campus, along with the underlying quality culture issues now identified."

159.    ZBH admittedly made management changes in the following positions to address Quality Management System issues at Warsaw North, along with underlying quality issues: (i)

_____

[16] QMS is an abbreviation for Quality Management System.

Senior Vice President of Global Operations and Logistics Team; (ii) Vice President of Quality Assurance responsible for the Warsaw sites; (iii) Quality Assurance Director responsible for the North Campus; (iv) Compliance Director responsible for the Biomet Network; and (v) Quality Assurance Director responsible for the Warsaw Post Market Surveillance (PMS) and Complaint Handling Group.

160.    ZBH admits that it was not until July 2016 that "[a] remediation program with approved funding [redacted] was established … to address the systemic issues."  On the next page of December 2016 Letter, ZBH also indicates, "Remediation funding for the North Campus of [redacted] was approved in [redacted] by the CEO."  Based on the information in both sentences, Plaintiffs are informed and believe that the redacted language indicates that the July 2016 funding was approved directly by Defendant Dvorak.

161.    While in the December 2016 Letter ZBH attempts to portray itself as having promptly taken action, ZBH nevertheless concedes that it was not until the September 2016 FDA Inspection that it began undertaking serious remediation efforts.  For example, ZBH admitted that "the remediation program was [only] in the initial phase of execution" when the FDA inspection commenced and that "[r]emediation efforts were accelerated as additional issues were identified by FDA during the inspection."

162.    ZBH also makes a stunning concession that the Company knew at the start of the inspection that the issuance of a serious FDA-483 was both a foregone conclusion and the best case scenario for the Company.  For example, ZBH stated:

> ***Rather than wait for the issuance of the FDA 483 to plan and take action, we immediately took steps to correct and improve various aspects of the North Campus quality management system.***  Immediate containment and investigation actions to date included the initiation of [redacted] product holds, [redacted] health hazard safety evaluations, and [redacted] interim control documents.

163.    Among the "[i]mmediate [a]ctions taken during the Inspection to address FDA Observations," ZBH admits that **on Sepember 29, 2016 (the second to last day of Q3'16)**, ZBH undertake the drastic and severe measure of implementing a major product hold of all products cleaned and packed at the facility:

> ***Product ship hold (16-064) was issued on September 29, 2016 to stop shipments of all final product cleaned, sterile packed, and sterilized at the Warsaw North Campus.*** After investigations were completed and documented justifications were prepared and approved, initial product ship hold releases under interim controls first began on October 21 , 2016. Product holds were released only after detailed justifications were documented to address product safety and effectiveness using the enhanced hold process implemented during the inspection.

164.    While in the December 2016 Letter ZBH self-servingly claims to have "promptly" taken corrective action upon learning of the "systemic issues," it is clear that ZBH did not promptly take corrective action.  For example, although the issues were raised by corporate audit reports issued on March 31, April 13, and June 7, 2016, ZBH did not establish a comprehensive remediation program until sometime in July 2016 to address the systemic issues and ZBH admits that this was only "in the initial phase of execution" when the FDA inspection commenced on September 12, 2016.  Furthermore, ZBH admits that "[r]emediation efforts were accelerated as additional issues were identified by FDA during the inspection."

165.    The discussion points raised by the FDA at the conclusion of the inspection on November 22, 2016, appear to contradict ZBH's claims that they took prompt action upon learning of the "systemic" issues.  Discussion point Number 15 appears to relate to ZBH's failure to timely issue CAPAs resulting from certain findings in the corporate audit reports:[17]

> The Investigators made two points regarding internal audits. First, ***they noted that Zimmer Biomet should be timely in*** concluding internal audits and ***initiating***

---

[17] ZBH's response notes that on October 20, 2016 (*i.e.*, in the middle of the inspection), ZBH ironically "initiated CAPA CA-02976 to investigate the lack of timely issuance of CAPAs resulting from the audit report from a March, 2016 Design Control Audit . . . ."

*corrective actions*. Second, the Investigators stated that Zimmer Biomet should be certain to follow the procedures in CP1700 "Internal Audit Program."

166.    ZBH's failure to take "prompt" action is magnified by the fact that when the Corporate General QMS Audit report was issued on June 7, 2016, ZBH corporate management knew that an FDA inspection of the North Campus was imminent.

167.    As discussed below, given the ultimate amount of time[18] and the substantial $300 million that was necessary to remediate the "systemic" regulatory and quality deficiencies at the North Campus (as well as the substantial impact on its manufacturing operations and the substantial supply shortages in the second half of 2016 and first half of 2017) between September 2016 and 2018, if ZBH had taken prompt action to address the systemic issues in June 2016 it would have had a grave and immediate impact on the Company's financial performance.

168.    As alleged below, CW1 said that ZBH was waiting until November 2016 to convert to Zimmer policies and procedures over a six to eight month process but after the FDA inspection commenced the poly bearing clean room was completely shut down and production was mostly shut down for approximately six weeks to conduct this conversion.  Moreover, CW1 also said that new procedures were put in place that included more documentation than the Legacy Biomet procedures and that it took longer to produce because of the paperwork.  CW1 said that the additional processes (documentation) cut production by one-third.

169.    If ZBH had promptly commenced the necessary actions in June 2016 to address the "systemic issues" identified with the Quality Management System, it would have necessitated a complete shutdown of major operations at the North Campus.  Doing so would

---

[18] For example, a Wells Fargo analyst indicated that their FDA consultant had reviewed the November FDA-483 and "believe[d] it will take ZBH at least a year to address all the issues" cited by the FDA in the 14 observations. *See* ¶__.

have caused immediate product supply shortages and made it impossible for ZBH to achieve its promised return to above market organic growth rates in the second half of 2016.

170.    After the Class Period, during an April 27, 2017 conference call regarding ZBH's Q1'17 financial results, Defendant Dvorak addressed a question about "the root cause of these issues on the legacy Biomet side and just on the supply side generally."  Defendant Dvorak acknowledged that the "integration process to harmonize and optimize our quality and manufacturing systems as part of the integration … as it relates to the Warsaw North Campus were greatly accelerated as a consequence of both *internal audit findings* as well as the FDA's inspection . . . ."

171.    Moreover, during the April 27, 2017 Q1'17 conference call, Defendant Dvorak admitted that the products impacted by the issues with the North Campus were key products that were essential to the Company's ability to accelerate top line revenue: "Because some of these *key brands* that come out of that [North Campus] facility provide us with some of our *best competitive opportunities*, so they're a very important set of brands and *strategically relevant to the acceleration of the top line*."

**4.    Analysts Confirm that the 14 Observations in the 58 Page November 2016 FDA-483 were Serious and Highly Concerning**

172.    On December 14, 2016, one or more research analysts issued reports indicating that, in response to FOIA[19] requests, the analysts had received copies of the November 2016 FDA-483.

---

[19] As noted in a December 16, 2016, report issued by Morningstar: "Upon hearing rumors that Zimmer Biomet had been caught in the sights of the FDA last month, we'd filed a request under the [FOIA].  At the time, we were skeptical that any recent Form 483 directed at the firm existed, as in the past, we've seen other medical device firms take a more proactive stance in these situations to reassure investors that management was working decisively to resolve the FDA's issues.  In the ensuing four-week period that was required to process our FOIA request a Form 483 had been issued to Zimmer Biomet."

173.   In response, ZBH issued the following statement acknowledging that the Company had received the November 2016 FDA-483 and that there were "regulatory compliance gaps at the legacy Biomet operation in Warsaw:"

As an update to the Company's statement published on November 8, 2016 concerning product supply matters, Zimmer Biomet continues to make excellent progress enhancing certain aspects of its supply chain infrastructure as it harmonizes and optimizes its sourcing, manufacturing and quality management systems.  The Company has been successfully addressing the previously disclosed temporary shipping delays involving certain products and, as expected, most of the impacted product lines have returned to full shipping capacity.

Separately, on December 14, 2016, one or more investment analysts have published reports concerning a recent FDA inspection of a Zimmer Biomet manufacturing facility, and the Company is issuing this statement in response. Like all medical device companies, Zimmer Biomet is subject to periodic FDA inspections.  Recently, the FDA completed an inspection of the legacy Biomet manufacturing site in Warsaw, Indiana.  As is often the case, at the conclusion of the inspection, the FDA issued various inspectional observations on Form 483.

Zimmer Biomet takes these matters very seriously and is in the process of preparing its written response to the Form 483 observations.  The Company has developed and is executing a remediation plan to fully address the issues cited by the FDA and this work is progressing well.  Additionally, the Company will continue to communicate with the FDA regarding the status of the corrective actions and remediation work.

Zimmer Biomet is committed to operating a first-rate quality management system across its global manufacturing network.  While the Company is taking the necessary steps to address *certain regulatory compliance gaps at the legacy Biomet operation in Warsaw*, it remains confident in the quality, safety and efficacy of all of its products.  No patient safety concerns have been identified with any of the products manufactured at the site.

In conclusion, the anticipated full impact of all of the above-described matters was included in the Company's sales and earnings guidance update issued on October 31, 2016.

174.   Analyst reports issued on December 14 and 16, 2016, confirmed the severity and magnitude of the issues raised by the FDA in the 58 page November 2016 FDA-483.

175.   For example, a December 14, 2016, Wells Fargo report detailed the reaction of

their FDA legal consultant to the November 2016 FDA-483: "The bottom line is, this is one of the longest and most serious 483s [the] consultant has ever seen" and their consultant "believes it will take ZBH at least a year to address all the issues in the 483."

176.    Wells Fargo's FDA legal consultant deemed the magnitude of the issues raised by the FDA as "unusual" and "serious."  For example, the report stated:

> . . . According to our consultant, this 483 is far longer than the average 483. The number of observations (14) is towards the upper end of 483s, but the length (57 pages) is quite unusual according to our consultant. While he assumes that other 483s have been issued that are as long or longer, ***this is the longest one he remembers seeing. The corollary is that FDA has gone to considerable efforts to document what the agency perceives as significant violations. The 483 does not simply provide an example or two of deficiencies, but it provides multiple examples. It is unusual to be so thorough in documenting a company's perceived shortcomings.***

177.    Wells Fargo's legal consultant deemed FDA's concerns as "significant, both from a regulatory perspective and from the standpoint of safety."  For example, the report stated:

> . . . FDA has written the 483s in such a way as to argue that these are not just technical violations, ***but ones that potentially go to safety***, e.g., whether products were properly sterilized or steps adequately documented so that the safety is known.  At a minimum, ***our consultant believes ZBH is going to have to spend a significant amount of time and effort addressing these issues.***

178.    Wells Fargo's legal consultant also noted that the 21 pages dedicated exclusively to was significant: "Our FDA consultant does not recall ever seeing a 21 page single observation. FDA not only documented that this was a repeat observation, but went to great lengths to document myriad manifestations that the company failed to comply with FDA's regulations." The legal consultant opined that it was "very likely" that ZBH would receive a warning letter from the FDA relating to the North Campus:

> . . . Given the 15-day period for responding to 483s, our consultant does not believe ZBH will be able to provide objective evidence that it has corrected all of these issues in that 15-day window. Any corrective actions submitted after the 15-day period can be discounted by FDA in deciding whether to issue a warning

letter.  If there are any PMAs (premarket approvals) that are pending from the facility, these quality issues could substantially delay the approval of those PMAs. Fortunately for ZBH, we are not aware of any pending PMAs. Warning letters do not prevent the clearance of 510(k)s.  Given the number and severity of issues, FDA could contemplate other actions, such as requesting a Regulatory Meeting at the District to emphasize to company management the agency's concerns. FDA could also pursue an injunction, although there have been relatively few injunctive proceedings recently and the change in administration may play a role here according to our consultant.

(Emphasis in original).

179.    The seriousness of the November 2016 FDA-483 was echoed by other analysts as well.  For example, Northcoast Research issued a report on December 16, 2016, after reaching out to "an independent consulting firm (not affiliated with the FDA) to seek their assessment[20] of the FDA's observations."  Northcoast's consultant similarly expressed their view that the FDA-483 was "unusual" and "intense:"

- While Form 483 observations are fairly common following FDA inspections, *our FDA consulting contact suggested the number of observations and items within each observation make Biomet's recent Form 483 an "intense" one.*  According to our contact, the FDA's most serious concerns are typically addressed in the initial observations of a Form 483. While our contact suggests inadequate CAPA (Corrective and Preventative Action) procedures commonly lead-off Form 483s, *the Biomet document was somewhat unusual in having 21 pages addressing process validation (split into nine parts, including items such as sterilization validation, sterile packaging validation, and validation of various cleaning processes for implantable devices) before mentioning any CAPA items.*

***

- Most importantly, our contact thinks the observations in Biomet's Form 483 are fixable (with most being characterized as easily remediated) although *this process is expected to take time (at least one year of remediation according to our contact). Our contact also believes remediation efforts will "significantly tie up (ZBH's) R&D and Quality Assurance departments" during this time.*

180.    Similar concerns were also expressed in a December 16, 2016, Morningstar report

---

[20] The report also indicates that the "FDA consulting contact's feedback is based on the presently available data (the FDA's observations, but not ZBH's responses)."

about the "worrisome" FDA-483:

> Compared with redacted Form 483s that we've seen issued to other medical device firms over the years, ***this one is substantially more extensive and serious***. For example, the FDA raised issues with water samples that failed to meet acceptable microbial and endotoxin tolerances, and the possibility of particulate contamination of some clean rooms. ***We are perhaps most troubled by this Form 483 because the FDA had already raised a number of these issues at least two years ago. Based on the FDA's current assessment, the firm has not adequately resolved these issues and it continued to ship product manufactured under these conditions during that period***.
>
> In most Form 483s that we've reviewed, the majority of the issues are related to quality control--specifically, documenting the processes and procedures in place to ensure quality-related aspects of how products are manufactured. ***It is unusual, in our experience, to see specific issues raised with direct implications for the sterility of the manufactured product, for example. This is why we find Zimmer-Biomet's Form 483 to be so worrisome.***

181.   The Morningstar analyst opined, "Considering the extensive issues the FDA has identified and that ***some of them may actually require Zimmer Biomet to construct or remodel parts of the physical plant, we think it could take 12 to 18 months to ameliorate conditions*** to the FDA's satisfaction."

> **5.     Former ZBH Employees Confirm that ZBH Waited Until the September 2016 Inspection to take Serious Remedial Actions, Which Devastated the Output at the North Campus**

182.   CW1, a Production Supervisor of the poly bearing department at the North Campus, explained that his department manufactured the poly bearings for Biomet devices. According to CW1, poly bearings are used for hip, knee and shoulder devices and that poly bearings are both incorporated into devices but also separate devices. CW1 also explained that the production area included a manufacturing area, as well as a "clean room" where products were sterilized and packaged.

183.   CW1 indicated that ZBH knew from the "get go" (*i.e.*, the time of the merger) that the two companies employed different policies and procedures in the clean room as well as

manufacturing.  CW1 said the plan from the beginning was to convert Biomet to Zimmer policies and procedures.  CW1 indicated that the plan was to begin this ***approximately six to eight month process in November 2016***.  CW1 explained that the plan to convert [the North Campus] to [Legacy] Zimmer procedures changed soon after the FDA started its inspection.

184.    CW1 recalled that the FDA inspection began in the Sports Medicine department and then the FDA began looking at poly because it shared some area with Sports Medicine.  CW1 noted that the FDA inspection was primarily focused on the cleaning area but also included the manufacturing area.

185.    CW1 said the FDA inspection "devastated" his department, which was almost completely shut down for six weeks beginning at the end of September 2016, though CW1 could not be specific about the date.

186.    Though CW1 was not involved in communications with the FDA nor privy to the specifics of the decision, CW1 understood that ZBH executives actually made the decision to shut down production in the poly bearing department instead of waiting for the FDA to order it.[21]  CW1 explained that would have looked worse to have to announce that the FDA shut down production.

187.    CW1 said that instead of waiting until November 2016 as planned and converting [the North Campus] to [Legacy] Zimmer policies and procedures over a six to eight month process, the poly bearing clean room was completely shut down and production was mostly shut down for approximately six weeks to conduct this conversion.  CW1 recalled that production started again at the end of October 2016/beginning of November 2016, meaning that the shutdown would have had to start in September 2016.

---

[21] CW1's account is independently corroborated by the Company's admissions in the December 2016 Letter.

188.    CW1 understood that the main reason for the shutdown was to convert [the North Campus to Legacy] Zimmer's processes and procedures.  CW1 also said there were concerns about cleanliness and sterilization in the clean room and the manufacturing areas.  In addition to the clean room, CW1 said production was shut down but not completely.  CW1 said that the department tried to keep at least a couple of machines running through the shutdown to have some supply available.  However, CW1 said it was risky because the product just piled up waiting to be processed through the clean room, which was completely shut down.  Also, CW1 further stated that, if the FDA found contamination then the product would have to be thrown out.  CW1 said the company cut off the supply of materials to the poly bearing manufacturing after a couple weeks and then the manufacturing area was also completely shut down.

189.    CW1 indicated that once the shutdown was over, the poly bearing department had to run constant shifts in order to replenish inventories.  CW1 worked 31 or 32 days in a row once it was operational again.  CW1 then took a week off and upon returning continued to work six days a week and every weekend. In early 2017, CW1 left the Company because he did not see a light at the end of the tunnel and was burned out.

190.    CW1 also said the new procedures put in place included more documentation than the [Legacy] Biomet procedures.  As such, CW1 said that it took longer to produce because of the paperwork.  CW1 said that the additional processes (documentation) cut production by one-third.  CW1 explained that in a typical shift, one of CW1's employees would complete 185 parts a night but with the documentation, a person was lucky to complete 24 to 25 parts in a shift.[22]

---

[22] CW1's account in this respect is significant.  As noted above, according to CW1 poly bearings are used for hip, knee and shoulder devices and that poly bearings are both incorporated into devices but also separate devices.  The obvious implication of CW1's account is that the drastic decrease in manufacturing resulting from the implementation of adequate procedures would result in an exponential impact on the manufacturing of hip, knee and shoulder products at the

With the additional paperwork, CW1's department had difficulty keeping up with demand and thus, there were constant shifts running even through the Thanksgiving holiday weekend.

191.    Although CW2 was a Legacy Zimmer employee and based in the Warsaw West Campus (*i.e.*, the Legacy Zimmer facility) after the merger, CW2 was aware of information pertinent to the issues at the North Campus before, during and after the Class Period.

192.    CW2 said that the most significant supply constraint CW2 was aware of was when the company stopped shipping product due to the ongoing FDA inspection.

193.    Like CW1, CW2 understood that ZBH made the decision to hold product shipments because of the ongoing FDA inspection.  CW2 similarly explained that if ZBH had continued shipping product during the inspection and the FDA found issues, then the Company would have to issue a recall, which would be much worse than a shipment hold.

194.    CW2 had been aware that the FDA was conducting an inspection.  CW2 said that everyone was aware of the inspection because many people were moved from West Campus to North Campus to help with the audit.  CW2 said there were three or four people in CW2's immediate working area (not within CW2's department) that were temporarily assigned to help with the FDA inspection.  As such, CW2 said the inspection caused a disruption at the West Campus as well because of the reassignment of employees.

195.    CW2 understood from discussions with people working in CW2's area that the main issues at North Campus were that the processes in place were not validated properly.  In addition, CW2 indicated that it was found that management signed off on the improperly

_____

North Campus, which rely on poly bearings.   If ZBH had implemented the proper procedures immediately in June 2016, ZBH would not have been able to manufacture sufficient supply to support market level organic revenue growth.  As noted above, Defendant Dvorak later admitted that the products manufactured at the North Campus were "a very important set of brands and strategically relevant to acceleration of the top line" [*i.e.*, revenue].

validated processes.  According to CW2, ZBH determined that high management encouraged or endorsed the sign off of improperly validated processes.  As such, CW2 indicated that legacy Biomet senior management were fired or resigned as a result of these findings.[23]  CW2 noted certain Biomet senior personnel that were fired or resigned.

196.    CW2 explained that it was known that [Legacy] Biomet was quite profitable and it was suspected at the time of the merger that the high profitability might have been because [Legacy] Biomet took short cuts.   In addition, CW2 said [Legacy] Zimmer knew that if the FDA arrived to conduct an inspection there would be a problem with the [Legacy] Biomet campus [*i.e.*, the North Campus].  CW2 said it was common knowledge there were cleanliness and quality issues at the [Legacy] Biomet campus and while CW2 did not witness it first-hand, CW2 was not that far removed in CW2's reporting chain from individuals in the know such as Adrian Furey (who had previously held the position of VP of North America)[24] and Sam Stutzman (a Legacy Biomet employee at the North Campus that was moved to the West Campus after the Merger).[25]

---

[23] Although CW2's account is based on discussions with people working in CW2's area, his account is sufficiently reliable because it is independently corroborated by ZBH's own admissions.  For example, as described in more detai, ZBH cryptically admitted in the December 2016 Letter that actions had been taken "to address the quality culture" at the North Campus and that "management changes have been implemented by ZBH to address Quality Management System performance issues noted at the Warsaw North Campus, along with underlying quality culture issues now recognized."   CW2's account is also independently corroborated by the information in the November 8, 2017, Northcoast Research analyst report.  *See* ("ZBH's SVP, Global Operations and Logistics[] resigned from the company on November 1. We have also heard several other senior-level employees in ZBH's quality and regulatory department were let go by the company recently. We believe the recent FDA inspection at Biomet's Warsaw manufacturing operations could be at least partially responsible for this turnover …").

[24] The December 2016 Letter, at 3, notes that "Furey, a legacy Zimmer leader, was named the interim leader" of the North Campus after the departure of the prior Senior Vice President of Global Operations and Logistics Team.

[25] On the internet, Mr. Stutzman identifies himself as the Senior Director of Operations at ZBH.

6. **ZBH's Post-Class Period Disclosures Revealed that the North Campus Required $300 Million of Remediation Costs and that the Resulting Supply Shortages of Key Products Would Continue Into the Second Half of 2017**

197.    When ZBH reported its Q4'16 financial results, the Company indicated that in Q4'16 it had spent approximately $145 million related to "integration activities" and at least $38 million of quality remediation expenses.[26]

198.    During the January 31, 2017 conference call to discuss the Company's Q4'16 financial results, Defendant Florin also noted that in 2017, the Company expected to spend "approximately $170 million of cost to harmonize and optimize our supply chain and manufacturing and quality systems," which would be generally related to the Company's efforts to address the issues raised by the corporate audits and the observations in the November 2016 FDA-483.

199.    When the Company subsequently reported its financial results for Q1'17, Defendant Florin revealed that the Company was increasing its expected expenditures to address the quality and remediation issues (by another $40 million) to $210 in 2017.

200.    During an analyst conference on May 3, 2017, Defendant Florin indicated that the Company expected additional remediation efforts and costs to continue into 2018 and that ZBH presently expected "the full remediation spend to approach $300 million before its complete."

201.    When ZBH announced its Q1'17 financial results, ZBH revealed that it was still experiencing supply shortages because of the remediation activities at the North Campus, which

---

[26] It appears that some undisclosed portion of the "integration" expenses was spent on remediation efforts.  As explained during a January 31, 2017 conference call to discuss the Company's Q4'16 financial results, Defendant Florin stated: "[T]o the extent we're incurring remediation expenses, that's running through as a special charge. To the extent we're making permanent investments in the quality infrastructure and manufacturing overhead infrastructure, that's running through the adjusted P&L [*i.e.*, profit and loss]."

would continue into the second half of 2017.  During a April 27, 2017 conference call to discuss the Company's Q1'17 results, Defendant Dvorak acknowledged that in Q1'17 "we experienced a greater-than-expected number of temporary and occasional production delays" and that "[w]hile our overall production throughput improved during the quarter, these delays resulted in lower-than-expected levels of finished goods and strained inventory availability of key brands throughout" Q1'17.

202.    During the conference call, Defendant Dvorak was asked about the root cause of the quality problems at the North Campus and the supply shortages.  Dvorak admitted that the issue stemmed from the above discussed corporate audit reports and subsequent remediation work that was undertaken in response.  Dvorak admitted that the products impacted at the North Campus were crucial to ZBH's ability to drive top line revenue growth from cross-selling:

> [*Defendant Dvorak*:] … [A]s we explained in the last call, ***we have been working through the integration process to harmonize and optimize our quality and manufacturing systems as part of the integration. Those efforts as it relates to the Warsaw North Campus were greatly accelerated as a consequence of both internal audit findings as well as the FDA's inspection that concluded in the fourth quarter of last year.*** So we had a pretty fluid situation in the fourth quarter leading into the beginning of this year. We've made accelerated changes to those operations. And obviously, in addition to implementing operational improvements at the facility as part of these regulatory compliance enhancement efforts, we were focused on ensuring that the production was coming back up to satisfy, in a prioritized way, existing customer demand and then working towards replenishing safety stocks that would allow us to go back on offense. ***Because some of these key brands that come out of that facility provide us with some of our best competitive opportunities, so they're a very important set of brands and strategically relevant to the acceleration of the top line. And so it really is a matter that is focused on that facility.*** And as we got into the beginning of the year and production began to accelerate back up, it just took us longer to ramp that production back up. You can understand why we'd be operating with an abundance of caution, most importantly, with the interest of the patients that are served by these products in mind. These are high-quality products. We want to make sure that we're putting them out without any compromise, and so the monitoring processes are very sensitive. The implementation of these processes, as I said, this was done on a very accelerated basis for obvious reasons, and it just took us longer to ramp up that production in the first quarter than we originally

anticipated. As we exited the quarter and in most recent weeks, those production levels have been brought up to a point where we're going to be able to begin to more fully satisfy existing customers and, as the second quarter progresses, work towards replenishing those safety stocks. So in the summer months, we expect, in particular, to make a lot of progress on that front and to put ourselves in a position then to not only fully satisfy existing customer demands but then to go back on offense.

203.    The magnitude of the necessary remediation and the resulting impact on the

ZBH's ability to generate sufficient supply of key products was extremely frustrating to investors

and analysts.  An April 27, 2017, J.P. Morgan report entitled, "Patience Wearing Thin" noted,

"While the rest of the industry is posting quarter after quarter mid-single digit or better top-line

growth, Zimmer is struggling and *the pitchforks are out*."  Further, the report noted:

**The weak start to the year was caused by a greater than expected number of process monitoring failures at the Warsaw facility.** These process enhancements were more expansive overhauls of manufacturing lines that took place in 4Q-1Q in a bid to address concerns raised by the 483s issued to Zimmer in December last year. Given the broad scope of these line changes, monitoring failures led to manufacturing lines being shut down, remediated, and brought back up. While Zimmer initially thought they could make up for initial delays in the quarter itself, new process monitoring failures and corresponding field actions led Zimmer to fall further behind.

**These delays led Zimmer to fall even further behind schedule.** As a reminder, Zimmer was already playing catch-up on the back of the 3Q16 supply issue and the 483s added another layer of delays on top of that. While management sees current output as being sufficient for their needs, Zimmer still has multiple tiers of demand they need to work through: (1) clearing back orders left over from the end of 2016 and 1Q17; (2) creating enough product to satisfy existing demand; (3) replenishing safety stocks; and (4) building up enough inventory to begin aggressively taking share.

**With that as the backdrop, management lowered full year organic growth guidance to 2.0-3.0%.**

(Emphasis in original).

204.    At a May 17, 2017 analyst conference, Defendant Florin was asked how the

Company went from 40 years of having no problems to $300 million of needed investments to

fix the issues.  Florin admitted the 483s are deep and broad, running the gamut of an FDA-483:

> [*Analyst:*] …[H]how do you go from 40 years of no problems to $300 million of needed investment to fix the issues and just we're having a hard time understanding how we got from here to here?

> [*Defendant Florin*:] It's – Bob, I would just say the **483s are deep and broad**, much deeper and broader than we expected, observation noted.  …

> So again, at this juncture, our focus is executing the plan that we've laid out. It is an – it's very expensive. **It runs the gamut between, across all the major subsystems of a quality system, production and process control, design history file remediation, how we clean, pack, sterilize products, cap our systems, complaint handling systems, supplier certifications.** It really, it runs the gamut and that's out in the public domain in terms of the 483. So, it's a very expensive remediation plan and we're executing to that. We know how to do this. We're spending the money necessary with a lot of outside help, that was quite the biggest reason for the increase in spend. We've had to go outside, Warsaw is a pretty small place. So, to get the quantity of people that we needed to execute the plan, we had to bring in more outside consultants. And to execute it with excellence, do that – do it right the first time and get it done by the end of 2018, thus the price tag.

205.    Defendant Florin went on to explain that the $40 million increase to anticipated remediation costs was due to the significant time and expense associated with remediating observations related to design controls and design history files:

> [Defendant Florin]: It was a $40 million bump and it was again a combination of having to spend more money with outside consultants, which comes at a premium, just because of the sheer numbers of people that we needed, as well as during the first quarter, as we looked at a particular remediation area, such as design controls and design history file remediation. We found that it was far more significant. So just for perspective, a design history file in order to take a file that's been in existence for in some cases, decades. So open that file up and to bring it to the standards that we've agreed to with FDA, we're going to have to spend 700 hours per file to remediate that design history file. So that's just – in terms of order magnitude I think that just shows you the what we have to go through.

**E.    Defendants Knew that ZBH Lacked Timely Visibility of Inventory, the Ability to Forecast Demand, and "Key Foundational Elements of the Supply Chain" such as Integrated Demand and Production Planning Tools**

206.    When ZBH announced that it had completed the integration of its commercial

operations in Q4'15, ZBH claimed it would provide cross-selling opportunities that would be a key source of accelerating revenue growth in 2016.  At a subsequent analyst conference in May 2016, Defendant Dvorak acknowledged that being able to benefit from the cross-selling opportunities "***necessitates the demand signal back to the operations side*** . . . ."

207.    However, ZBH lacked the ability to drive revenue growth from cross-selling because it lacked the demand signal back to the operations side that Defendant Dvorak had said was necessary.  ZBH had not yet completed the crucial integration of the supply chain, forecast, and sales and operations planning ("S&OP") and as a result lacked the inventory to meet demand.   The integration of critical supply chain and demand functions was being delayed and ZBH was instead relying on "interim processes," which Defendants Florin admitted were "not [] robust enough."

208.    ZBH lacked critical capabilities, including, "appropriate forecasting" and "forward visibility" with respect to demand and inventory.  For example, ZBH did not have the following which Defendant Florin identified on separate occasions as "key foundational elements of the supply chain" and as the "fundamental building blocks to a robust supply chain:" (i)  integrated global inventory data warehouses; (ii) integrated demand planning tools; and (iii) integrated production planning tools.

209.    When ZBH "blindsided investors" with its Q3'16 financial results and lowered guidance, Defendant Florin revealed the supply shortages and admitted that the Company's supply chain had not been integrated and lacked core functions in the areas of demand forecasting and global inventory tracking:

> As a consequence, we underestimated demand for certain key cross-sell brands within our existing customer base, leading to a depletion of our safety stocks, and also affecting our ability to capitalize on new customer opportunities. ***We are working diligently to enhance our supply chain processes and execution,***

> *particularly in the areas of demand forecasting, global inventory tracking, and asset deployment systems,* while we replenish our safety stock levels.  However, these issues have some carryover effect into the fourth quarter, which I will address shortly in the context of our updated Q4 guidance.

210.   Defendant Dvorak also shockingly admitted that, in its current state, ZBH's supply chain lacked the ability to respond to changes in demand.

> … and late in the quarter the signs became clear that we had a pretty significant product mix with the lack of visibility on a forward basis that allowed our supply chain to respond.  Obviously, *as we fully integrate on the operations front, we're going to have a much more agile supply chain, and be able to respond to these demands in a much shorter time period. As we are in our natural state now, we just did not have the ability or the foresight* …

211.   When an analyst from J.P. Morgan who was "still struggling a bit with this" asked why "it wouldn't have been obvious until late in the quarter," Defendant Dvorak again acknowledged that the issue had been occurring during the quarter but again claimed it had gone unnoticed because of the Company's complete lack of visibility: "I think the lack of visibility we have with forecasting systems, as safety stocks were burning down, it just became a more profound issue as the quarter progressed. In  retrospect, we looked back, and we can understand why some of those demand signals weren't as timely, but that's in retrospect."

212.   Defendant Florin further admitted that ZBH currently lacked critical capabilities that were "key foundational elements of the supply chain" and that ZBH had been relying on "interim processes" that had not been robust:

> And I think also with respect to the supply chain just to indicate, or give a little more color on the fixes that are coming along, we've been integrating all of the back office functions. *The supply chain is extraordinarily complex; however, importantly, we do have new tools coming online at the beginning of this quarter, with integrated global inventory, data warehouses which did not exist in that part of the visibility fix that we lacked.*
>
> *We had some interim processes in place, that in hindsight, were not as robust as we needed them to be. We also have integrated demand planning tools and production planning tools coming online next quarter. So those are the key*

*foundational elements of the supply chain, that are coming online and critical to the fix.*

213.   Importantly, during the October 31, 2016 Q3'16 conference call, Defendants Dvorak and Florin both noted that during Q3'16, ZBH had been depleting its "safety stock."  The purported depletion of ZBH's safety stock was a key indicator that should have alerted ZBH and the Officer Defendants of the supply issues early in Q3'16, if not earlier.  Alternatively, if the Officer Defendants were not aware that ZBH had substantially burned through its safety stock of key products, it is a shocking admission of a wholesale failure by the Officer Defendants to monitor inventory levels.

214.   The Company's revelations about the supply shortages and supply chain issues bewildered analysts who could not comprehend how these issues went undetected.  For example, BMO Capital Markets promptly issued an analyst report on October 31, 2016, entitled, "What? Supply Chain Issues?" The report stated:

**Key Points**

*What? Supply chain issues? To being to say that this was a surprise is an understatement.* For a management team that has integrated many acquisitions, this was clearly not expected. *As we understand it, the [interim] fixes put in place to help integrate the Zimmer and Biomet processes did not give management the line of sight in shifting product demand. This includes: 1) an inability to respond to shifting product mix; 2) underestimating demand in key brands (e.g., Persona Knee, Biomet's legacy hip portfolio, and the Comprehensive Total Shoulder System); and 3) a failure to monitor its inventory levels, which meant it needed to service existing accounts and missed the opportunity to penetrate competitive ones in some cases.* In the 3Q16, this negatively affected revenue by about 100 basis points. It is estimated it will have a 200 basis point impact in the 4Q16 and roll into the 1Q17 before dissipating. *In terms of taking action, fixes are coming in the form of an integrated global inventory data warehouse that will give visibility to finished goods inventory and is expected to be on line in 4Q16. Integrated demand and production planning tools are also being developed to aid in forecasting,* which we expect to see implemented early 2017.

215.   At an analyst conference on November 15, 2016, Defendant Florin effectively

conceded that ZBH lacked the ability to benefit from cross-selling because ZBH had not yet

integrated crucial elements of its supply chain and demand forecasting:

> That acceleration in the first half of the year, a big component of that was a mix shift that was occurring within hips and knees in particular, which was a positive thing in the sense that we expected the brands to be in high demand by our surgeon customers. What we did not fully expect or fully appreciate is the pace at which that mix shift took place. ***And when you combine a really accelerated mix shift with a supply-chain organization and processes that were still being integrated, it, frankly, caught us flat-footed from a supply perspective in terms of the ability to capitalize on that demand during the third quarter***.

216.     Defendant Florin claimed ZBH was implementing certain "fixes" to address the

issues, yet he also admitted that the Company had completely lacked these tools/capabilities

which he described as the "very fundamental building blocks to a robust supply chain:"

> And the good news is we understand the problem far better than we did coming into the quarter. ***We've already put in place a number of fixes to the issue. The fixes, quite frankly, are very fundamental building blocks to a robust supply chain.*** And the term "supply chain" entails a number of components to getting that right, and ***it very much starts with a projected demand signal that is accurate looking out into the future***.

> And one of the implications of not having a fully harmonized supply-chain is, in our case with perfect hindsight, that we did not get that demand signal nearly correct in terms of the pace of that mix shift. So, for example, we did see increasing Persona sales. We saw the Biomet hip portfolio being well accepted. And our demand signal into the plants had a certain trajectory to it. And it turned out, in reality, with hindsight, that trajectory was much steeper. ***And by virtue of a supply chain that was not integrated, we underappreciated that demand signal, and we did not have good visibility to inventory levels around the world. And again, that's very fixable. We are already putting in place the fixes. One of the key components of the fix to that visibility is coming online here in the month of November. And the reason that's important, Rick, is, by having inventory all in one data warehouse with a robust system, you can redeploy instruments and inventory much faster. In the absence of that, inventory levels were being depleted. We did not have good visibility to that and our ability to respond and be agile to that changing shift mix caught us flatfooted, frankly.***[27]

---

[27] Defendants Florin's above statement was also a significant admission because he discretely conceded that this problem had been known prior to Q3'16: "And the good news is we understand the problem ***far better than we did coming into the quarter***."

217.    Defendant Florin also indicated that integration of the supply chain had been delayed, forcing ZBH to rely on "interim processes" that were not "robust enough:"

> We are confident because the tools exist in the marketplace. And the tools, the integration of that supply chain, has always been on our roadmap for integration. ***We had a little bit of slippage on that roadmap*** and those interim processes ended up not being robust enough, so we have fixes coming online in November in terms of visibility to inventory and then we have fixes coming online with the more robust integrated end-to-end demand planning system that comes on in Q1 of next year.

218.    In the days following the Company's bombshell Q3'16 disclosures, various securities analysts issued reports, some of which were issued after follow up conversations with ZBH about the Q3'16 disclosures.  These reports provided further insight about the causes and timing of the supply shortages and the issues with the Company's supply chain integration (or lack thereof).

219.    For example, J.P. Morgan issued a report on October 31, 2016, entitled, "We Spoke to Mgmt; Here's What We Learned."  Therein, the analyst indicated that he had a call with ZBH "management" that "helped shed some light into exactly what drove the miss in 3Q."  As the analyst noted, "The #1 question investors have is why didn't they see this coming and how could management have been so bullish on 3Q as late as the September investor conferences and an NDR in Boston on September 28th?"[28]

220.    According to the October 31, 2016, report from J.P. Morgan, ZBH management had explained to the analyst that management sees daily sales reports for the U.S. businesses and gets updated weekly sales projections from every business around the globe, including the U.S.  The J.P. Morgan report indicates that the inventory issues existed as early as August 2016.  Specifically, according to the report management admitted to the J.P. Morgan analyst that they

---

[28] *See, e.g.*, (September 29, 2016, Piper Jaffray report expressing confidence following meeting with Defendants Dvorak, Florin, and Marshall, one day earlier).

receive supply chain reports and that management knew that ZBH had an inventory issue when the "August supply chain report came in to them in mid-September."

221.    As the J.P. Morgan analyst noted, the obvious question was "[w]hy did it take so long?"   The report continued by revealing: "[w]ith Zimmer consolidating its inventory management systems, *the monthly supply chain reports at this point are being crafted manually. As a result, it takes a lot longer than it usually would.* Why no one raised an alarm prior to the report is unclear, and obviously an issue management is focused on."

222.    ZBH's admission that its August supply chain report lagged the end of August by roughly two weeks is significant.  Given the substantial amount of time necessary for sourcing certain materials and to replenish inventory, a two week delay (from the end of the preceding month) would exponentially magnify any problems identified in the reports and the amount of time necessary to address the underlying issues.

223.    The J.P. Morgan report also noted that " . . . the ongoing integration of the Biomet and Zimmer supply chains and ERP systems meant that the organization wasn't able to connect the dots on a number of red flags earlier in the quarter to prevent the situation."  The report also highlighted the "complete disconnect between supply and demand" and ZBH's "broken" forecasting system:

> **The lack of visibility to safety stock across distributors and long lead times from production meant that there was just a complete disconnect between supply and demand.** Part of the problem was that the people providing directions to management didn't have a clear line of sight to instrumentation levels for Persona, while in Hips and Shoulders the issue was that the company has seen a big mix shift away from the Zimmer products towards the Biomet ones, and the necessary inventory wasn't there. This was partly due to a "broken" forecasting process and the fact that the supply chain couldn't adjust quickly enough to this shift in demand. By the time the problem was finally realized the last week in September, there just wasn't enough inventory on hand to fill demand as they had to curtail new account activity and shipments of certain products. And since they can't go after new business until they fill back orders and replenish their safety

stocks, this issue will linger through 1Q17 with the worst of the impact (~200bps) in 4Q16.

(Emphasis in original).

224.    A November 1, 2016, Morgan Stanley report similarly emphasized that this issue must have existed for more than just a few weeks and had likely built over time.   The report indicated that ZBH had encountered issues which had led to the delay in implementing the inventory management and demand forecasting systems.  For example, the report stated:

> . . . The lack of visibility management had deep into the quarter is likely to signal some alarm for many investors for good reason. The answer lies in the fact this problem did not develop over a matter of weeks but rather built over time. In our view, this issue stems back to the delay in the implementation of various inventory management and demand forecasting systems earlier in the year due to integration complexity. While Zimmer threw manpower at the problem, the mix and demand elements created complexity that the company could not solve for until it was too late. Whether management took on too much prior to systems being in place is a good question but at this point somewhat moot.

225.    The Morgan Stanley report continued by again noting that this issue must have been building over time and expressing its view that the disclosure had called into question management's credibility:

> . . . While the supply constraint issue manifested acutely, it was likely building over time. Admittedly, this is a material setback to management credibility, not just because of the communication strategy around the issue, but also what it implies to business systems, controls, and subsequent visibility. This is unfortunate as confidence in management's expectations for growth and margins were all building throughout the first two quarters this year . . .

226.    CW3 was generally aware that supply chain reports were assembled manually after the ZBH merger.[29]  CW3 also noted that if those manually assembled supply chain reports were inaccurate, it would have a "snowball effect."   As generally explained by CW3, for

---

[29] While CW3 indicated that he had little exposure to the supply chain reports, CW3 indicated that CW3 could request and receive the reports pertaining to CW3's projects, which CW3 would use to help with calculations for CW3's projects.

instance, once it was discovered that inventory levels were low, it could still take 12 weeks of lead time to correct the problem with various suppliers.

227.    CW3 also explained that if safety stock inventory is shipped, it triggers a notification to buyers within ZBH.[30]  The buyers then manually place the order for additional inventory to keep the safety stock supplies.  CW3 further explained that most ERPs are designed to automatically place the re-order when safety stock falls below certain levels.  However, CW3 said due to the merger and integration, ZBH had three different ERPs in use.[31]  CW3 said the ERPs used were Oracle, AS400 and JD Edwards.  According to CW3, since these ERPs were not integrated, the buyers had to first check each ERP system to ensure the additional inventory was needed before manually placing the order.  CW3 said CW3 heard there were issues with a couple of products not "linking properly" or not being reflected in the safety stock.

## VIII.   VIOLATIONS OF THE EXCHANGE ACT[32]

228.    ZBH and the Officer Defendants made materially false or misleading statements omissions of material fact to investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.   Among others, these defendants falsely and misleadingly represented to investors that ZBH's revenue growth was accelerating and that revenue growth would continue accelerate due to cross-selling opportunities, while also failing to disclose, among others:

        (a)    ZBH was manufacturing and distributing key products/brands from the

---

[30] CW3 was also generally familiar with "safety stock" and how it was managed.  CW3 described safety stock as an amount of inventory above forecasted amounts that is typically kept in the warehouse available if inventory is depleted.  For example, if the company forecast 10 units and there were 15 units in inventory, the additional five units is safety stock.

[31] As noted above, CW3 left ZBH in July 2016.

[32] For purposes of this section only, any references to defendants is limited to Defendant ZBH and the Officer Defendants.

Legacy Biomet North Campus – including "key" products Defendant Dvorak later admitted were "strategically relevant" to ZBH's revenue acceleration – despite knowing of "systemic" issues with the quality system at the North Campus that had not been remediated and knowing that an FDA inspection of the facility was imminent, which would result in grave consequences when the FDA learned that ZBH was continuing to distribute the products.

(b)      If ZBH had taken the necessary remediation efforts when the Company learned of the issues at the North Campus, it would have caused substantial disruptions to the manufacturing/distribution of products at the North Campus and ZBH would not have had sufficient supply of key products to accelerate revenue growth.

(c)      that ZBH had not yet integrated the Legacy Zimmer and Legacy Biomet supply chains, demand forecasting, or production planning systems; as a result, ZBH corporate management did not have timely visibility into global inventory nor the abilities to adequately plan or forecast in order to capture the level of cross-selling opportunities that the Officer Defendants were telling investors would produce the revenue growth acceleration in the second half of 2016.

A.      **ZBH and the Officer Defendants' Material Misstatements and Omissions in Violation of the Exchange Act**

1.      **The June 7, 2016 Statement**

229.      The Class Period starts on June 7, 2016.  On this day, ZBH held a conference call in connection with the Company's announcement of the LDR acquisition.  During the conference call, an analyst noted, "I guess one concern I have is the timing of this deal, given that you have a lot left to accomplish with the Biomet integration and that you have yet to return your core hip and knee business to market growth rates."  The analyst then noted that ZBH had reiterated its

guidance for the year and asked, "[A]re you also comfortable reiterating the second quarter revenue growth guidance for Zimmer Biomet" and "just broadly, how confident are you in the Q2 and 2016 revenue growth outlook for your Company today?"   In response, Defendant Dvorak, stated:

> *We are highly confident and we are reiterating guidance for the year*, and in response to your question, comfortable reiterating guidance for the second quarter just the same. *I think you ought to interpret this announcement as being confidence, in the state of the integration, the progress that we've made on the Biomet side*, we obviously feel like we're well-positioned to be able to put the right integration plan together and realize the full benefits of this LDR combination that we announced this morning, otherwise we wouldn't be putting ourselves in a position to overlay an integration that we weren't comfortable with.

230.    Defendant Dvorak's above statement was materially false and/or misleading when made because Defendant Dvorak knowingly disregarded that: (i) the Company had learned of "systemic issues" with the quality system at the North Campus – that had not been remediated and required substantial time and money to remediate – that would substantially disrupt production and supply of several key Legacy Biomet products/brands that were essential cross-selling opportunities underlying ZBH's guidance for accelerating revenue in the second half of 2016; and (ii) the Company had not yet completed the essential integration of Legacy Zimmer and Legacy Biomet's supply chain and demand planning and forecasting functions, which meant that ZBH lacked the inventory visibility, demand forecasting ability, and production planning tools, necessary to capture the underlying cross-selling opportunities that ZBH stated formed the basis for achieving its guidance for accelerating revenue in the second half of 2016.

231.    Defendant Dvorak also knew but failed to disclose, among others:

(a)      that, in the first half of 2016, corporate audit reports issued on March 31, April 13, and June 7, 2016, had revealed to ZBH corporate management, that contrary to their prior beliefs, that the quality system at the primary Legacy Biomet North Campus

manufacturing facility was not in substantial compliance (*see* ¶¶154, 156, 157):

(b)      that, the corporate audits being conducted in the first several months of 2016 alerted ZBH corporate management to "systemic" quality and compliance issues at the North Campus (*see* ¶¶153, 154, 156) – for example, the issues and expected remediation costs were of such a magnitude that it necessitated Defendant Dvorak approving the remediation budget in July of 2016 (*see* ¶¶156, 160);

(c)      that ZBH knew or reasonably expected that the FDA was going to imminently conduct a routine Level 1 or Level 2 inspection of the North Campus by June 30, 2016, or soon thereafter (*see* ¶¶145-148);

(d)      that the corporate audits of the North Campus had alerted ZBH corporate management to "major compliance-related issues in areas such as design controls, sterile packaging, complaint handling, nonconforming material, and CAPAs," which included issues ZBH had self-identified, related to 7 of 14 (half) of the observations later contained in the November 2016 FDA-483 and 6 of 15 discussion points later raised by the FDA following the conclusion of the September 2016 FDA Inspection of the North Campus  (*see* ¶156);

(e)      that there were "quality culture issues" with the regulatory compliance at the North Campus and that ZBH high management had encouraged or endorsed the sign off of improperly validated processes at the North Campus (*see* ¶¶158-159);

(f)      that despite learning of "systemic" issues with the North Campus' quality management system and knowing that an FDA inspection was imminent, ZBH was not taking prompt action to address the quality and compliance issues at the North Campus (*see* ¶¶164-169);

(g)      that ZBH corporate management knew remediation work was needed at the North Campus that would require upwards of $300 million and over a year to complete (*see* ¶200);

(h)      that despite knowing of the "systemic" issues with the quality system at the North Campus, ZBH was exposing itself and patients to risks arising from the continued distribution of products, including key products/brands, that were manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(g));

(i)      that ZBH had not corrected the observations from the June 2014 FDA-483 (*see* ¶¶128, 151);

(j)      ZBH was manufacturing and distributing key products/brands from the Legacy Biomet North Campus – including "key" products Defendant Dvorak later admitted were "strategically relevant" to ZBH's revenue acceleration – despite knowing of "systemic" issues with the quality system at the North Campus that had not been remediated and knowing that an FDA inspection of the facility was imminent, which would result in grave consequences when the FDA learned that ZBH was continuing to distribute the products (*see* ¶¶145-148, 156, 202); and

(k)      that, as a result, ZBH knew by virtue of manufacturing/distributing products at the North Campus while "systemic" issues had not been adequately remediated, when the FDA inspected the North Campus, the FDA would take action or the Company would have to take voluntary preemptive action to limit distribution of products, including key products/brands, that had been manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(j)).

232.     Among others, for the reasons stated in ¶¶202-217 and ¶¶219-225, Defendant Dvorak knew but failed to disclose:

(a)     that ZBH admittedly lacked, among others, the following which Defendant Florin identified on separate  occasions as "key foundational elements of the supply chain" and "quite frankly, are very fundamental building blocks to a robust supply chain:" (i)  integrated global inventory data warehouses; (ii) integrated demand planning tools; and (iii) integrated production planning tools;

(b)     that, as a result, ZBH lacked real time visibility into global inventory;

(c)     that the Company's safety stock of Persona knee instruments was being depleted;

(d)     that ZBH management was relying on manually crafted supply chain reports that lagged the end of the month by approximately two weeks and, even if a belated supply chain report identified an issue, there was nothing that the Company would be able to do to immediately address the issue because it lacked integrated demand planning and inventory capabilities;

(e)     that the Company lacked fundamental and basic tools that any reasonable investor would expect were used to formulate guidance;

(f)     that, at the time ZBH was reaffirming guidance, it did not have any current visibility into whether it had the sufficient inventory and production to meet the guidance it was affirming; and

(g)     that, as a result, ZBH lacked the fundamental supply chain and demand forecasting tools necessary to capture the benefits from cross-selling opportunities that ZBH and the Officer Defendants were touting to the public.

## 2.    The June 2016 SPO Materials

233.    On June 13, 2016, ZBH and certain ZBH investors, consisting of affiliates of KKR, Goldman Sachs, and TPG, offered for sale in an underwritten public offering 11,116,533 shares of ZBH common stock (the "June 2016 Offering").  Those selling shareholders received all of the proceeds of the offering.  Ultimately, the selling shareholders sold the 11,116,533 shares of ZBH common stock at a price of $115.85 per share, for net proceeds of approximately $1.28 billion.

234.    The June 2016 SPO was conducted pursuant to a registration statement on Form S-3 ZBH filed with the SEC on February 4, 2016 (the "Registration Statement").    The Registration Statement was signed by Defendants Dvorak, Florin and Collins.

235.    ZBH supplemented the Registration Statement with a Preliminary Prospectus Supplement filed with the SEC on June 13, 2016 (the "June Preliminary Prospectus") and a Final Prospectus Supplement filed with the SEC on June 15, 2016 (the "June Final Prospectus" and together with the Registration Statement and the June Preliminary Prospectus, the "June SPO Offering Materials").

236.    The June SPO Offering Materials incorporated by reference, among others: (i) ZBH's Annual Report on Form 10-K for the year ended December 31, 2015 (filed on February 29, 2016) (the "2015 10-K"); and (ii) ZBH's Quarterly Report on Form 10-Q for the quarter ended March 31, 2016 (filed with the SEC on May 10, 2016) (the "Q1'16 10-Q").

237.    The June SPO Offering Materials were defective because they contained untrue statements of material facts and/or omitted to state facts necessary to make the statements made therein not misleading and the June SPO Offering Materials were not prepared in accordance with the rules and regulations governing their preparation.

238.    The June Preliminary Prospectus and the June Final Prospectus, both represented that any "forward-looking statements are based upon the current beliefs and expectations of our management" and purported to identify, among others, the following generic and boilerplate "risks and uncertainties:" (i) "the risks and uncertainties related to our ability to successfully integrate the operations, products, employees and distributors of the legacy companies;" (ii) "our ability to remediate matters identified in any inspectional observations or warning letters issued by the FDA;" and (iii) "the success of our quality and operational excellence initiatives."

239.    The 2015 10-K, which was incorporated by reference into the June SPO Materials, contained a number of stale risk factors that purported to caution investors about risks and uncertainties that had not occurred.   Additionally, the Q1'16 10-Q, which was also incorporated by reference into the June SPO Materials, directed investors to the same stale risk warnings contained in the 2015 10-K and added: "***There have been no material changes in our risk factors from those disclosed in our Annual Report*** on Form 10-K for the year ended December 31, 2015."

240.    The June SPO Materials incorporated the following risk factor from the 2015 10-K and the Q1'16 10-Q (which had been incorporated from the 2015 10-K):

**Successful integration of Biomet and anticipated benefits of the Biomet merger are not assured and integration matters could divert attention of management away from operations. Also, the merger could have an adverse effect on our business relationships.**

Although Biomet has become an indirect wholly owned subsidiary of ours, it is initially continuing its operations on a basis that is separate from the legacy Zimmer operations. There can be no assurance that Biomet will be able to maintain and grow its business and operations . . .

Our ability to realize the anticipated benefits of the Biomet merger will depend, to a large extent, on our ability to integrate the legacy businesses. Integrating and coordinating certain aspects of the operations and personnel of Biomet with ours involves complex operational, technological and personnel-related challenges.

This process is time-consuming and expensive, disrupts the businesses of both companies and may not result in the full benefits expected by us, including cost synergies expected to arise from supply chain efficiencies and overlapping general and administrative functions. The ***potential difficulties, and resulting costs and delays***, include:

• managing a larger combined company;
• consolidating corporate and administrative infrastructures;
• ***issues in integrating manufacturing, warehouse and distribution facilities***, research and development and sales forces;
• difficulties attracting and retaining key personnel;
• loss of customers and suppliers and inability to attract new customers and suppliers;
• unanticipated issues in integrating information technology, communications and other systems;
• incompatibility of purchasing, logistics, marketing, administration and other systems and processes; and
• unforeseen and unexpected liabilities related to the merger or Biomet's business.

Additionally, the integration of our and Biomet's operations, products and personnel may place a significant burden on management and other internal resources. The attention of our management may be directed towards integration considerations and may be diverted from our day-to-day business operations, and matters related to the integration may require commitments of time and resources that could otherwise have been devoted to other opportunities that might have been beneficial to us. The diversion of management's attention, and any difficulties encountered in the transition and integration process, could harm our business, financial condition and operating results.

Even if our businesses are successfully integrated, we may not realize the full benefits of the merger, including anticipated synergies, cost savings or growth opportunities, within the expected timeframe or at all. In addition, we expect to incur significant integration and restructuring expenses to realize synergies. However, many of the expenses that will be incurred are, by their nature, difficult to estimate accurately. These expenses could, particularly in the near term, exceed the savings that we expect to achieve from elimination of duplicative expenses and the realization of economies of scale and cost savings. Although we expect that the realization of efficiencies related to the integration of the businesses may offset incremental transaction, merger-related and restructuring costs over time, we cannot give any assurance that this net benefit will be achieved in the near term, or at all.

Any of these matters could adversely affect our businesses or harm our financial condition, results of operations or business prospects.

241.    The above purported risk warning was materially false or misleading because

Defendants Dvorak, Florin and Collins, knowingly and/or recklessly omitted the following material facts, in their possession, that were necessary to make the above statements not misleading:

(a)      Despite warning about "potential difficulties, and resulting costs and delays" relating to "issues in integrating manufacturing … facilities," ZBH did not update its risk disclosure in light of new information from the corporate audit reports (issued on March 31, April 13, and June 7, 2016) that had alerted ZBH corporate management to "systemic issues" with the quality system at the North Campus that had not been remediated and would require substantial time and money (in excess of one year and $300 million) to remediate, which would cause substantial disruptions to the production and supply of several key Legacy Biomet products/brands that were essential cross-selling opportunities. For example, the issues and expected costs were of such magnitude that it necessitated Defendant Dvorak personally approving a remediation budget in July of 2016;

(b)      that, contrary to their prior beliefs, ZBH corporate management had learned that the quality system at the primary Legacy Biomet North Campus manufacturing facility was not in substantial compliance  and ZBH did not update its risk disclosure to include the additional risks arising from ZBH having to substantially harmonize/integrate the grossly deficient North Campus to the same level of the Legacy Zimmer quality systems;

(c)      ZBH did not update its risk disclosure to include the additional risk arising from the fact that that ZBH knew or reasonably expected that the FDA was going to imminently conduct a routine Level 1 or Level 2 inspection of the North Campus by June

30, 2016, and that because of the timing of merger, the Company would not have sufficient time to remediate the newly learned of "systemic" issues with the quality system at the North Campus prior to the FDA conducting an inspection;

(d)     ZBH was manufacturing and distributing key products/brands from the Legacy Biomet North Campus – including "key" products Defendant Dvorak later admitted were "strategically relevant" to ZBH's revenue acceleration – despite knowing of "systemic" issues with the quality system at the North Campus that had not been remediated and knowing that an FDA inspection of the facility was imminent, which would result in grave consequences when the FDA learned that ZBH was continuing to distribute the products;

(e)     the Company had not yet completed the essential integration of Legacy Zimmer and Legacy Biomet's supply chains and demand planning and forecasting functions, which meant that ZBH lacked the inventory visibility, demand forecasting ability, and production planning tools, necessary to capture the underlying cross-selling opportunities;

(f)     the Company was experiencing delays in the integration of the legacy companies' back office systems and supply chain, and as a result, ZBH management was relying on "interim processes" that included manually crafted supply chain reports that lagged the end of the month by approximately two weeks and, even if a belated supply chain report identified an issue, there was nothing that the Company would be able to do to immediately address the issue because it lacked integrated demand planning and inventory capabilities; and

(g)     as a result of the delay in integrating the back office systems and supply

chains, the Company was being negatively impacted by supply shortages, which were

causing the Company to deplete safety stock of Persona knee instruments.

242.   The June SPO Materials incorporated the following stale risk factor from the 2015

10-K and the Q1'16 10-Q (which had been incorporated from the 2015 10-K):

**We are subject to various governmental regulations relating to the manufacturing, labeling and marketing of our products, non-compliance with which could adversely affect our business, financial condition and results of operations.**

***

*Both before and after a product is commercially released, we have ongoing responsibilities under FDA regulations. Compliance with the FDA's requirements, including the Quality System regulation,* recordkeeping regulations, labeling and promotional requirements and adverse event reporting regulations, *is subject to continual review and is monitored rigorously through periodic inspections by the FDA, which may result in observations on Form 483, and in some cases warning letters, that require corrective action, or other forms of enforcement. If the FDA were to conclude that we are not in compliance with applicable laws or regulations,* or that any of our medical devices are ineffective or pose an unreasonable health risk, the FDA could ban such medical devices, detain or seize adulterated or misbranded medical devices, order a recall, repair, replacement, or refund of payment of such devices, refuse to grant pending premarket approval applications, refuse to provide certificates to foreign governments for exports, and/or require us to notify healthcare professionals and others that the devices present unreasonable risks of substantial harm to the public health. The FDA may also impose operating restrictions on a company-wide basis, enjoin and restrain certain violations of applicable law pertaining to medical devices and assess civil or criminal penalties against our officers, employees or us. The FDA may also recommend prosecution to the DOJ. Any adverse regulatory action, depending on its magnitude, may restrict us from effectively marketing and selling our products and could have a material adverse effect on our business, financial condition and results of operations.

In 2012, we received a warning letter from the FDA citing concerns relating to certain processes pertaining to products manufactured at our Ponce, Puerto Rico manufacturing facility. In June 2015, Biomet received a warning letter from the FDA that requested additional information to allow the FDA to evaluate the adequacy of Biomet's responses to certain Form 483 observations issued following an inspection of Biomet's Zhejiang, China manufacturing facility in January 2015. As of December 31, 2015, these warning letters remained pending. Until the violations are corrected, we may become subject to additional regulatory action by the FDA, the FDA may refuse to grant premarket approval applications and/or the FDA may refuse to grant export certificates, any of which could have a

material adverse effect on our business, financial condition and results of operations. Additional information regarding these and other FDA regulatory matters can be found in Note 20 to the consolidated financial statements.

243.    The above purported risk warning was materially false and misleading because Defendants Dvorak, Florin and Collins, knowingly and/or recklessly omitted the following material facts, in their possession, that were necessary to make the above statements not misleading:

(a)      that, in the first half of 2016, corporate audit reports issued on March 31, April 13, and June 7, 2016, had revealed to ZBH corporate management, that contrary to their prior beliefs, that the quality system at the primary Legacy Biomet North Campus manufacturing facility was not in substantial compliance (*see* ¶¶154, 156, 157);

(b)      that, the corporate audits being conducted in the first several months of 2016 alerted ZBH corporate management to "systemic" quality and compliance issues at the North Campus (*see* ¶¶153, 154, 156) – for example, the issues and expected remediation costs were of such a magnitude that it necessitated Defendant Dvorak approving the remediation budget in July of 2016 (*see* ¶¶156, 160);

(c)      that ZBH knew or reasonably expected that the FDA was going to imminently conduct a routine Level 1 or Level 2 inspection of the North Campus by June 30, 2016, or soon thereafter (*see* ¶¶145-148);

(d)      that the corporate audits of the North Campus had alerted ZBH corporate management to "major compliance-related issues in areas such as design controls, sterile packaging, complaint handling, nonconforming material, and CAPAs," which included issues, ZBH had self-identified, related to 7 of 14 (half) of the observations later contained in the November 2016 FDA-483 and 6 of 15 discussion points later raised by

the FDA following the conclusion of the September 2016 FDA Inspection of the North Campus  (*see* ¶156);

(e)      that there were "quality culture issues" with the regulatory compliance at the North Campus and that ZBH high management had encouraged or endorsed the sign off of improperly validated processes at the North Campus (*see* ¶¶158-159);

(f)      that despite learning of "systemic" issues with the North Campus' quality management system and knowing that an FDA inspection was imminent, ZBH was not taking prompt action to address the quality and compliance issues at the North Campus (*see* ¶¶164-169);

(g)      that ZBH corporate management knew remediation work was needed at the North Campus that would require upwards of $300 million and over a year to complete (*see* ¶200);

(h)      that despite knowing of the "systemic" issues with the quality system at the North Campus, ZBH was exposing itself and patients to risks arising from the continued distribution of products, including key products/brands, that were manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(g));

(i)      that ZBH had not corrected the observations from the June 2014 FDA-483 (*see* ¶¶128, 151);

(j)      ZBH was manufacturing and distributing key products/brands from the Legacy Biomet North Campus – including "key" products Defendant Dvorak later admitted were "strategically relevant" to ZBH's revenue acceleration – despite knowing of "systemic" issues with the quality system at the North Campus that had not been

remediated and knowing that an FDA inspection of the facility was imminent, which would result in grave consequences when the FDA learned that ZBH was continuing to distribute the products (*see* ¶¶145-148, 156, 202); and

(k)     that, as a result, ZBH knew by virtue of manufacturing/distributing products at the North Campus while "systemic" issues had not been adequately remediated, when the FDA inspected the North Campus, the FDA would take action or the Company would have to take voluntary preemptive action to limit distribution of products, including key products/brands, that had been manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(j)).

244.   The June SPO Materials incorporated the following stale risk factor from the 2015 10-K and the Q1'16 10-Q (which had been incorporated from the 2015 10-K):

**Interruption of our manufacturing operations could adversely affect our business, financial condition and results of operations.**

We have manufacturing sites all over the world. In some instances, however, the manufacturing of certain of our product lines is concentrated in one or more of our plants. Damage to one or more of our facilities from weather or natural disaster-related events, or *issues in our manufacturing arising from* failure to follow specific internal protocols and procedures, *compliance concerns relating to the Quality System regulation and Good Manufacturing Practice requirements*, equipment breakdown or malfunction or other factors *could adversely affect our ability to manufacture our products. In the event of an interruption in manufacturing, we may be unable to move quickly to alternate means of producing affected products or to meet customer demand. In the event of a significant interruption, for example, as a result of a failure to follow regulatory protocols and procedures, we may experience lengthy delays in resuming production of affected products* due primarily to the need for regulatory approvals. As a result, we may experience loss of market share, which we may be unable to recapture, and harm to our reputation, which could adversely affect our business, financial condition and results of operations.

245.   The above purported risk warning was materially false and misleading because Defendants Dvorak, Florin and Collins, knowingly and/or recklessly omitted the same material

facts set forth above, in their possession, that were necessary to make the above statements not misleading.

246.   The Company's 2015 10-K, under the heading "Government Regulation and Compliance," contained the following statement:

> . . . [W]e have ongoing responsibilities under FDA regulations. The FDA reviews design and manufacturing practices, labeling and record keeping, and manufacturers' required reports of adverse experiences and other information to identify potential problems with marketed medical devices. ***We are also subject to periodic inspection by the FDA for compliance with the FDA's Quality System regulations among other FDA requirements***, such as restrictions on advertising and promotion. ***The Quality System regulations govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging and servicing of all finished medical devices intended for human use.*** If the FDA were to conclude that we are not in compliance with applicable laws or regulations, or that any of our medical devices are ineffective or pose an unreasonable health risk, the FDA could require us to notify healthcare professionals and others that the devices present unreasonable risks of substantial harm to the public health, order a recall, repair, replacement, or refund payment of such devices, detain or seize adulterated or misbranded medical devices, or ban such medical devices.

247.   The Company's Q1'16 10-Q contained the following statement (which was substantially the same as a statement contained in the 2015 10-K) under the heading "Regulatory Matters, Government Investigations and Other Matters:"

> *FDA warning letters*: In September 2012, Zimmer received a warning letter from the U.S. Food and Drug Administration ("FDA") citing concerns relating to certain processes pertaining to products manufactured at our Ponce, Puerto Rico manufacturing facility. In June 2015, Biomet received a warning letter from the FDA that requested additional information to allow the FDA to evaluate the adequacy of Biomet's responses to certain Form 483 observations issued following an inspection of Biomet's Zhejiang, China manufacturing facility in January 2015. We have provided detailed responses to the FDA as to our corrective actions and will continue to work expeditiously to address the issues identified by the FDA during inspections in Ponce and Zhejiang. As of March 31, 2016, these warning letters remained pending. Until the violations are corrected, we may be subject to additional regulatory action by the FDA, including seizure, injunction and/or civil monetary penalties. Additionally, requests for Certificates to Foreign Governments related to products manufactured at the Ponce and Zhejiang facilities may not be granted and premarket approval applications for

Class III devices to which the quality system regulation deviations at these facilities are reasonably related will not be approved until the violations have been corrected. ***In addition to responding to the warning letters described above, we are in the process of addressing various FDA Form 483 inspectional observations at certain of our manufacturing facilities.*** The ultimate outcome of these matters is presently uncertain.

248.    The above statements incorporated by reference into the June SPO Materials was materially false and misleading because Defendants Dvorak, Florin and Collins, knowingly and/or recklessly omitted same material facts set forth above, in their possession, that were necessary to make the above statements not misleading.

249.    The 2015 10-K contained the following statement about the Company's outlook for 2016: "We expect pro forma sales growth will improve in the last half of the year compared to the first half as our sales force stabilizes, we take advantage of cross-selling opportunities and we anniversary out of many sales force dissynergies caused by the merger."

250.    Under the heading "2016 Outlook," the Company's Q1'16 10-Q also contained the following statement that was substantially similar to the above statement from the 2015 10-K: "We expect pro forma sales growth will improve in the second half of the year compared to the first half as our sales force stabilizes, we take advantage of cross-selling opportunities and we anniversary out of the impact of product line divestitures and certain sales force dissynergies caused by the merger."

251.    The above statements, which were incorporated by reference into the June SPO Materials, were materially false and misleading because Defendants Dvorak, Florin, and Collins, knowingly failed to disclose that: (i) the Company had learned of "systemic issues" with the quality system at the North Campus – that required substantial time and money to remediate – that would substantially disrupt production and supply of several key Legacy Biomet products/brands that were essential cross-selling opportunities underlying ZBH's guidance for

accelerating revenue in the second half of 2016; and (ii) the Company had not yet completed the essential integration of Legacy Zimmer and Legacy Biomet's supply chain and demand planning and forecasting functions, which meant that ZBH lacked the inventory visibility, demand forecasting ability, and production planning tools, necessary to capture the underlying cross-selling opportunities that ZBH stated formed the basis for achieving its guidance for accelerating revenue in the second half of 2016.

252.    Among others, Defendants Dvorak, Florin and Collins, knew but failed to disclose:

(a)      that, in the first half of 2016, corporate audit reports issued on March 31, April 13, and June 7, 2016, had revealed to ZBH corporate management, that contrary to their prior beliefs, that the quality system at the primary Legacy Biomet North Campus manufacturing facility was not in substantial compliance (*see* ¶¶154, 156, 157);

(b)      that, the corporate audits being conducted in the first several months of 2016 alerted ZBH corporate management to "systemic" quality and compliance issues at the North Campus (*see* ¶¶153, 154, 156) – for example, the issues and expected remediation costs were of such a magnitude that it necessitated Defendant Dvorak approving the remediation budget in July of 2016 (*see* ¶¶156, 160);

(c)      that ZBH knew or reasonably expected that the FDA was going to imminently conduct a routine Level 1 or Level 2 inspection of the North Campus by June 30, 2016, or soon thereafter (*see* ¶¶145-148);

(d)      that the corporate audits of the North Campus had alerted ZBH corporate management to "major compliance-related issues in areas such as design controls, sterile packaging, complaint handling, nonconforming material, and CAPAs," which included

issues, ZBH had self-identified, related to 7 of 14 (half) of the observations later contained in the November 2016 FDA-483 and 6 of 15 discussion points later raised by the FDA following the conclusion of the September 2016 FDA Inspection of the North Campus  (*see* ¶156);

(e)      that there were "quality culture issues" with the regulatory compliance at the North Campus and that ZBH high management had encouraged or endorsed the sign off of improperly validated processes at the North Campus (*see* ¶¶158-159);

(f)      that despite learning of "systemic" issues with the North Campus' quality management system and knowing that an FDA inspection was imminent, ZBH was not taking prompt action to address the quality and compliance issues at the North Campus (*see* ¶¶164-169);

(g)      that ZBH corporate management knew remediation work was needed at the North Campus that would require upwards of $300 million and over a year to complete (*see* ¶200);

(h)      that despite knowing of the "systemic" issues with the quality system at the North Campus, ZBH was exposing itself and patients to risks arising from the continued distribution of products, including key products/brands, that were manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(g));

(i)      that ZBH had not corrected the observations from the June 2014 FDA-483 (*see* ¶¶128, 151);

(j)      ZBH was manufacturing and distributing key products/brands from the Legacy Biomet North Campus – including "key" products Defendant Dvorak later

admitted were "strategically relevant" to ZBH's revenue acceleration – despite knowing of "systemic" issues with the quality system at the North Campus that had not been remediated and knowing that an FDA inspection of the facility was imminent, which would result in grave consequences when the FDA learned that ZBH was continuing to distribute the products (*see* ¶¶145-148, 156, 202); and

(k)      that, as a result, ZBH knew by virtue of manufacturing/distributing products at the North Campus while "systemic" issues had not been adequately remediated, when the FDA inspected the North Campus, the FDA would take action or the Company would have to take voluntary preemptive action to limit distribution of products, including key products/brands, that had been manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(j)).

253.    Among others, for the reasons stated in ¶¶207-217 and ¶¶219-225, Defendants Dvorak, Florin, and Collins specifically knew but failed to disclose:

(a)      that ZBH admittedly lacked, among others, the following which Defendant Florin identified on separate occasions as "key foundational elements of the supply chain" and "very fundamental building blocks to a robust supply chain:" (i) integrated global inventory data warehouses; (ii) integrated demand planning tools; and (iii) integrated production planning tools;

(b)      that, as a result, ZBH lacked real time visibility into global inventory;

(c)      that the Company's safety stock of Persona knee instruments was being depleted;

(d)      that ZBH management was relying on manually crafted supply chain reports that lagged the end of the month by approximately two weeks and, even if a

belated supply chain report identified an issue, there was nothing that the Company would be able to do to immediately address the issue because it lacked integrated demand planning and inventory capabilities;

(e)      that the Company lacked fundamental and basic tools that any reasonable investor would expect were used to formulate guidance;

(f)      that, at the time ZBH was reaffirming guidance, it did not have any current visibility into whether it had the sufficient inventory and production to meet the guidance it was affirming; and

(g)      that, as a result, ZBH lacked the fundamental supply chain and demand forecasting tools necessary to capture the benefits from cross-selling opportunities that ZBH and the Officer Defendants were touting to the public.

254.    The June SPO Offering Materials also failed to provide material information required by Item 303 of SEC Regulation S-K ("Item 303"), 17 C.F.R. §229.303(a)(3)(ii), which mandates that registration statements disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, the regulation requires that registration statements disclose events that the registrant knows would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii).

255.    The June SPO Offering Materials were materially false and misleading because they omitted the following known adverse trends and/or uncertainties that ZBH was required to

disclose under Item 303:

        (a)    that ZBH knew that an FDA inspection of the North Campus was imminent and that ZBH had learned of "systemic issues" with the quality system at the North Campus, which required substantial remediation that ZBH reasonably expected would result in substantial future costs and negatively impact revenue because:

        (i)    ZBH corporate management knew substantial remediation requiring substantial time and money (which would exceed more than a year and later cost upwards of $300 million), as evidenced by the fact that even the insufficient initial funding approved in July 2016 for remediation efforts was of a sufficient magnitude that it warranted Defendant Dvorak to personally approve the funding;

        (ii)    ZBH corporate management knew that given the magnitude and severity of the issues identified (which ZBH admits it had self-identified nearly half of the issues raised by the FDA), there was a near certainty that the FDA would take action or the Company would have to voluntarily take preemptive action to limit the distribution of products manufactured, cleaned, sterile packed, or sterilized at the North Campus; and/or

        (iii)    the magnitude of the needed remediation activities would substantially impact the Company's  production and supply of "key" and "very important" products/brands made at the North Campus which Defendant Dvorak admitted were some of the Company's "best competitive products" essential to cross-selling and "strategically relevant to the acceleration" of the Company's revenue.

(b)      Continuing to manufacture and distribute products from the North Campus – while fully aware of "systemic" issues with the North Campus quality system and aware that an FDA inspection of the facility was imminent – would ultimately result in a disruption to the production and supply of key products when the FDA learned that ZBH was distributing products despite its knowledge of "systemic" issues with the North Campus' quality system; and

(c)      the Company had not yet completed the essential integration of Legacy Zimmer and Legacy Biomet's supply chain and demand planning and forecasting functions, which meant that ZBH lacked the inventory visibility, demand forecasting ability, and production planning tools, necessary to capture the underlying cross-selling opportunities that ZBH stated was necessary to further accelerate revenue.

### 3.      The July 28, 2016 Statements

256.    On July 28, 2016, ZBH issued a press release entitled, "Zimmer Biomet Reports Second Quarter 2016 Financial Results."  For the Company's second quarter ending June 30, 2016, the Company reported net sales of $1.934 billion and provided updated/increased revenue guidance for 2016.

257.    The July 28, 2016, press release also provided materially false and misleading "updated" guidance, which *increased* ZBH's revenue guidance for 2016: "Organic revenue growth . . . is now expected to be in a range of 2.5% to 3.0%.  Previously, the Company estimated full-year revenue growth to be in a range of 2.0% to 3.0% on a similar basis."

258.    The above statement in the July 28, 2016, press release was knowingly materially false and misleading because ZBH and the Officer Defendants knew: (i) the Company had learned of "systemic issues" with the quality system at the North Campus – that required

substantial time and money to remediate – that would substantially disrupt production and supply of several key Legacy Biomet products/brands that were essential cross-selling opportunities underlying ZBH's guidance for accelerating revenue in the second half of 2016; and (ii) the Company had not yet completed the essential integration of Legacy Zimmer and Legacy Biomet's supply chain and demand planning and forecasting functions, which meant that ZBH lacked the inventory visibility, demand forecasting ability, and production planning tools, necessary to capture the underlying cross-selling opportunities that ZBH stated formed the basis for achieving its guidance for accelerating revenue in the second half of 2016.

259.    Among others, the Officer Defendants and ZBH knew but failed to disclose:

(a)     that, in the first half of 2016, corporate audit reports issued on March 31, April 13, and June 7, 2016, had revealed to ZBH corporate management, that contrary to their prior beliefs, that the quality system at the primary Legacy Biomet North Campus manufacturing facility was not in substantial compliance (*see* ¶¶154, 156, 157);

(b)     that, the corporate audits being conducted in the first several months of 2016 alerted ZBH corporate management to "systemic" quality and compliance issues at the North Campus (*see* ¶¶153, 154, 156) – for example, the issues and expected remediation costs were of such a magnitude that it necessitated Defendant Dvorak approving the remediation budget in July of 2016 (*see* ¶¶156, 160);

(c)     that ZBH knew or reasonably expected that the FDA was going to imminently conduct a routine Level 1 or Level 2 inspection of the North Campus by June 30, 2016, or soon thereafter (*see* ¶¶145-148);

(d)     that the corporate audits of the North Campus had alerted ZBH corporate management to "major compliance-related issues in areas such as design controls, sterile

packaging, complaint handling, nonconforming material, and CAPAs," which included issues, ZBH had self-identified, related to 7 of 14 (half) of the observations later contained in the November 2016 FDA-483 and 6 of 15 discussion points later raised by the FDA following the conclusion of the September 2016 FDA Inspection of the North Campus  (*see* ¶156);

(e)      that there were "quality culture issues" with the regulatory compliance at the North Campus and that ZBH high management had encouraged or endorsed the sign off of improperly validated processes at the North Campus (*see* ¶¶158-159);

(f)      that despite learning of "systemic" issues with the North Campus' quality management system and knowing that an FDA inspection was imminent, ZBH was not taking prompt action to address the quality and compliance issues at the North Campus (*see* ¶¶164-169);

(g)      that ZBH corporate management knew remediation work was needed at the North Campus that would require upwards of $300 million and over a year to complete (*see* ¶200);

(h)      that despite knowing of the "systemic" issues with the quality system at the North Campus, ZBH was exposing itself and patients to risks arising from the continued distribution of products, including key products/brands, that were manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(g));

(i)      that ZBH had not corrected the observations from the June 2014 FDA-483 (*see* ¶¶128, 151);

(j)      ZBH was manufacturing and distributing key products/brands from the

Legacy Biomet North Campus – including "key" products Defendant Dvorak later admitted were "strategically relevant" to ZBH's revenue acceleration – despite knowing of "systemic" issues with the quality system at the North Campus that had not been remediated and knowing that an FDA inspection of the facility was imminent, which would result in grave consequences when the FDA learned that ZBH was continuing to distribute the products (*see* ¶¶145-148, 156, 202); and

(k)     that, as a result, ZBH knew by virtue of manufacturing/distributing products at the North Campus while "systemic" issues had not been adequately remediated, when the FDA inspected the North Campus, the FDA would take action or the Company would have to take voluntary preemptive action to limit distribution of products, including key products/brands, that had been manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(j)).

260.     Among others, for the reasons stated in ¶¶207-217 and ¶¶219-225, the Officer Defendants also specifically knew but failed to disclose:

(a)     that ZBH admittedly lacked, among others, the following which Defendant Florin identified on separate  occasions as "key foundational elements of the supply chain" and "very fundamental building blocks to a robust supply chain:" (i) integrated global inventory data warehouses; (ii) integrated demand planning tools; and (iii) integrated production planning tools

(b)     that, as a result, ZBH lacked real time visibility into global inventory;

(c)     that the Company's safety stock of Persona knee instruments was being depleted;

(d)     that ZBH management was relying on manually crafted supply chain

reports that lagged the end of the month by approximately two weeks and, even if a belated supply chain report identified an issue, there was nothing that the Company would be able to do to immediately address the issue because it lacked integrated demand planning and inventory capabilities;

(e)     that the Company lacked fundamental and basic tools that any reasonable investor would expect were used to formulate guidance;

(f)     that, at the time ZBH was reaffirming guidance, it did not have any current visibility into whether it had the sufficient inventory and production to meet the guidance it was affirming; and

(g)     that, as a result, ZBH lacked the fundamental supply chain and demand forecasting tools necessary to capture the benefits from cross-selling opportunities that ZBH and the Officer Defendants were touting to the public.

261.    On July 28, 2016, the Company held a conference call with investors, analysts, and the public, to discuss the Company's Q2 2016 financial results (the "July 28th Call" announced that day.  Defendants Dvorak, Florin and Marshall participated in the conference call.

262.    On the July 28th Call, Defendant Dvorak made the following statement in which he falsely represented, among others, that the Company had reached an inflection point and had successfully reestablished top-line (*i.e.*, revenue) momentum:

> … I would like to take a moment to reflect on the one-year anniversary of the formation of [ZBH]. …
>
> **We successfully integrated and leveraged the combined expertise and cultures of the two organizations**, while executing on a highly complementary portfolio of technologies, services and solutions. Our financial results have provided the tangible proof points that Zimmer Biomet reflects our initial vision of an ideal fit.
>
> **Our Company has reached an important inflection point, having successfully reestablished top-line momentum by beginning to capture the promise of the**

*attractive cross-selling opportunities inherent in our merger, in addition to successfully delivering on our synergy commitments.*

\*\*\*

Consistent with this progress, *Zimmer Biomet generated solid revenue acceleration in the second quarter, again above the top end of our expectations, further validating our strategies to achieve above-market revenue growth by the close of 2016. Our steady advance towards this goal demonstrates the increasing productivity and focused execution of our commercial organization and for the balance of the year, will continue to exploit the opportunities presented by our differentiated musculoskeletal portfolio.*

263.    The above statement made by Defendant Dvorak on the July 28th Call was materially false and misleading for the same reasons set forth above.  Additionally, Defendant Dvorak's statement was materially false and misleading because Defendant Dvorak knowingly and/or recklessly disregarded:

(a)    that ZBH had not "reached an important inflection point" and did not have the ability to "capture the promise of the attractive cross-selling opportunities" because Defendant Dvorak knew that ZBH was facing substantial remediation work at the North Campus that was limiting production of key brands/products strategically relevant to accelerating revenue and that the Company lacked the demand planning, production planning, and inventory visibility that was causing the Company to deplete its safety stock and was limiting the Company's ability to capture cross-selling opportunities.

(b)    that ZBH had not "successfully integrated and leveraged the combined expertise and cultures of the two organizations," because ZBH admits that the ZBH "corporate management team" was aware at the latest by June 7, 2016, that contrary to their prior beliefs, the Legacy Biomet North Campus' quality management systems and regulatory compliance were not what they had previously believed and required substantial time and expense to remediate the "systemic" issues and bring the North

Campus' quality systems in line with the Legacy Zimmer quality systems. Also, ZBH admitted that the systemic issues with the North Campus also included "quality culture issues." [33]

(c)     Defendant Dvorak knew that the supply chain reports that he received were being manually crafted and that he would not see a supply chain report for the first month of Q3'16 (*i.e.*, July) for up to two weeks after the end of July and had no basis at that time for stating that ZBH would be able to benefit from cross-selling to drive/accelerate revenue growth because ZBH lacked visibility into inventory and because if there was a problem with inventory, ZBH lacked the capability to timely address the issue by the end of Q3'16.

264.    On the July 28th Call, Defendant Dvorak made the following statement: "As anticipated, the cross-selling opportunities of our market-leading knee portfolio continue to drive growth, led by the ongoing sales performance of premium reconstructive systems such as our flagship Persona, the Personalized Knee System and the Vanguard 360 Revision Knee System."

265.    The above statement made by Defendant Dvorak on the July 28th Call, was materially false and misleading because Defendant Dvorak knowingly and/or recklessly failed to disclose the same facts set forth above and omitted that (a) ZBH lacked the ability to benefit from cross-selling opportunities of the Persona product because of its unintegrated supply chain which was causing ZBH to deplete its Persona safety stock; (b) production/supply of the Vanguard product was limited because remediation being undertaken and would be further

---

[33] The falsity of Defendant Dvorak's statement is also evidenced by his post-Class Period statement on April 27, 2017 where he *admitted* that ZBH was "*working through the integration process to harmonize and optimize our quality and manufacturing systems* as part of the integration" and "[t]hose efforts as it relates to the Warsaw North Campus *were greatly accelerated as a consequence of [] internal audit findings*" (*i.e.*, the corporate audit reports issued on March 31, April 13, and June 7, 2016).

limited because of the substantial remediation still needed at the North Campus; and (c) because ZBH had continued to knowingly distribute Vanguard product manufactured, cleaned, sterile packed, and sterilized at the North Campus while knowing of systemic issues with the North Campus quality system, there was a near certainty that when the FDA inspected the North Campus, the FDA would take action or the Company would have to voluntarily take preemptive action to limit the distribution of the Company's safety stock of Vanguard product manufactured, cleaned, sterile packed, and sterilized during that time.

266.    On the July 28th Call, Defendant Florin made the following statement: "We *remain on track to deliver cumulative net EBIT merger synergies of $225 million by the end of 2016* which is ahead of our expectations at the time of the merger closing and consistent with our full year of guidance."

267.    The above statement made by Defendant Florin was materially false and misleading because Defendant Florin knew and/or recklessly omitted that despite being purportedly on track to deliver the synergies, the Company had also approved significant remediation funding (approved by Defendant Dvorak) to address the "systemic" issues with the North Campus and that even more substantial time and funding would be necessary to fully address the issues (which would later cost upwards of $300 million).   Touting being on track to achieve the stated synergies was materially misleading without also disclosing the unexpected expenses the Company was facing to remediate the North Campus and that would likely offset a substantial or majority of the synergies that Defendant Florin was touting.

268.    On the July 28th Call, Defendant Florin made the following statement:

I will provide updated revenue and adjusted earnings per share guidance for the full year as well as our expectations for the second half of the year. *Our guidance reflects continued accelerating sales momentum, consistent with our prior expectations* . . . .

. . . [O]*rganic revenue growth, on a constant currency adjusted pro forma basis, is now expected to be in a range of 2.5% to 3.0%. Previously, the Company estimated full-year revenue growth to be in a range of 2.0% to 3.0% on a similar basis.*

269.    During the July 28th Call, Defendant Florin also stated: "As we look to the second half of the year, revenue growth is expected to be in a range of 4.0% to 5.0% for both the third and fourth quarter . . . ."

270.    The above statements were knowingly materially false or misleading for the same reasons set forth above.

271.    On the July 28th Call Defendant Florin also stated: "… [I]mportantly, as we said in our prepared remarks, *with the Biomet integration, solidly on track and accelerating revenue growth that it really does put us in a position to make important strategic investments* . . . ."

272.    The above statement made by Defendant Florin on the July 28th Call was materially false or misleading because Defendant Florin knew and/or recklessly disregarded that the integration of Legacy Biomet was not "solidly" on track and revenue growth was not accelerating for the same reasons set forth above.  Additionally, the integration was not "solidly" on track because the Company had encountered delays integrating crucial aspects of the Company's supply chain and demand forecasting functions, which had left the Company to make due with "interim processes" that were not "robust,".  Additionally, the integration of Legacy Biomet was not "solidly on track" because ZBH corporate management had learned of substantial regulatory gaps at the North Campus (which necessitated Defendant Dvorak approving special remediation funding in July 2016), requiring substantial work and expenses to bring the North Campus quality system and procedures in line with the Legacy Zimmer West Campus quality system and procedures.

### 4.    The August 8, 2016 Quarterly Report on Form 10-Q

273.    On August 8, 2016, ZBH filed its Quarterly Report on Form 10-Q for the 2016 second quarter (the "Q2'16 10-Q") with the SEC.   The Company's Q2'16 10-Q, which reaffirmed the Company's financial results previously announced on July 28, 2016, and was signed by Defendants Florin and Collins.

274.    The Company's Q2'16 10-Q contained Sarbanes-Oxley certifications from Defendants Florin and Dvorak who certified, among others, that, "[b]ased on [their] knowledge, th[e] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

275.    Under the heading "Regulatory Matters, Government Investigations and Other Matters," the Q2'16 10-Q contained the following statement:

> *FDA warning letters*: In September 2012, Zimmer received a warning letter from the U.S. Food and Drug Administration ("FDA") citing concerns relating to certain processes pertaining to products manufactured at our Ponce, Puerto Rico manufacturing facility. In June 2015, Biomet received a warning letter from the FDA that requested additional information to allow the FDA to evaluate the adequacy of Biomet's responses to certain Form 483 observations issued following an inspection of Biomet's Zhejiang, China manufacturing facility in January 2015. In May 2016, Zimmer received a warning letter from the FDA related to observed non-conformities with current good manufacturing practice requirements of the Quality System regulation at our facility in Montreal, Quebec, Canada. We have provided detailed responses to the FDA as to our corrective actions and will continue to work expeditiously to address the issues identified by the FDA during inspections in Ponce, Zhejiang and Montreal. As of June 30, 2016, these warning letters remained pending. Until the violations are corrected, we may be subject to additional regulatory action by the FDA, including seizure, injunction and/or civil monetary penalties. Additionally, requests for Certificates to Foreign Governments related to products manufactured at the Ponce facility may not be granted and premarket approval applications for Class III devices to which the quality system regulation deviations at these facilities are reasonably related will not be approved until the violations have been corrected. ***In addition to responding to the warning letters described above, we are in the process of addressing various FDA Form 483 inspectional observations at certain of our***

***manufacturing facilities.*** The ultimate outcome of these matters is presently uncertain.

276.   The above statement in the Q2'16 10-Q was materially false and/or misleading because Defendants Florin and Collins knowingly and/or recklessly omitted that the Company had learned of "systemic issues" with the quality system at the North Campus – that required substantial time and money to remediate – that would substantially disrupt production and supply of several key Legacy Biomet products/brands that were essential cross-selling opportunities. Specifically, Defendants Florin and Collins knowingly and/or recklessly failed to disclose the following material facts, in their possession, that were necessary to make the above statement not misleading:

(a)     that, in the first half of 2016, corporate audit reports issued on March 31, April 13, and June 7, 2016, had revealed to ZBH corporate management, that contrary to their prior beliefs, that the quality system at the primary Legacy Biomet North Campus manufacturing facility was not in substantial compliance (*see* ¶¶154, 156, 157);

(b)     that, the corporate audits being conducted in the first several months of 2016 alerted ZBH corporate management to "systemic" quality and compliance issues at the North Campus (*see* ¶¶153, 154, 156) – for example, the issues and expected remediation costs were of such a magnitude that it necessitated Defendant Dvorak approving the remediation budget in July of 2016 (*see* ¶¶156, 160);

(c)     that ZBH knew or reasonably expected that the FDA was going to imminently conduct a routine Level 1 or Level 2 inspection of the North Campus by June 30, 2016, or soon thereafter (*see* ¶¶145-148);

(d)     that the corporate audits of the North Campus had alerted ZBH corporate management to "major compliance-related issues in areas such as design controls, sterile

packaging, complaint handling, nonconforming material, and CAPAs," which included issues, ZBH had self-identified, related to 7 of 14 (half) of the observations later contained in the November 2016 FDA-483 and 6 of 15 discussion points later raised by the FDA following the conclusion of the September 2016 FDA Inspection of the North Campus  (*see* ¶156);

(e)     that there were "quality culture issues" with the regulatory compliance at the North Campus and that ZBH high management had encouraged or endorsed the sign off of improperly validated processes at the North Campus (*see* ¶¶158-159);

(f)     that despite learning of "systemic" issues with the North Campus' quality management system and knowing that an FDA inspection was imminent, ZBH was not taking prompt action to address the quality and compliance issues at the North Campus (*see* ¶¶164-169);

(g)     that ZBH corporate management knew remediation work was needed at the North Campus that would require upwards of $300 million and over a year to complete (*see* ¶200);

(h)     that despite knowing of the "systemic" issues with the quality system at the North Campus, ZBH was exposing itself and patients to risks arising from the continued distribution of products, including key products/brands, that were manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(g));

(i)     that ZBH had not corrected the observations from the June 2014 FDA-483 (*see* ¶¶128, 151);

(j)     ZBH was manufacturing and distributing key products/brands from the

Legacy Biomet North Campus – including "key" products Defendant Dvorak later admitted were "strategically relevant" to ZBH's revenue acceleration – despite knowing of "systemic" issues with the quality system at the North Campus that had not been remediated and knowing that an FDA inspection of the facility was imminent, which would result in grave consequences when the FDA learned that ZBH was continuing to distribute the products (*see* ¶145-148, 156, 202); and

(k)      that, as a result, ZBH knew by virtue of manufacturing/distributing products at the North Campus while "systemic" issues had not been adequately remediated, when the FDA inspected the North Campus, the FDA would take action or the Company would have to take voluntary preemptive action to limit distribution of products, including key products/brands, that had been manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(j)).

277.     The Q2'16 10-Q also directed readers to risk warnings in the 2015 10-K and contained the following statement: "Except as set forth below, *there have been no material changes in our risk factors from those disclosed in our Annual Report on Form 10-K for the year ended December 31, 2015*."   Q2'16 10-Q added one risk warning that was a warning purporting to caution investors that "[w]e may not be able to effectively integrate newly acquired businesses into our operations or achieve expected cost savings or profitability."   Three other changes/updates to the risk warnings pertained to unrelated matters such as the United Kingdom's referendum on whether to leave the European Union, future sales by stockholders (i.e., KKR and TPG) into the public market, and a prior governmental investigation of Biomet by the SEC and DOJ.

278.     The above statement, along with the incorporated risk warning statements from

the 2015 10-K quoted above in, were materially false and misleading for the same reasons set

forth above (setting forth why the risk warning statements in the 2015 10-K were false and/or

misleading) and because Defendants Florin and Collins knowingly and/or recklessly omitted the

following material facts, in their possession, that were necessary to make the above statements

not misleading:

279.    The Q2'16 10-Q also contained the following statement:

*Results for the Three and Six Month Periods ended June 30, 2016*

Our results have been significantly impacted by the Biomet merger. In 2016, ***we
have continued to make progress in our*** commercial and ***operational integration
across all geographies and functions***. As we expected, our sales growth rates
were below market growth rates in the first half of 2016, ***but we saw sequential
improvement from the second half of 2015 and expect to end 2016 at or above
market growth rates***.

280.    The above statement was materially false and misleading because Defendants

Florin and Collins knew but did not disclose, among others, the following: (i) the Company had

learned of "systemic issues" with the quality system at the North Campus – that required

substantial time and money to remediate – that would substantially disrupt production and supply

of several key Legacy Biomet products/brands that were essential cross-selling opportunities

underlying ZBH's guidance for accelerating revenue in the second half of 2016; and (ii) the

Company had not yet completed the essential integration of Legacy Zimmer and Legacy

Biomet's supply chain and demand planning and forecasting functions, which meant that ZBH

lacked the inventory visibility, demand forecasting ability, and production planning tools,

necessary to capture the underlying cross-selling opportunities that ZBH stated formed the basis

for achieving its guidance for accelerating revenue in the second half of 2016.

281.    Among others, Defendants Florin and Collins knew but failed to disclose:

(a)     that, in the first half of 2016, corporate audit reports issued on March 31,

April 13, and June 7, 2016, had revealed to ZBH corporate management, that contrary to their prior beliefs, that the quality system at the primary Legacy Biomet North Campus manufacturing facility was not in substantial compliance (*see* ¶¶154, 156, 157);

(b)  that, the corporate audits being conducted in the first several months of 2016 alerted ZBH corporate management to "systemic" quality and compliance issues at the North Campus (*see* ¶¶153, 154, 156) – for example, the issues and expected remediation costs were of such a magnitude that it necessitated Defendant Dvorak approving the remediation budget in July of 2016 (*see* ¶¶156, 160);

(c)  that ZBH knew or reasonably expected that the FDA was going to imminently conduct a routine Level 1 or Level 2 inspection of the North Campus by June 30, 2016, or soon thereafter (*see* ¶¶145-148);

(d)  that the corporate audits of the North Campus had alerted ZBH corporate management to "major compliance-related issues in areas such as design controls, sterile packaging, complaint handling, nonconforming material, and CAPAs," which included issues, ZBH had self-identified, related to 7 of 14 (half) of the observations later contained in the November 2016 FDA-483 and 6 of 15 discussion points later raised by the FDA following the conclusion of the September 2016 FDA Inspection of the North Campus  (*see* ¶156);

(e)  that there were "quality culture issues" with the regulatory compliance at the North Campus and that ZBH high management had encouraged or endorsed the sign off of improperly validated processes at the North Campus (*see* ¶¶158-159);

(f)  that despite learning of "systemic" issues with the North Campus' quality management system and knowing that an FDA inspection was imminent, ZBH was not

taking prompt action to address the quality and compliance issues at the North Campus (*see* ¶¶164-169);

(g)     that ZBH corporate management knew remediation work was needed at the North Campus that would require upwards of $300 million and over a year to complete (*see* ¶200);

(h)     that despite knowing of the "systemic" issues with the quality system at the North Campus, ZBH was exposing itself and patients to risks arising from the continued distribution of products, including key products/brands, that were manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(g));

(i)     that ZBH had not corrected the observations from the June 2014 FDA-483 (*see* ¶¶128, 151);

(j)     ZBH was manufacturing and distributing key products/brands from the Legacy Biomet North Campus – including "key" products Defendant Dvorak later admitted were "strategically relevant" to ZBH's revenue acceleration – despite knowing of "systemic" issues with the quality system at the North Campus that had not been remediated and knowing that an FDA inspection of the facility was imminent, which would result in grave consequences when the FDA learned that ZBH was continuing to distribute the products (*see* ¶145-148, 156, 202); and

(k)     that, as a result, ZBH knew by virtue of manufacturing/distributing products at the North Campus while "systemic" issues had not been adequately remediated, when the FDA inspected the North Campus, the FDA would take action or the Company would have to take voluntary preemptive action to limit distribution of

products, including key products/brands, that had been manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(j)).

282.    Among others, for the reasons stated in ¶¶207-217 and ¶¶219-225, Defendants Florin and Collins also specifically knew but failed to disclose:

(a)    that ZBH admittedly lacked, among others, the following which Defendant Florin identified on separate  occasions as "key foundational elements of the supply chain" and "very fundamental building blocks to a robust supply chain:" (i) integrated global inventory data warehouses; (ii) integrated demand planning tools; and (iii) integrated production planning tools

(b)    that, as a result, ZBH lacked real time visibility into global inventory;

(c)    that the Company's safety stock of Persona knee instruments was being depleted;

(d)    that ZBH management was relying on manually crafted supply chain reports that lagged the end of the month by approximately two weeks and, even if a belated supply chain report identified an issue, there was nothing that the Company would be able to do to immediately address the issue because it lacked integrated demand planning and inventory capabilities;

(e)    that the Company lacked fundamental and basic tools that any reasonable investor would expect were used to formulate guidance;

(f)    that, at the time ZBH was reaffirming guidance, it did not have any current visibility into whether it had the sufficient inventory and production to meet the guidance it was affirming; and

(g)    that, as a result, ZBH lacked the fundamental supply chain and demand

forecasting tools necessary to capture the benefits from cross-selling opportunities that ZBH and the Officer Defendants were touting to the public.

283.   The Company's Q2'16 10-Q contained Sarbanes-Oxley certifications from Defendants Florin and Dvorak who certified, among others, that, "[b]ased on [their] knowledge, th[e] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

284.   The above Sarbanes-Oxley certifications executed by Defendants Dvorak and Florin were materially false or misleading because, for the same reasons alleged above, they knew or recklessly disregarded that the Q2'16 10-Q contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements made in the Q2'16 10-Q, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Q2'16 10-Q.

### 5.    The August 2016 SPO Materials

285.   On August 9, 2016, ZBH and certain ZBH investors, consisting of affiliates of KKR and TPG, offered for sale in an underwritten public offering 7,440,675 shares of ZBH common stock.   Those selling shareholders received all of the proceeds of the offering. Ultimately, the selling shareholders sold the 7,440,675 shares of ZBH common stock at a price of $129.75 per share, for net proceeds of approximately $960 million.

286.   On February 4, 2016, ZBH filed a registration statement on Form S-3 (the "Registration Statement") with the SEC in connection with the August 2016 SPO.   The Registration Statement was signed by Defendants Dvorak, Florin and Collins.

287.   ZBH supplemented the Registration Statement with a Preliminary Prospectus

Supplement filed with the SEC on August 9, 2016 (the "August Preliminary Prospectus") and a Final Prospectus Supplement filed with the SEC on August 11, 2016 (the "August Final Prospectus" and together with the Registration Statement and the August Preliminary Prospectus, the "August SPO Offering Materials").

288.   The August SPO Offering Materials incorporated by reference, among others: (i) ZBH's Annual Report on Form 10-K for the year ended December 31, 2015 (filed on February 29, 2016); (ii) ZBH's Quarterly Report on Form 10-Q for the quarter ended March 31, 2016 (filed with the SEC on May 10, 2016); and (iii) ZBH's Quarterly Report on Form 10-Q for the quarter ended June 30, 2016 (filed with the SEC on August 8, 2016).

289.   The August SPO Offering Materials were defective because they contained untrue statements of material facts and/or omitted to state facts necessary to make the statements made therein not misleading and the August SPO Offering Materials were not prepared in accordance with the rules and regulations governing their preparation.

290.   The August SPO Offering Materials repeated and incorporated the statements from the June SPO Offering Materials (which were incorporated by reference from the Company's 2015 10-K and Q1'16 10-Q) contained above in ¶236, 238, 239, 240, 242, 244, 246, 247, 249, 250.

291.   The August SPO Offering Materials, which repeated and incorporated the statements from the June SPO Offering Materials, were materially false or misleading and/or omitted material facts required to be stated therein, for the same reasons set forth in ¶¶237, 241, 243, 245, 248, 251, 252, 253, 254, 255.

292.   the August SPO Offering Materials incorporated the same statements from the Q2'16 10-Q contained in ¶¶274, 275, 277, 279, 283.

293.    The August SPO Offering Materials, which incorporated the same statements from the Q2'16 10-Q, were materially false or misleading and/or omitted material facts required to be stated therein, for the same reasons set forth in ¶¶276, 278, 280-282, 284.

294.    The August SPO Offering Materials were also materially misleading because they omitted material information required to be disclosed under Reg. S-K Item 303.  As alleged above in ¶¶253-254 with respect to the June SPO Offering Materials; the August SPO Offering Materials failed to disclose the following known adverse trends and/or uncertainties:

(a)    that ZBH knew that an FDA inspection of the North Campus was imminent and that ZBH had learned of "systemic issues" with the quality system at the North Campus, which required substantial remediation that ZBH reasonably expected would result in substantial future costs and negatively impact revenue because:

(i)    ZBH corporate management knew substantial remediation requiring substantial time and money (which would exceed more than a year and later cost upwards of $300 million), as evidenced by the fact that even the insufficient initial funding approved in July 2016 for remediation efforts was of a sufficient magnitude that it warranted Defendant Dvorak to personally approve the funding;

(ii)    ZBH corporate management knew that given the magnitude and severity of the issues identified (which ZBH admits it had self-identified nearly half of the issues raised by the FDA), there was a near certainty that the FDA would take action or the Company would have to voluntarily take preemptive action to limit the distribution of products manufactured, cleaned, sterile packed, or sterilized at the North Campus; and/or

(iii)    the magnitude of the needed remediation activities would substantially impact the Company's  production and supply of "key" and "very important" products/brands made at the North Campus which Defendant Dvorak admitted were some of the Company's "best competitive products" essential to cross-selling and "strategically relevant to the acceleration" of the Company's revenue.

(b)    Continuing to manufacture and distribute products from the North Campus – while fully aware of "systemic" issues with the North Campus quality system and aware that an FDA inspection of the facility was imminent – would ultimately result in a disruption to the production and supply of key products when the FDA learned that ZBH was distributing products despite its knowledge of "systemic" issues with the North Campus' quality system.

(c)    the Company had not yet completed the essential integration of Legacy Zimmer and Legacy Biomet's supply chain and demand planning and forecasting functions, which meant that ZBH lacked the inventory visibility, demand forecasting ability, and production planning tools, necessary to capture the underlying cross-selling opportunities that ZBH stated was necessary to further accelerate revenue; and

(d)    the Company was burning through safety stock of Persona products, lacked supply necessary to keep up with demand from cross-selling, and was experiencing supply shortages that would negatively impact the Company's revenue growth for the rest of the year because the Company lacked the ability to timely address inventory shortages due to its unintegrated inventory, demand, and production planning processes.

6.      **The September 7, 2016 Wells Fargo Securities Healthcare Conference**

295.    On September 7, 2016, ZBH participated in the Wells Fargo Securities Healthcare

Conference.  Defendant Marshall was present to represent ZBH.

296.    During the September 7, 2016 Wells Fargo conference, an analyst from Wells

Fargo asked: "***And given that you plan to exit 2016 growing at 3.5% to 4.5%, it would seem***

***reasonable to expect you to grow at least 4% in 2017 on an organic basis. Is there anything***

***that you'd point to that would make that a challenge***? The push back I get on 2017 is that the

comps get tougher."

297.    In response to the above question, Defendant Marshall made the following

statement:

> Well, I mean, it would have -- and ***it's true, we have put out a longer-range goal
> for sustainable long-term growth. And we do believe that that is in that 4%-plus
> for just kind of the same reasons we were just talking about. And yes, the back
> half is a range of 2.5% to 4.5% on an organic basis. So it's reasonable to think
> that we can build on that momentum.***
>
> But as we think in terms of we're not here to give guidance on 2017, going to a
> strategic planning process at this point in time, so obviously during that planning
> process you evaluate the markets in which you're playing. ***So I do think that it
> does seem reasonable to think in terms of building on the momentum that we
> exit the year. So I think that that's -- particularly as you get more productivity
> out of your sales channels and you get all of your different categories and
> geographies growing at market***, that even though the comps may be different
> next year, you don't have a full year of any sort of building back towards market.

298.    The above statement made by Defendant Marshall at the September 7, 2016,

Wells Fargo conference was materially false and misleading because Defendant Marshall knew

and/or recklessly omitted the following known facts that were likely to make it a challenge for

ZBH to exit 2016 at a 3.5% to 4.5% organic growth rate: (i) the Company had learned of

"systemic issues" with the quality system at the North Campus – that required substantial time

and money to remediate – that would substantially disrupt production and supply of several key

Legacy Biomet products/brands that were essential cross-selling opportunities underlying ZBH's guidance for accelerating revenue in the second half of 2016; and (ii) the Company had not yet completed the essential integration of Legacy Zimmer and Legacy Biomet's supply chain and demand planning and forecasting functions, which meant that ZBH lacked the inventory visibility, demand forecasting ability, and production planning tools, necessary to capture the underlying cross-selling opportunities that ZBH stated formed the basis for achieving its guidance for accelerating revenue in the second half of 2016.

299.    Among others, Defendant Marshall knew but failed to disclose:

(a)    that, in the first half of 2016, corporate audit reports issued on March 31, April 13, and June 7, 2016, had revealed to ZBH corporate management, that contrary to their prior beliefs, that the quality system at the primary Legacy Biomet North Campus manufacturing facility was not in substantial compliance (*see* ¶¶154, 156, 157);

(b)    that, the corporate audits being conducted in the first several months of 2016 alerted ZBH corporate management to "systemic" quality and compliance issues at the North Campus (*see* ¶¶153, 154, 156) – for example, the issues and expected remediation costs were of such a magnitude that it necessitated Defendant Dvorak approving the remediation budget in July of 2016 (*see* ¶¶156, 160);

(c)    that ZBH knew or reasonably expected that the FDA was going to imminently conduct a routine Level 1 or Level 2 inspection of the North Campus by June 30, 2016, or soon thereafter (*see* ¶¶145-148);

(d)    that the corporate audits of the North Campus had alerted ZBH corporate management to "major compliance-related issues in areas such as design controls, sterile packaging, complaint handling, nonconforming material, and CAPAs," which included

issues, ZBH had self-identified, related to 7 of 14 (half) of the observations later contained in the November 2016 FDA-483 and 6 of 15 discussion points later raised by the FDA following the conclusion of the September 2016 FDA Inspection of the North Campus  (*see* ¶156);

(e)      that there were "quality culture issues" with the regulatory compliance at the North Campus and that ZBH high management had encouraged or endorsed the sign off of improperly validated processes at the North Campus (*see* ¶¶158-159);

(f)      that despite learning of "systemic" issues with the North Campus' quality management system and knowing that an FDA inspection was imminent, ZBH was not taking prompt action to address the quality and compliance issues at the North Campus (*see* ¶¶164-169);

(g)      that ZBH corporate management knew remediation work was needed at the North Campus that would require upwards of $300 million and over a year to complete (*see* ¶200);

(h)      that despite knowing of the "systemic" issues with the quality system at the North Campus, ZBH was exposing itself and patients to risks arising from the continued distribution of products, including key products/brands, that were manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(g));

(i)      that ZBH had not corrected the observations from the June 2014 FDA-483 (*see* ¶¶128, 151);

(j)      ZBH was manufacturing and distributing key products/brands from the Legacy Biomet North Campus – including "key" products Defendant Dvorak later

admitted were "strategically relevant" to ZBH's revenue acceleration – despite knowing of "systemic" issues with the quality system at the North Campus that had not been remediated and knowing that an FDA inspection of the facility was imminent, which would result in grave consequences when the FDA learned that ZBH was continuing to distribute the products (*see* ¶145-148, 156, 202); and

(k)      that, as a result, ZBH knew by virtue of manufacturing/distributing products at the North Campus while "systemic" issues had not been adequately remediated, when the FDA inspected the North Campus, the FDA would take action or the Company would have to take voluntary preemptive action to limit distribution of products, including key products/brands, that had been manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(j)).

300.      Among others, Defendant Marshall also specifically knew but failed to disclose:

(a)      that ZBH admittedly lacked, among others, the following which Defendant Florin identified on separate occasions as "key foundational elements of the supply chain" and "very fundamental building blocks to a robust supply chain:" (i) integrated global inventory data warehouses; (ii) integrated demand planning tools; and (iii) integrated production planning tools

(b)      that, as a result, ZBH lacked real time visibility into global inventory;

(c)      that the Company's safety stock of Persona knee instruments was being depleted;

(d)      that ZBH management was relying on manually crafted supply chain reports that lagged the end of the month by approximately two weeks and, even if a belated supply chain report identified an issue, there was nothing that the Company

would be able to do to immediately address the issue because it lacked integrated demand planning and inventory capabilities;

(e)      that the Company lacked fundamental and basic tools that any reasonable investor would expect were used to formulate guidance;

(f)      that, at the time ZBH was reaffirming guidance, it did not have any current visibility into whether it had the sufficient inventory and production to meet the guidance it was affirming; and

(g)      that, as a result, ZBH lacked the fundamental supply chain and demand forecasting tools necessary to capture the benefits from cross-selling opportunities that ZBH and the Officer Defendants were touting to the public.

301.   During the September 7, 2016 Wells Fargo conference, Defendant Marshall made the following statement:

> *. . . And the planning that has gone into the synergy capture opportunities that were inherent in this deal have been -- we've been able to capitalize on them by virtue of aggressive planning and execution. We have a dedicated full-time PMO, a project management office, that's being run by our ex-Controller who has a done a fantastic job of driving out costs as part of the operational excellence programs that we had in the pre-merger days.*
>
> *So the types of things that we've done in strategic sourcing -- these are two companies with very similar vendor bases; we're able to leverage scale and drive down our costs.* Shared service concepts, not just outside the US, but even within the US in terms of integrating small bolt-on acquisitions, it is easy sometimes to let some of those operations continue directly to move on, *but we do have centers of excellence around accounting, accounts payable, accounts receivable. Of course, optimizing the manufacturing network, we will start to be able to see some of those benefits pull into the synergy targets.*

302.   The above statement made by Defendant Marshall at the September 7, 2016, Wells Fargo conference was materially false and misleading because Defendant Marshall knew and/or recklessly failed to disclose the facts set forth above.

**7.    The September 12, 2016 Morgan Stanley Global Healthcare Conference**

303.    On September 12, 2016, ZBH participated in the Morgan Stanley Global Healthcare Conference.  Defendants Dvorak and Florin participated on behalf of ZBH.

304.    At the start of the session involving ZBH, an analyst from Morgan Stanley started off by stating:

> We had a really interesting morning presentation. We talked about how Medtech has been the outperforming sector of healthcare for the first time in several years, and Zimmer is one of the companies leading the charge in doing that. So it's my pleasure to have with us here morning both the CEO and CFO of Zimmer Biomet, David Dvorak and Dan Florin. ***David has said we can dispense with preamble commentary.*** We're going to jump right into Q&A.

305.    As noted above, during the September 12, 2016 Wells Fargo conference, Defendant Dvorak instructed the Morgan Stanley analyst to "dispense with the preamble" and during their presentation at the conference, Defendants Dvorak and Florin neither identified their subsequent statements as forward looking nor provide any meaningful cautionary language.

306.    At the outset of the September 12, 2016 Morgan Stanley conference, the analyst from Morgan Stanley asked Defendant Dvorak the following question: "I want to give you a chance to review. We sat here a year ago. It was a fundamentally different time for Zimmer Biomet. A deal had just closed, there was a dramatic amount of concern around growth rates. Growth rates have begun to recover. It's a fundamental different investor perception now versus a year ago. How do you think the deal has gone?"

307.    In response to the above question, Defendant Dvorak made the following statement:

> Yes, I think that the deal has validated the major premises that led us to the transaction in the first instance and our execution. And that was why, when we were sitting here last year, David, we were highly confident in our ability to deliver an improved top-line growth trajectory. ***We've reestablished that***

*momentum.* And part of the basis for that belief and the confidence was that these businesses independently had each generated mid-4% top-level growth prior to the combination.

There was a long pendency period because of the antitrust regulatory review; that went on for 14 months. And so we were just coming off of that, had closed the deal maybe a month or two prior to getting together with you last year, and ***since then we've executed our synergy plans. We've been very successful; actually increased from the initial predictions what we would generate by way of operating synergies. And we've been at or above expectations this year on top-line resurgence. The team is executing very well.*** But as I said, I think fundamentally the major premises for the deal are validated with the performance that we've delivered so far this year.

308.    The above statement made by Defendant Dvorak at the September 12, 2016, Morgan Stanley conference was materially false and misleading because Defendant Dvorak knew and/or recklessly disregarded: (i) that the FDA was starting an inspection that day at the North Campus and that the Company had learned of "systemic issues" with the quality system at the North Campus – that required substantial time and money to remediate – that would substantially disrupt production and supply of several key Legacy Biomet products/brands that were essential cross-selling opportunities underlying ZBH's ability to accelerate revenue in the second half of 2016; and (ii) the Company had not yet completed the essential integration of Legacy Zimmer and Legacy Biomet's supply chain and demand planning and forecasting functions, which meant that ZBH lacked the inventory visibility, demand forecasting ability, and production planning tools, necessary to capture the underlying cross-selling opportunities that ZBH stated formed the basis for achieving its guidance for accelerating revenue in the second half of 2016.

309.    Among others, Defendant Dvorak knew but failed to disclose:

(a)    that, in the first half of 2016, corporate audit reports issued on March 31, April 13, and June 7, 2016, had revealed to ZBH corporate management, that contrary to

their prior beliefs, that the quality system at the primary Legacy Biomet North Campus manufacturing facility was not in substantial compliance (*see* ¶¶154, 156, 157);

(b)     that, the corporate audits being conducted in the first several months of 2016 alerted ZBH corporate management to "systemic" quality and compliance issues at the North Campus (*see* ¶¶153, 154, 156) – for example, the issues and expected remediation costs were of such a magnitude that it necessitated Defendant Dvorak approving the remediation budget in July of 2016 (*see* ¶¶156, 160);

(c)     that ZBH knew or reasonably expected that the FDA was going to imminently conduct a routine Level 1 or Level 2 inspection of the North Campus by June 30, 2016, or soon thereafter (*see* ¶¶145-148);

(d)     that the corporate audits of the North Campus had alerted ZBH corporate management to "major compliance-related issues in areas such as design controls, sterile packaging, complaint handling, nonconforming material, and CAPAs," which included issues, ZBH had self-identified, related to 7 of 14 (half) of the observations later contained in the November 2016 FDA-483 and 6 of 15 discussion points later raised by the FDA following the conclusion of the September 2016 FDA Inspection of the North Campus  (*see* ¶156);

(e)     that there were "quality culture issues" with the regulatory compliance at the North Campus and that ZBH high management had encouraged or endorsed the sign off of improperly validated processes at the North Campus (*see* ¶¶158-159);

(f)     that despite learning of "systemic" issues with the North Campus' quality management system and knowing that an FDA inspection was imminent, ZBH was not taking prompt action to address the quality and compliance issues at the North Campus

(*see* ¶¶164-169);

(g)     that ZBH corporate management knew remediation work was needed at the North Campus that would require upwards of $300 million and over a year to complete (*see* ¶200);

(h)     that despite knowing of the "systemic" issues with the quality system at the North Campus, ZBH was exposing itself and patients to risks arising from the continued distribution of products, including key products/brands, that were manufactured, cleaned, sterile packed, or sterilized at the North Campus (*see* ¶231(a)-(g));

(i)     that ZBH had not corrected the observations from the June 2014 FDA-483 (*see* ¶¶128, 151);

(j)     ZBH was manufacturing and distributing key products/brands from the Legacy Biomet North Campus – including "key" products Defendant Dvorak later admitted were "strategically relevant" to ZBH's revenue acceleration – despite knowing of "systemic" issues with the quality system at the North Campus that had not been remediated and knowing that an FDA inspection of the facility was imminent, which would result in grave consequences when the FDA learned that ZBH was continuing to distribute the products (*see* ¶145-148, 156, 202); and

(k)     that, as a result, ZBH knew by virtue of manufacturing/distributing products at the North Campus while "systemic" issues had not been adequately remediated, when the FDA inspected the North Campus, the FDA would take action or the Company would have to take voluntary preemptive action to limit distribution of products, including key products/brands, that had been manufactured, cleaned, sterile

packed, or sterilized at the North Campus (*see* ¶231(a)-(j)).

310.     Among others, Defendant Marshall also specifically knew but failed to disclose:

(a)     that ZBH admittedly lacked, among others, the following which Defendant Florin identified on separate  occasions as "key foundational elements of the supply chain" and "very fundamental building blocks to a robust supply chain:" (i) integrated global inventory data warehouses; (ii) integrated demand planning tools; and (iii) integrated production planning tools;

(b)     that, as a result, ZBH lacked real time visibility into global inventory;

(c)     that the Company's safety stock of Persona knee instruments was being depleted and that the Officer Defendants had been alerted to this fact as a result of the supply chain report for August that they received in mid-September 2016;

(d)     that ZBH management was relying on manually crafted supply chain reports that lagged the end of the month by approximately two weeks and, even if a belated supply chain report identified an issue, there was nothing that the Company would be able to do to immediately address the issue because it lacked integrated demand planning and inventory capabilities;

(e)     that the Company lacked fundamental and basic tools that any reasonable investor would expect were used to formulate guidance;

(f)     that, at the time ZBH was reaffirming guidance, it did not have any current visibility into whether it had the sufficient inventory and production to meet the guidance it was affirming; and

(g)     that, as a result, ZBH lacked the fundamental supply chain and demand forecasting tools necessary to capture the benefits from cross-selling opportunities that

ZBH and the Officer Defendants were touting to the public.

311.    During the September 12, 2016 Morgan Stanley conference, the analyst from

Morgan Stanley asked the following question:

> So, it's a complicated integration and company. From a stock perspective, though, we think it's a pretty simple thesis, right? Organic growth acceleration and then earnings growth inflection. Those two things should drive the stock, and they are and we think they'll continue. So, let's talk about this first component, which is organic growth acceleration.
>
> I think at the time of the LDR transaction a few months back you had a lot of conviction that that second quarter was going to see acceleration. ***Talk to us about what's driving that near-term acceleration of organic growth and what your conviction is that that pathway to further growth acceleration continues into the back half of this year and 2017.***

312.    In response to the above question, Defendant Dvorak made the following

statement:

> Sure. The advantage that the government provided us with the long pendency period prior being able to close the deal was we were able to do a lot of planning. ***So we put together very detailed integration plans. In fact, there were in excess of 8,000 milestones, the majority of which have now been fully executed and realized.***
>
> But right on the front-end, priority wise, was the commercial channel integration. So we appointed the leaders throughout the globe at the senior level. That process cascades down all the way to sales representatives being reappointed by way of territories; compensation programs; clarity as to what product bag they are going to be carrying. Cross training on the product bag, because we've had gabs, relatively speaking, in each of the legacy Zimmer and Biomet organizations.
>
> ***And so as a consequence, the scale and the breadth and the comprehensiveness of the product bag is greatly enhanced by the combination. And so, we knew that it was just a matter of time if we were executing the right plans that we were going to see the cross-sell start to take place. Some of the understood and forecasted revenue dissynergies were going to dissipate, and that's exactly what you've seen as this year has progressed.***
>
> ***We began executing those synergy plans, the cross-sell with the products. We're kicking in in Q1, Q2; continuing into the second half of the year. Meanwhile, the revenue dis-synergies that were fully expected start dissipating and***

*anniversarying out. That's why we are confident we're going to get back to at or above market growth rate as we exit this year.*

313.   The above statement made by Defendant Dvorak at the September 12, 2016, Morgan Stanley conference was knowingly or recklessly false and misleading for the same reasons set forth above.

314.   During the September 12, 2016 Morgan Stanley conference, the analyst from Morgan Stanley asked the following question to Defendant Florin:

So Dan, the second quarter took a step forward on organic growth. I think the investors were happy the stock has been inflecting . . . That being said, I felt the second quarter message harshed my mellow to a certain extent on my earnings thesis. Because you talked about lower buybacks because of LDR and some other headwinds in the business, most notably currency, less hedging gain.

*So, I kind of left the second quarter a little more nervous about earnings outlook, even though our thesis is a very powerful one about earnings. So talk to us about why we heard more about headwinds on the second-quarter call than potential tailwinds*?

315.   In response to the above question, Defendant Florin made the following statement:

Well, I think first, David, you have to keep in mind that we've grown earnings 22% year-on-year since the merger closed. And for 2016, we're going to deliver 15% or so earnings growth. So, that very much is intact. *Our synergy program is absolutely -- continues to provide tailwinds from an earnings perspective. We talked about $225 million of net EBIT synergies by the end of this year, and then $350 million of net EBIT synergies by the middle of 2018. So that's very much intact.*

*At the same time you've seen -- with that earnings growth, you've also seen this accelerating top line.* And that really is by virtue of what David [Dvorak] has described. And also the investments that we continue to make back into the business: the sales force specialization; medical training and education; instrument deployments. Our signature solutions platform, which is all about the continuum of care and innovating across that whole continuum of care are important investments that we continue to make into the business.

*As we look at the back half of the year, we've reiterated our earnings guidance for the full year.* LDR, as we've described, is a company with a high growth

profile but with some operating losses. So we're absorbing that while making these strategic investments, and then delivering earnings at the high-end of our original guidance for 2016.

316.    The above statement made by Defendant Florin at the September 12, 2016, Morgan Stanley conference was knowingly or recklessly materially false and misleading for the same reasons set forth above, including because Defendant Florin did not identify any of the known issues set forth above as potential "headwinds" in response to the question.

317.    During the September 12, 2016 Morgan Stanley conference, when asked about "the potential continued tailwinds into 2017 and 2018," Defendant Florin made the following statement: "I would think of the tailwinds continuing to be our step plan on synergies. So you'll see another installment of synergies in 2017 and 2018. ***Our top-line growth continuing to accelerate***. . . ."

318.    The above statement made by Defendant Florin at the September 12, 2016, Morgan Stanley conference was knowingly materially false and misleading for the same reasons set forth above, and because Defendants' statement touting the synergies of the merger were misleading by not disclosing the substantial remediation expenses for the North Campus that Defendant Dvorak had approved in July 2016 to address the "systemic issues" or the additional necessary remediation costs (upwards of $300 million) that were needed, all of which would offset a substantial portion or majority of the synergies.

319.    During the September 12, 2016 Wells Fargo conference Defendant Florin made the following statement: "***We continue to feel very good about our $225 million this year and our path to $350 million.*** To the extent there are excess synergies, we first and foremost would look to reinvest that into top-line growth. Top-line growth in that mid-single digit range is a high priority for us, and that's where we'd to look first and foremost to reinvest any excess synergies."

(Emphasis added).

320.    The above statement made by Defendant Florin at the September 12, 2016, Morgan Stanley conference was knowingly materially false and misleading for the same reasons set forth above, and because Defendants' statement touting the synergies of the merger were misleading by not disclosing the substantial remediation expenses for the North Campus that Defendant Dvorak had approved in July 2016 to address the "systemic issues" or the additional necessary remediation costs (upwards of $300 million) that were needed, all of which would offset a substantial portion or majority of the synergies.

### 8.    The October 31, 2016 Statements

321.    On October 31, 2016, ZBH held a public conference call with investors and analysts to discuss the Company's financial results announced that same day.  Defendants Dvorak, Florin, and Marshall participated in the conference call.

322.    During the October 31, 2016 conference call, Defendant Dvorak made the following statement:

> *Variable commercial performances by our sales teams were in part caused by unanticipated supply constraints, related to our transitioning supply chain infrastructure.* This resulted in shortfalls of needed implants and additional instrument sets, to fully exploit sales opportunities in key product categories.
>
> *In response to this challenge, we've accelerated work to enhance certain aspects of our supply chain infrastructure as we harmonize and optimize our sourcing, manufacturing and quality management systems.* Through these efforts, we expect to improve our demand fulfillment in the coming months.
>
> *As a consequence of these supply constraints, we project fourth quarter sales results to be similar to those of the third quarter;* however, as we look ahead, we remain confident in our ability to successfully reaccelerate our revenue growth in 2017. As I mentioned, demand for our expansive portfolio of differentiated and clinically proven musculoskeletal technologies, solutions and services has never been stronger.

323.    The above statements made by Defendant Dvorak were each materially false and

misleading because Defendant Dvorak knowingly and/or recklessly omitted, among others, the following material facts necessary to not make their statements about the Company's misleading:

(a)      that the supply issues the Company experienced in Q3'16, with respect to the Legacy Biomet products, were actually the result of a voluntary product hold on September 29, 2016 (the second to last day of Q3'16) of all products manufactured, cleaned, sterile packed, or sterilized at the North Campus;

(b)      that the FDA had been conducting an inspection of the North Campus and that, although the inspection was not completed yet, ZBH admits that it already knew that ZBH was going to receive a serious FDA-483;

(c)      that the necessary remediation to address the "systemic issues" at the North Campus would take a substantial amount of time (over a year) and upwards of $300 million in expenses;

(d)      that a substantial reason for ZBH's decreased Q4'16 guidance was related to disruptions from the ongoing FDA inspection and remediation, which would likely continue well into 2017.

324.      During the October 31, 2016 conference call Defendant Florin made the following statements:

Third-quarter revenue was below our expectations, ***primarily due to execution issues within our large joints supply chain, which led to a degradation in order fulfillment rates late in the quarter***, as well as our performance in dental. As noted by David, customer demand was strong in the quarter, ***but certain aspects of our supply chain integration impacted our ability to effectively respond to shifting product mix, most notably within*** our knee ***and hip portfolios***.

As a consequence, we underestimated demand for certain key cross-sell brands within our existing customer base, leading to a depletion of our safety stocks, and also affecting our ability to capitalize on new customer opportunities. ***We are working diligently to enhance our supply chain processes and execution***,

particularly in the areas of demand forecasting, global inventory tracking, and asset deployment systems, while we replenish our safety stock levels.

***However, these issues have some carryover effect into the fourth quarter, which I will address shortly in the context of our updated Q4 guidance.***

\*\*\*

I'd like now to review our guidance. ***As we look to the fourth quarter, revenue growth is expected to be in a range of 1.6% to 2.6%*** . . .

325.    The above statement made by Defendant Florin were each knowingly or recklessly false or misleading for the same reasons set forth above.  Additionally, the statement was knowingly or recklessly false or misleading because the main problem was not that ZBH had "underestimated demand" but really that the Company was forced to "voluntarily" stop production/distribution out of its North Campus facility because the FDA had commenced an inspection of the North Campus and uncovered that ZBH had been distributing products manufactured at the facility despite ZBH corporate management knowing that there were "systemic" issues with the quality system that had not been remediated.

### B.    Additional Allegations Regarding the Officer Defendants' Scienter

326.    As alleged herein, Defendant ZBH and the Officer Defendants acted with scienter since Defendant ZBH and the Officer Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Officer Defendants, by virtue of their receipt of information reflecting the true facts regarding Zimmer, their control over, and/or receipt and/or modification of Zimmer's allegedly materially misleading misstatements and/or their associations with the

Company which made them privy to confidential proprietary information concerning Zimmer, participated in the fraudulent scheme alleged herein.

327.    The Officer Defendants knew or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Officer Defendants.

328.    The following additional facts give rise to strong inference that ZBH and the Officer Defendants' acted with scienter.

329.    The fraud alleged herein relating to concealing of the true state of affairs at the North Campus, the supply chain integrations between Legacy Zimmer and Legacy Biomet, and the Company's focus on driving accelerated revenue growth in 2016, all involved ZBH's core operations, and knowledge of the fraud may therefore be imputed to the Officer Defendants. Specifically, the North Campus was one of the Company's primary and most important manufacturing facilities and the successful integration of the Legacy Zimmer and Legacy Biomet operations following the colossal $13 billion merger was undoubtedly crucial to the Company's viability and success.

330.    With respect to the North Campus, Defendant Florin acknowledged on multiple occasions, including at a February 2017 Leerink Partners Global Healthcare Conference, that the North Campus was "one of our major production facilities."  Defendant Dvorak noted on the April 27, 2017 1Q'17 earnings call that the products produced at the North Campus were a vital part of the Company's promised accelerated revenue growth in 2016 from cross selling opportunities: "some of these key brands that come out of that facility provide us with some of

our best competitive opportunities, so they're a very important set of brands and strategically relevant to the acceleration of the top line."

331.    Defendants Dvorak and Florin were substantially involved in the planning and monitoring of the integration of the Legacy Biomet and Legacy Zimmer operations.  According to a Form 425 filed with the SEC by LVB Acquisition Group, Inc. on October 23, 2014, Defendants Dvorak and Florin were both members of the Integration Steering Committee ("ISC"), which was established in June 2014.  The ISC was responsible for a "smooth and seamless integration planning effort" and was to meet weekly to review progress of the teams on integration planning.  The ISC: (a) set priorities and strategic direction for the new company; (b) established the overall process for planning the integration; (c) established goals and identified opportunities that will create value and bring together the best of both companies; (d) worked closely with the Integration Management Office ("IMO") to evaluate the progress of integration planning and resolve any emerging issues that require ISC attention; (e) monitored integration planning teams' weekly updates and monthly submissions; and (f) conducted detailed reviews ("deep dives") of integration planning teams' plans to ensure that they are in line with the priorities established for the new company.

332.    The Officer Defendants, as members of ZBH corporate management, had access to and reviewed reports and information about ZBH's sales, internal projections, inventory, and corporate audit reports of the North Campus.  According to a J.P. Morgan report issued on October 31, 2016, which recounted a conversation it had with ZBH management about the 3Q'16 supply issues, ZBH management admitted that "management sees daily sales reports for the US businesses and gets updated weekly sales projections from every business around the globe."  The report also indicated that management received monthly supply chain reports,

which were being crafted manually because the Company was still consolidating its inventory management system.

333.    By virtue of receiving these reports, ZBH corporate management also knew or recklessly disregarded the fact that it lacked critical capabilities, including, "appropriate forecasting" and "forward visibility" with respect to demand and inventory and had not yet completed the integration its supply chain, forecast, and sales and operations planning ("S&OP"); but instead, was relying on "interim processes" which Defendant Florin admitted were "not [] robust enough."  For example, ZBH management admitted in the October 31, 2016, J.P. Morgan report that they received monthly supply chain reports, which were being crafted manually, which were not timely, and could take in some instances (such as the August 2016 report) not available until "mid-September."

334.    In the December 2016 Letter, ZBH acknowledged/admitted that "corporate management" had had access to and had learned of the "systemic" issues at the North Campus from the corporate audit reports of the North Campus issued on March 31, 2016, April 13, 2016 and June 7, 2016.  The December 2016 Letter admits that Defendant Dvorak knew of these issues because he personally approved certain funding to address the "systemic" issues at the North Campus in July 2016.

335.    Additionally, as alleged above FDA regulations make senior company management responsible for ensuring adherence to cGMP.  Defendant Dvorak as the CEO of the Company was directly responsible for ensuring the products manufactured at the North Campus were produced in accordance with cGMP.  The Officer Defendants were aware of FDA policy with respect to cGMP and understood and appreciated the ramifications if ZBH failed to comply with FDA requirements, as indicated in the Company's annual report to shareholders filed with

the SEC on February 29, 2016.   Despite this responsibility and admittedly knowing of "systemic" issues that had not been remediated, Defendant Dvorak and the other Officer Defendants knowingly permitted or recklessly disregarded that ZBH was continuing to manufacture and distribute products that were manufactured, cleaned, sterile packed, and sterilized at the North Campus.

336.   Furthermore, as indicated below, corporate compliance and regulatory compliance, including product quality and safety, were considered in Defendant Dvorak's and Defendant Florin's performance evaluations.

337.   The Officer Defendants were also well aware of the FDA regulations, including the industry requirements and timing of FDA inspections, by virtue of their extensive industry experience.   Because, as alleged supra, the FDA had conducted inspections at the North Campus in June 2014 resulting in a FDA-483, the Officer Defendants were well aware and reasonably expected that another biennial inspection would occur by June 30, 2016, or soon thereafter.

338.   According to the Company's proxy statement filed with the SEC on March 21, 2016, the Company's Board of Directors, of which Defendant Dvorak was a member, was responsible for overseeing risk management and "the full Board considers specific risk topics, including risk-related issues pertaining to laws and regulations enforced by the U.S. Food and Drug Administration."   Like the other members of ZBH's Board of Directors, Defendant Dvorak and the other Officer Defendants were highly skilled and experienced veterans of some of the medical device and healthcare industries' largest corporations, and they were familiar with FDA regulations, manufacturing requirements, and the timing and nature of FDA inspections, as well as the grave consequences that would result if the FDA discovered that ZBH was continuing to manufacture and distribute products from the North Campus without having adequately

remediated known "systemic" issues with the quality system.

339.    By virtue of serving as a ZBH director, Defendant Dvorak also had access to and was provided other types of critical information.  For example, the March 21, 2016 Proxy statement also indicated that "The Board is routinely informed of developments that could affect our risk profile or other aspects of our business."

340.    The Officer Defendants also had access to and received important information about regulatory risks from the Company's Audit Committee.  The March 21, 2016 Proxy statement indicates that the audit committee is "tasked with overseeing our compliance with legal and regulatory requirements, *discussing our risk assessment and risk management processes with management* and receiving information on material legal and regulatory affairs, including litigation."

341.    In light of the Officer Defendants' complete dereliction of their duties by allowing the Company to continue distributing products from the North Campus in the face of known "systemic" issues, the Company's most recent Proxy statement filed with the SEC on March 30, 2017, indicates that:

>    We expect that the committee will be *re-named to incorporate the word "Quality"* and that its charter will be amended to address its expanded scope of responsibilities, including the following:
>
>    • providing assistance to the Board in its oversight of product quality and safety; and
>    • overseeing risk management in the area of product quality and safety, *including reviewing processes in place to monitor and control* product quality and safety; periodically *reviewing results of product quality and quality system assessments by the company* and external regulators; and reviewing any significant product quality issues that may arise.

342.    The Officer Defendants were also highly motivated to conceal the adverse facts about the North Campus (rather than take prompt remediation actions, which would have

stopped ZBH's ability to reaccelerate revenue growth) and conceal adverse facts about the problems with the integration of the Legacy Zimmer and Legacy Biomet operations, because of ZBH's executive compensation program, which included annual and long-term incentive programs, as well as, a Zimmer Biomet Cash Integration Incentive.  These incentives were based on weighted performance metrics, including 35% constant currency revenue; 35% Adjusted operating profit; 10% Free Cash Flow; and 20% Adjusted EPS.

343.    For example, Defendant Florin admitted that the Officer Defendants were highly motivated by ZBH compensation plans to achieve organic revenue growth.  Before the Class Period, during a March 16, 2016, industry conference, Defendant Florin stated:  "***The management team is very focused on driving organic growth and to the point that our incentives are weighted towards driving organic revenue growth.*** So we understand the import of that. We are focused on it and feel really bullish about our opportunity to drive that acceleration."

344.    Specifically, under the programs, the revenue target must be achieved at 95% for a 50% payout; other metrics must be achieved at 90% for a 50% payout.  Achievement below these thresholds would result in zero payout.  The committee would also consider individual performance and consider goals pertaining to corporate strategy, corporate compliance and regulatory compliance, including product quality and safety, among other areas.  Defendant Dvorak was rewarded $1,205,714 and Defendant Florin was rewarded $422,357 based on the Company's 2016 net earnings achievement, representing an 83.4% weighted payout.

345.    In June 2015, the compensation committee adopted a three-year cash integration incentive plan upon the closing of the Biomet merger "to promote the integration of Zimmer and Biomet, which is critical to our long-term value creation strategy and to achieving target

synergies over the first three years post-closing." The 2016 performance measure was Earnings before interest and taxes from integration cost synergies related to the Zimmer Biomet merger, net of revenue dis-synergies ("net EBIT synergies") in the amount of $249 million and the Company's actual performance was $252 million, resulting in 100% payouts for Defendant Dvorak and Defendant Florin in the amounts of $727,740 and $254,925 respectively.

346.    ZBH also considered performance in awarding long-term equity-based awards and annual equity-based awards. The Company used iTSR, a function of operating profit growth and free cash flow yield, over a three-year period as the performance measure applicable to the PRSU component of the annual LTI grant. The annual equity-based awards in 2016 were an equal mix of stock options and PRSUs.

347.    In 2016, Defendant Dvorak earned 76% of target award earned under PRSU component of 2014 LTI grant resulting in $3,750,023 stock awards, $2,750,039 option awards. Defendant Florin's 2016 compensation included $1,000,189 stock awards and $999,982 option awards. The stock awards consist of PRSUs at target and Defendant Florin's includes a one-time grant of RSUs in 2015 in connection with the Biomet merger and his commencement of employment.

348.    At a May 3, 2017, Deutsche Bank Securities Health Care Conference, Defendant Florin acknowledged the focus on these incentives: "So, we're very focused on not just our adjusted earnings, but our GAAP earnings. In fact, our internal incentives include our adjusted – not our adjusted earnings, but our reported earnings, as well as our free cash flow yield. Those metrics drive a lot of our performance-based restricted stock vesting criteria. So we're very focused on all metrics."

349.    These metrics were artificially inflated as a result of ZBH's failure to remediate

known compliance issues at the North Campus.  For example, the Company has estimated the total remediation costs at $300 million, yet only $38 million of that amount was incurred in 2016 because ZBH failed timely or adequately take necessary remediation steps until the FDA arrived in September 2016, thereby artificially inflating the performance metrics for 2016.

C.      **Additional Allegations Regarding Loss Causation**

350.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

351.    During the Class Period, Plaintiffs and the Class purchased Zimmer's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

352.    The artificial inflation in ZBH's stock price was removed when the truth was partially revealed about these material misrepresentations and omissions to the public on October 31, 2016, and November 8, 2016.  The disclosures made on those days revealed on a piecemeal basis the true nature and extent of the scheme to conceal, among others, the "systemic" issues with the quality system at the North Campus and imminent FDA inspection, the supply chain integration issues, and the falsity of ZBH's guidance.  These disclosures, more particularly described above, reduced the amount of inflation in the price of ZBH's publicly traded securities, causing economic injury to Plaintiffs and other members of the Class.

353.    None of these disclosures was sufficient on its own to fully remove the inflation from ZBH's stock price because each of them only partially revealed the conditions, risks and trends that had been concealed from investors.  The corrective impact of the disclosures alleged

herein was tempered by Defendant ZBH and the Officer Defendants' continued misstatements and omissions about ZBH's revenue growth.  These misrepresentations and omissions inflated and maintained the prices of ZBH's publicly traded stock at levels that were artificially inflated, inducing members of the Class to continue purchasing ZBH stock even after the truth began to partially enter the market.

### D.    Presumption of Reliance

354.    The market for Zimmer's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Zimmer's securities traded at artificially inflated prices during the Class Period.  On October 10, 2016, the Company's stock price closed at a Class Period high of $132.74 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Zimmer's securities and market information relating to Zimmer, and have been damaged thereby.

355.    During the Class Period, the artificial inflation of Zimmer's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Zimmer's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Zimmer and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities

at such artificially inflated prices, and each of them has been damaged as a result.

356.    At all relevant times, the market for Zimmer's securities was an efficient market for the following reasons, among others:

(a)    ZBH stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, ZBH filed periodic public reports with the SEC and/or the NYSE;

(c)    ZBH regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    ZBH was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

357.    As a result of the foregoing, the market for ZBH's securities promptly digested current information regarding ZBH from all publicly available sources and reflected such information in Zimmer's stock price.  Under these circumstances, all purchasers of ZBH's securities during the Class Period suffered similar injury through their purchase of ZBH's securities at artificially inflated prices and a presumption of reliance applies.

358.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material

misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.    VIOLATIONS OF THE SECURITIES ACT

359.    Plaintiffs' claims under the Securities Act do not sound in fraud and Plaintiffs expressly disavows and disclaims any allegations of fraud, scheme or intentional conduct as part of its claims under the Securities Act.  Any allegations of fraud, fraudulent conduct, or  motive are specifically disclaimed from the following allegations for the purposes of Plaintiffs' claims under the Securities Act, which do not have scienter, fraudulent intent or motive as required elements. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiffs or members of the Class.

360.    As alleged below, ZBH and other Defendants made a series of materially untrue statements and omissions of material facts in: (i) the June SPO Offering Materials in connection with the Company's June 2016 Offering of 11,116,533 shares of ZBH common stock; and (ii) in the August SPO Offering Materials in connection with the August 2016 Offering of 7,440,675 shares of ZBH common stock.

361.    Both the June 2016 Offering and August 2016 Offering were made pursuant to an automatic "shelf" registration statement filed with the SEC on Form S-3 on February 4, 2016.

The Registration Statement was signed by the Director Defendants and Defendants Dvorak, Florin, and Collins.  Both the June 2016 Offering and August 2016 Offering were underwritten by the Underwriter Defendants.

362.    The June SPO Offering Materials incorporated by reference, among other documents: (i) ZBH's 2015 10-K; and (ii) ZBH's Q1'16 10-Q.

363.    The June SPO Offering Materials contained or incorporated by reference the statements contained in ¶¶236, 238, 239, 240, 242, 244, 246, 247, 249, 250.

364.    The August SPO Offering Materials incorporated by reference, among other documents: (i) ZBH's 2015 10-K; (ii) ZBH's Q1'16 10-Q; and (iii) ZBH's Q2'16 10-Q.

365.    The August SPO Offering Materials contained or incorporated by reference the statements contained in ¶¶290, 292.

366.    The June SPO Offering Materials and August SPO Offering Materials were negligently prepared and, as a result, contained untrue statements of material facts and/or omitted to state facts necessary to make the statements made therein not misleading and neither the June SPO Offering Materials nor the August SPO Offering Materials were prepared in accordance with the rules and regulations governing their preparation.

367.    These statements in the June SPO Offering Materials and the August SPO Offering Materials were materially misleading and omitted to state the following facts necessary to make the statements made therein not misleading:

(a)    Corporate  audit reports issued between March 31 and June 7, 2016, had identified and alerted ZBH corporate management to "systemic" issues the with the quality system at the North Campus but which had not been adequately remediated and would require substantial time and money (in excess one year and $300 million) to

remediate, and would cause substantial disruptions to the production and supply of several key Legacy Biomet products/brands that were essential cross-selling opportunities. For example, the issues and expected costs were of such magnitude that the Company had approved a substantial remediation budget in July of 2016.

(b)     Contrary to their prior beliefs, ZBH corporate management had learned that the quality system at the primary Legacy Biomet North Campus manufacturing facility was not in substantial compliance and ZBH would have to substantially harmonize/integrate the grossly deficient North Campus to the same level of the Legacy Zimmer quality systems, which would be highly disruptive to ZBH's supply of key products and brands.

(c)     The FDA was going to imminently conduct a routine Level 1 or Level 2 inspection of the North Campus on or around June 30, 2016, and that because of the timing of when ZBH had recently learned of issues and deficiencies with the North Campus' quality system, there was not sufficient time to remediate the issues prior to the FDA conducting an inspection.

(d)     ZBH was manufacturing and distributing products/brands from the Legacy Biomet North Campus – including "key" products Defendant Dvorak later admitted were "strategically relevant" to ZBH's revenue acceleration – despite substantial regulatory gaps with the quality system at the North Campus that had not been adequately remediated. As a result, the imminent FDA inspection would significantly disrupt supply of key products when the FDA identified that products were being manufactured/distributed while there were substantial issues with the facility's quality system that had not been adequately remediated.

(e)      the Company had not yet completed the essential integration of Legacy Zimmer and Legacy Biomet's supply chains and demand planning and forecasting functions, which meant that ZBH lacked the inventory visibility, demand forecasting ability, and production planning tools, necessary to capture the underlying cross-selling opportunities.

(f)      the Company was experiencing delays in the integration of the legacy companies' back office systems and supply chain, and as a result, ZBH management was relying on "interim processes" that included manually crafted supply chain reports that lagged the end of the month by approximately two weeks and, even if a belated supply chain report identified an issue, there was nothing that the Company would be able to do to immediately address the issue because it lacked integrated demand planning and inventory capabilities.

(g)      As a result of the delays in integrating the back office systems and supply chains, the Company was being negatively impacted by supply shortages, which were causing the Company to deplete safety stock of Persona knee instruments.

368.    Also, the June SPO Offering Materials and August SPO Offering Materials were also rendered materially misleading because they omitted material information required to be stated therein pursuant to Reg S-K.  Among others, the June SPO Offering Materials and August SPO Offering Materials omitted the following information required to be disclosed under Reg. S-K Item 303, including:

(a)      that ZBH knew that an FDA inspection of the North Campus was imminent and that ZBH had learned of "systemic issues" with the quality system at the North Campus, which required substantial remediation that ZBH reasonably expected

would result in substantial future costs and negatively impact revenue because:

(i)     The North Campus' quality system required substantial remediation, necessitating significant time and money (which would exceed more than a year and later cost upwards of $300 million), as evidenced by the fact that the Company approved initial funding in July 2016 for remediation efforts that was sufficiently large enough to be approved by the Company's CEO.

(ii)     ZBH corporate management was alerted to the same issues raised by the FDA and reasonably expected that when the FDA conducted an inspection of the North Campus, ZBH would receive an FDA-483 and was at risk of receiving a warning letter.

(iii)     the remediation activities needed at the North Campus were reasonably likely to impact the Company's production and supply of "key" and "very important" products/brands made at the North Campus which Defendant Dvorak acknowledged were some of the Company's "best competitive products" essential to cross-selling and "strategically relevant to the acceleration" of the Company's revenue.

(b)     Continuing to manufacture and distribute products from the North Campus – while there were issues with the North Campus' quality system – was reasonably expected to result in a disruption to the production and supply of key products when the FDA conducted its next routine inspection and identified that products had been distributed prior to sufficient remediation occurring.

(c)     The Company had not yet completed the essential integration of Legacy Zimmer and Legacy Biomet's supply chain and demand planning and forecasting

functions, which meant that ZBH lacked the inventory visibility, demand forecasting ability, and production planning tools, necessary to capture the underlying cross-selling opportunities that ZBH stated was necessary to further accelerate revenue.

(d)     The Company was burning through safety stock of Persona products, lacked supply necessary to keep up with demand from cross-selling, and was experiencing supply shortages that would negatively impact the Company's revenue growth for the rest of the year because the Company lacked the ability to timely address inventory shortages due to its unintegrated inventory, demand, and production planning processes.

## X.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

369.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Zimmer who knew that the statement was false when made.

**XI.     CLASS ACTION ALLEGATIONS**

370.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or acquired ZBH's common stock or options during the Class Period, and who were damaged thereby, and also including persons or entities that: (i) purchased ZBH common stock pursuant and/or traceable to the June 2016 Offering; and/or (iii) purchased ZBH common stock pursuant and/or traceable to the August 2016 Offering (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

371.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Zimmer's common stock actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Zimmer shares were traded publicly during the Class Period on the NYSE.  As of October 28, 2016, Zimmer had 200,299,566 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Zimmer or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

372.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

373.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

374.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants made false and/or misleading statements;

(d)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

375.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.   CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder

**Against ZBH and the Officer Defendants**

376.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

377.     During the Class Period, Defendant ZBH and the Officer Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Zimmer's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

378.     Defendant ZBH and the Officer Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ZBH's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants ZBH and the Officer Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

379.     Defendant ZBH and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about ZBH's financial well-being, operations and prospects, as specified herein.

380.     Defendant ZBH and the Officer Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged

in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ZBH's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about ZBH and its business, operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

381.    Each of the Officer Defendants' primary liability and controlling person liability arises from the following facts: (i) the Officer Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

382.    Defendant ZBH and the Officer Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such

facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ZBH's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendant ZBH and the Officer Defendants' misstatements and omissions of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendant ZBH and the Officer Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

383.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of ZBH's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendant ZBH and the Officer Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendant ZBH and the Officer Defendants, but not disclosed in public statements by Defendant ZBH and the Officer Defendants during the Class Period, Plaintiffs and the other members of the Class acquired ZBH's securities during the Class Period at artificially high prices and were damaged thereby.

384.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems

that ZBH was experiencing, which were not disclosed by Defendant ZBH and the Officer

Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise

acquired their ZBH securities, or, if they had acquired such securities during the Class Period,

they would not have done so at the artificially inflated prices which they paid.

385.    By virtue of the foregoing, Defendant ZBH and the Officer Defendants violated

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

386.    As a direct and proximate result of Defendant ZBH and the Officer Defendants'

wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection

with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of The Exchange Act
### Against the Officer Defendants

387.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

388.    Officer Defendants acted as controlling persons of ZBH within the meaning of

Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and

their ownership and contractual rights, participation in, and/or awareness of the Company's

operations and intimate knowledge of the false financial statements filed by the Company with

the SEC and disseminated to the investing public, Officer Defendants had the power to influence

and control and did influence and control, directly or indirectly, the decision-making of the

Company, including the content and dissemination of the various statements which Plaintiffs

contend are false and misleading. Officer Defendants were provided with or had unlimited access

to copies of the Company's reports, press releases, public filings, and other statements alleged by

Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the

ability to prevent the issuance of the statements or cause the statements to be corrected.

389.    In particular, Officer Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

390.    As set forth above, Zimmer and Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Officer Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT III**
**Violation of Section 11 of the Securities Act**
**Against Defendants ZBH, Dvorak, Florin, and Collins,**
**the Director Defendants, and the Underwriter Defendants**
**(Relating to the June 2016 SPO)**

391.    Plaintiffs repeat and reallege the allegations in ¶¶359-368 as if alleged fully in this Count.

392.     This Count is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired ZBH common stock pursuant or traceable to the June 2016 Offering, and who were damaged thereby.

393.    This Count expressly excludes and disclaims any allegation of fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that

Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

394.    Liability under this Count is predicated on ZBH's filing the June 2016 Offering Materials, the Director Defendants', Dvorak's, Florin's, and Collin's signing of the Registration Statement for the June 2016 Offering, and ZBH's, the Director Defendants', the Underwriter Defendants', Dvorak's, Florin's, and Collin's respective participation in the June 2016 Offering, which was conducted pursuant to the June 2016 Offering Materials. The June 2016 Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

395.    Less than one year elapsed between the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based and the initial complaint in this action. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

396.    By reason of the foregoing, the Defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class pursuant to Section 11(e).

<u>COUNT IV</u>
**Violation of Section 12(a)(2) of the Securities Act**
**Against ZBH and the Underwriter Defendants**
**(Relating to the June 2016 SPO)**

397.    Plaintiffs repeat and reallege the allegations contained in ¶¶359-368 above as if fully set forth herein.

398.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, on behalf of all members of the Class who purchased or otherwise acquired ZBH

securities in the June 2016 Offering and who were damaged thereby.

399.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that ZBH and the Underwriter Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

400.    The Underwriter Defendants and ZBH were statutory sellers of ZBH securities that were registered in the June 2016 Offering pursuant to the Registration Statement and sold by means of the June 2016 Offering Materials. By means of the June 2016 Offering Materials, the Underwriter Defendants and ZBH sold approximately 11,116,533 shares of common stock in the June 2016 Offering to members of the Class. The Underwriter Defendants and ZBH were at all relevant times motivated by their own financial interests. In sum, the Underwriter Defendants and ZBH were sellers, offerors, and/or solicitors of sales of the securities that were sold in the June 2016 Offering by means of the materially false and misleading June 2016 Offering Materials.

401.    Plaintiff UFCW 1500 purchased or acquired ZBH common stock in the June 2016 Offering from one of the Underwriter Defendants and subsequently sustained an economic loss when it sold the shares.

402.    The June 2016 Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

403.    Less than one year elapsed between the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based and the initial

complaint in this action. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

404.    By reason of the foregoing, the Underwriter Defendants and ZBH are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased securities in or traceable to the Offerings, and who were damaged thereby.

**COUNT V**
**Violation of Section 15 of the Securities Act**
**Against Defendants Dvorak, Florin, and Collins, and the Director Defendants**
**(Relating to the June 2016 SPO)**

405.    Plaintiffs repeat and reallege the allegations contained in ¶¶359-368 above as if fully set forth herein.

406.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Director Defendants and Defendants Dvorak, Florin, and Collins.

407.    At all relevant times, the Director Defendants and Defendants Dvorak, Florin, and Collins were controlling persons of ZBH within the meaning of Section 15 of the Securities Act. As set forth herein, because of their positions at ZBH and/or because of their positions on ZBH Board, the Director Defendants and Defendants Dvorak, Florin, and Collins had the requisite power to directly or indirectly control or influence the decision-making of the Company and the conduct of ZBH's business, including the wrongful conduct complained of herein.

408.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Dvorak, Florin, and Collins had direct involvement in the day-today operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein. They were also directly involved in providing false information and certifying and/or approving the false and/or misleading statements disseminated by ZBH during the Class Period.

As a result of the foregoing, Defendants Dvorak, Florin, and Collins, as a group and individually, were controlling persons of ZBH within the meaning Section 15 of the Exchange Act.

409.    Defendants Dvorak, Florin, and Collins also each signed the Registration Statement in connection with the June 2016 Offering, the June 2016 Offering Materials were disseminated to the investing public, and the Registration Statement became effective. Thus, these defendants controlled the contents and dissemination of the June 2016 Offering Materials.

410.    Similarly, the Director Defendants and Defendant Dvorak served as Directors on ZBH's board of directors at the time the June 2016 Offering was conducted and at the time that the Registration Statement was signed. As directors of a publicly owned company, these defendants had a duty to disseminate accurate and truthful information with respect to ZBH's financial condition and results of operations. These Director Defendants and Defendant Dvorak each signed the Registration Statement in connection with the June 2016 Offering, the June 2016 Offering Materials were disseminated to the investing public, and the Registration Statement became effective. Thus, these defendants controlled the contents and dissemination of the June 2016 Offering Materials.

411.    This claim does not sound in fraud. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that any defendant acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

412.    By reason of the aforementioned conduct, each of the defendants named in this Count is liable under Section 15 of the Securities Act to Plaintiffs and the other members of the Class with claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above. As a direct and proximate result of the conduct of these Defendants, Plaintiffs and members of the Class suffered damages in connection with their purchase or acquisition of securities pursuant

and/or traceable to the June 2016 Offering.

**COUNT VI**
**Violation of Section 11 of the Securities Act**
**Against Defendants ZBH, Dvorak, Florin, and Collins,**
**the Director Defendants, and the Underwriter Defendants**
**(Relating to the August 2016 SPO)**

413.    Plaintiffs repeat and reallege the allegations in ¶¶359-368 as if alleged fully in this Count.

414.    This Count is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired securities sold pursuant or traceable to the August 2016 Offering, and who were damaged thereby.

415.    This Count expressly excludes and disclaims any allegation of fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that Defendants ZBH, Dvorak, Florin, and Collins, the Director Defendants, and the Underwriter Defendants, acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

416.    Liability under this Count is predicated on ZBH's filing the August 2016 Offering Materials, the Director Defendants', Dvorak's, Florin's, and Collin's signing of the Registration Statement for the Offering, and ZBH's, the Director Defendants', the Underwriter Defendants', Dvorak's, Florin's, and Collin's respective participation in the Offering, which was conducted pursuant to the August 2016 Offering Materials. The August 2016 Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated

therein.

417.    Less than one year elapsed between the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based and the initial complaint in this action. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

418.    By reason of the foregoing, the defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class pursuant to Section 11(e).

<u>COUNT VII</u>
**Violation of Section 12(a)(2) of the Securities Act**
**Against ZBH and the Underwriter Defendants**
**(Relating to the August 2016 SPO)**

419.    Plaintiffs repeat and reallege the allegations contained in ¶¶359-368 above as if fully set forth herein.

420.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, on behalf of all members of the Class who purchased or otherwise acquired ZBH securities in the August 2016 Offering and who were damaged thereby.

421.    This Count expressly excludes and disclaims any allegation of fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

422.    The Underwriter Defendants and ZBH were statutory sellers of ZBH securities that were registered in the August 2016 Offering pursuant to the Registration Statement and sold

by means of the August 2016 Offering Materials. By means of the August 2016 Offering Materials, the Underwriter Defendants and ZBH sold approximately 7,440,675 shares of ZBH common stock in the August 2016 Offering to members of the Class. The Underwriter Defendants and ZBH were at all relevant times motivated by their own financial interests. In sum, the Underwriter Defendants and ZBH were sellers, offerors, and/or solicitors of sales of the securities that were sold in the August 2016 Offering by means of the materially false and misleading August 2016 Offering Materials.

423.    Plaintiff UFCW 1500 purchased or acquired ZBH common stock in the August 2016 Offering from one of the Underwriter Defendants and subsequently sustained an economic loss when it sold the shares.

424.    The  August 2016 Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

425.    Less than one year elapsed between the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based and the initial complaint in this action. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

426.    By reason of the foregoing, the Underwriter Defendants and ZBH are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased securities in or traceable to the Offerings, and who were damaged thereby.

**<u>COUNT VIII</u>**
**Violation of Section 15 of the Securities Act**
**Against Defendants Dvorak, Florin, and Collins,**
**and the Director Defendants**
**(Relating to the August 2016 SPO)**

427.    Plaintiffs repeat and reallege the allegations contained in ¶¶359-368 above as if fully set forth herein.

428.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Director Defendants and Defendants Dvorak, Florin, and Collins.

429.    At all relevant times, the Director Defendants and Defendants Dvorak, Florin, and Collins were controlling persons of ZBH within the meaning of Section 15 of the Securities Act. As set forth herein, because of their positions at ZBH and/or because of their positions on ZBH Board, the Director Defendants and Defendants Dvorak, Florin, and Collins had the requisite power to directly or indirectly control or influence the decision-making of the Company and the conduct of ZBH's business, including the wrongful conduct complained of herein.

430.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Dvorak, Florin, and Collins had direct involvement in the day-today operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein. They were also directly involved in providing false information and certifying and/or approving the false and/or misleading statements disseminated by ZBH during the Class Period. As a result of the foregoing, Defendants Dvorak, Florin, and Collins, as a group and individually, were controlling persons of ZBH within the meaning Section 15 of the Exchange Act.

431.    Defendants Dvorak, Florin, and Collins also each signed the Registration Statement in connection with the August 2016 Offering, the August 2016 Offering Materials were disseminated to the investing public, and the Registration Statement became effective. Thus, these defendants controlled the contents and dissemination of the August 2016 Offering Materials.

432.    Similarly, the Director Defendants and Defendant Dvorak served as Directors on ZBH's board of directors at the time the August 2016 Offering was conducted and at the time that the Registration Statement was signed. As directors of a publicly owned company, these defendants had a duty to disseminate accurate and truthful information with respect to ZBH's financial condition and results of operations. These Director Defendants and Defendant Dvorak each signed the Registration Statement in connection with the August 2016 Offering, the August 2016 Offering Materials were disseminated to the investing public, and the Registration Statement became effective. Thus, these defendants controlled the contents and dissemination of the August 2016 Offering Materials.

433.    This claim does not sound in fraud. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that any defendant acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

434.    By reason of the aforementioned conduct, each of the defendants named in this Count is liable under Section 15 of the Securities Act to Plaintiffs and the other members of the Class with claims pursuant to Section 11 of the Securities Act, as set forth above. As a direct and proximate result of the conduct of these defendants, Plaintiffs and members of the Class suffered damages in connection with their purchase or acquisition of securities pursuant and/or traceable to the August 2016 Offering.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    awarding compensatory damages in favor of Plaintiffs and the other Class

members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)      as to the claims set forth under the Securities Act, awarding rescission or a recessionary measure of damages; and

(e)      such other and further relief as the Court may deem just and proper.

## XIV.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  June 16, 2017

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Robert V. Prongay*
Robert V. Prongay
Jason L. Krajcer
Christopher Fallon
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160

**KIRBY McINERNEY LLP**
Ira M. Press
David A. Bishop
Thomas W. Elrod
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

**KATZ & KORIN, PC**

Offer Korin, Indiana Atty. No. 14014-49
334 North Senate Avenue
Indianapolis, IN 46204
317-464-1100 (tel.)
317-464-1111 (fax)
E-mail: okorin@katzkorin.com

*Attorneys for Plaintiffs*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

__ANTHONY G. SPEELMAN__ declares as follows:

1.      I am the Plan Manager at UFCW Local 1500 Pension Fund (the "Plaintiff").  As such, I am authorized to make this certification on Plaintiff's behalf.

2.      I have reviewed complaints filed on behalf of investors in Zimmer Biomet Holdings, Inc. ("ZBH"), and have authorized the filing of a similar complaint on Plaintiff's behalf.  Plaintiff retains Kirby McInerney LLP and such co-counsel as it deems appropriate to associate with to pursue such action on a contingent fee basis.

3.      Plaintiff did not purchase ZBH securities at the direction of Plaintiff's counsel or in order to participate in this private action.

4.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

5.      Plaintiff's holdings in ZBH as set forth in the complaint are set forth on the attached Schedule A.

6.      During the three years prior to the date of this certification, Plaintiff has not served or sought to serve as a representative party for a class in any action filed under the federal securities laws, except as listed below:

> *United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 v. Ocwen Fin. Corp., et al.*,
> No. 14 Civ. 81057 (S.D. Fla.), consolidated with No. 14 Civ. 81064 (S.D. Fla.) and No. 14 Civ. 81076 (S.D. Fla.)

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any class recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ___ day of May, 2017.

Anthony G. Speelman
Plan Manager

2

**Schedule A**

**Class Period Transactions of Plaintiff UCFW Local 1500 in ZimmerBiomet Stock:**

| Date | Purchase/Sale | Number of Shares | Price Per Share |
|---|---|---|---|
| *Account #: 1* | | | |
| 6/7/2016 | Purchase | 600.00 | $119.13 |
| 6/8/2016 | Purchase | 100.00 | $119.34 |
| 6/10/2016 | Purchase | 200.00 | $118.79 |
| 6/13/2016 | Purchase | 600.00 | $115.85 |
| 6/23/2016 | Purchase | 250.00 | $120.00 |
| 8/9/2016 | Purchase | 300.00 | $129.75 |
| 10/31/2016 | Sale | (150.00) | $105.75 |
| 11/1/2016 | Sale | (250.00) | $104.00 |
| 11/8/2016 | Sale* | (125.00) | $101.17 |
| 11/8/2016 | Sale* | (675.00) | $101.67 |
| 11/14/2016 | Sale* | (100.00) | $96.19 |
| 11/14/2016 | Sale* | (550.00) | $96.07 |
| 11/14/2016 | Sale* | (200.00) | $96.72 |
| | | | |
| | | | |
| *Account #: 2* | | | |
| 10/31/2016 | Purchase | 600 | $106.79 |

*post class period sales

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On June 16, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of Indiana, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 16, 2017.


*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 3:16-cv-00815-PPS-MGG Shah v. Zimmer Biomet Holdings, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Troy S Brown PHV**
  troy.brown@morganlewis.com,kathleen.kosiek@morganlewis.com

- **Offer Korin**
  okorin@katzkorin.com,cmurphy@katzkorin.com

- **Jason L Krajcer PHV**
  jkrajcer@glancylaw.com

- **Lesley F Portnoy PHV**
  lportnoy@glancylaw.com,info@glancylaw.com

- **Robert V Prongay PHV**
  rprongay@glancylaw.com,info@glancylaw.com

- **Marc J Sonnenfeld PHV**
  marc.sonnenfeld@morganlewis.com

- **Paul A Wolfla**
  paul.wolfla@faegrebd.com,kristina.tinsley@faegrebd.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)