UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| RAJESH M. SHAH, *et al* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 3:16-cv-815-PPS-MGG |
| | ) |
| ZIMMER BIOMET HOLDINGS, INC., | ) |
| *et al* | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiffs Rajesh M. Shah, Matt Brierley, Eric Levy and UFCW Local 1500, which I'll refer to in this opinion as either "Shah" or "plaintiffs", bring this putative securities fraud class action on behalf of themselves and all other similarly situated individuals who bought shares in Zimmer Biomet Holdings, Inc. ("ZBH") during a specified period. ZBH is a publicly traded company that manufactures medical devices, based in Warsaw, Indiana. The case concerns alleged materially false statements relating to the financial performance of ZBH during the summer and fall of 2016. Four separate but overlapping motions to dismiss on behalf of four subsets of the defendants are presently before me. They all argue that Shah has failed to sufficiently allege any actionable claims. [DE 94, 96, 98, and 99.] But because Shah's allegations paint a convincing story that, if proven true, would constitute fraud in violation of the securities laws, I cannot dismiss this suit in its entirety. But as explained below, the complaint is not without deficiencies, and thus some claims must be dismissed.

## Background

Before analyzing the sufficiency of the claims before me, I will summarize the factual allegations. Given the procedural posture of the case, the following summation comes from the complaint and certain incorporated exhibits, all of which I must assume to be true. It's difficult to tell the players without a scorecard so I'll start with a roster of defendants for fear that the underlying factual allegations would be incomprehensible without one.

### I.     The Cast of Defendants.

ZBH is the main defendant here. ZBH is a relatively recently formed entity, coming into existence as a result of a $13.4 billion mega-merger between Zimmer Holdings, Inc. and Biomet, Inc., that closed in June 2015. [DE 60 ¶ 4.] Prior to the Merger, Zimmer and Biomet were two of the major players in the medical device manufacturing industry and both were headquartered in the small town of Warsaw, Indiana. [*Id.*] But the crosstown rivals now operate as one; ZBH remains headquartered in Warsaw, has a presence in more than 100 countries, and employs more than 18,000 individuals. [*Id.*]

Plaintiffs have also sued several ZBH C-suite executives and corporate officers who they allege played a central role in the perpetuation of the wrongs at issue, including the individuals who made the allegedly misleading statements concerning ZBH's financial performance.  These include: David C. Dvorak, ZBH's CEO, President and one its directors; Daniel P. Florin, ZBH's Senior Vice President and CFO; Robert J.

Marshall, Jr., ZBH's Vice President of Investor Relations and Treasurer; and Tony W.

Collins, ZBH's Vice President and Corporate Controller and Chief Accounting Officer.

[DE at ¶¶ 52-56.] I will refer to these defendants by their last names individually and

collectively as the "ZBH Management."

Plaintiffs have further named additional members of ZBH's Board of Directors as

culpable parties. This subset includes the aforementioned Dvorak, as well as Larry

Glasscock, the Chairman of ZBH's Board of Directors, and ten additional directors:

Christopher B. Begley; Betsy J. Bernard; Paul M. Bisaro; Gail K. Boudreux; Michael J.

Farrell; Robert A. Hagemann; Arthur J. Higgins; Michael W. Michelson; Cecil B. Pickett;

and Jeffrey K. Rhodes. [DE 60 ¶¶ 57-68.] I will refer to these defendants by their last

names individually and collectively as the "ZBH Directors."

There are also the eighteen private equity funds named as defendants. These

entities previously owned Biomet stock and acquired a 15% stake in ZBH as part of the

merger. [DE 60 ¶ 5.] These defendants then later sold their stakes in ZBH after the

merger was consummated. This subset of defendants can further be categorized by the

three private equity firms with whom these funds were affiliated. First, there are the

funds affiliated with Kohlberg Kravis Roberts & Co. LP (the "KKR Funds"); second, the

funds affiliated with TPG Global, LLC (the "TPG Funds"); and third, the funds affiliated

with Goldman Sachs Capital Partners (the "Goldman Funds"). [*Id.*] To the extent it is

necessary to discuss these defendants collectively, I will refer to them as the Private

Equity Defendants.

## II. Plaintiffs' Substantive Allegations.

Having defined the cast of relevant players, we now come to the main action, namely the conduct which Shah has alleged transpired and how he says that conduct amounts to fraud within the meaning of the federal securities laws. Shah's 185 page complaint is a blunderbuss that paints a picture of ZBH, the ZBH Management and the ZBH Directors knowingly sitting on a proverbial ticking time bomb of a factory known as North Campus. Shah tells me that the Private Equity Defendants were allowed to make an immensely profitable escape before the clock reached zero and news of the problem first reached ZBH's regulator, the Food and Drug Administration, and, more important for present purposes, the investing public.

Here are the details, according to Shah. By 2016 the North Campus was a facility which needed a complete overhaul in order to be compliant with federal regulations. But North Campus was also a facility which needed to be running at full capacity to realize the ambitious revenue and sales growth goals that ZBH had touted. These two needs were mutually-exclusive and plaintiffs allege that defendants kept the need for remediation on temporary hold, and hidden, in favor of trying to meet their growth goals. In effect, plaintiffs allege that ZBH took a gamble that it could in the long run accomplish both of these needs which were diametrically opposed to one another in the short term. Of course, this lawsuit would likely not exist if the gamble had worked. But instead, ZBH was forced to reveal the issues at North Campus that were previously

concealed and, as a consequence, that it would miss its revenue and growth goals, sending its stock price down by approximately 20% in the span of a week.

While analysts may have been shocked by this development, Shah alleges that defendants were anything but taken aback. According to Shah, the company's challenging situation would have come as no surprise at all had ZBH not misled investors as to the cause of the issues and made materially misleading statements in the process. Shah alleges that all of the causes of the lower-than-anticipated third quarter growth, downward projection in fourth quarter growth and attendant supply shortages were the result of substantial issues at North Campus which ZBH and its co-defendants are alleged to have known about and appreciated for months.

A.     Problems Identified at North Campus Throughout 2016.

Key to plaintiffs's theory that defendants' knowingly concealed their manufacturing problems is the fact that defendants engaged in a series of audits of ZBH's North Campus facility in the spring of 2016. The audits of North Campus were begun in response to problems which ZBH had identified at its other main facility in Indiana, known as "West Campus." [DE 60 ¶ 15.] The prior year, the FDA began an inspection of this separate West Campus facility and issued a letter to ZBH regarding deficiencies observed in West Campus. [*Id.* At ¶ 14.] ZBH later acknowledged the "systemic issues" the FDA pointed out at West Campus in a series of letters with the FDA and agreed to remediate the problems.

It was against this backdrop that Shah alleges that ZBH decided to conduct

audits of North Campus and its quality systems. [*Id.* at ¶ 137.] The audit reports were

issued on March 31, 2016, April 13, 2016, and June 7, 2016 (the final date marking the

beginning of the class period). While plaintiffs do not allege the full scope of these audit

reports or their findings (as it seems they have not yet had the chance to review them

via discovery), they allege that they identified significant quality system problems at

North Campus. In other words, ZBH learned that its quality systems issues (and thus its

FDA non-compliance) were not isolated to West Campus, which had already

undergone a full FDA review, but instead were present in two of the company's main

manufacturing facilities.

While the complaint itself focuses on the temporal connection between the West

Campus inspection by the FDA and subsequent internal audits of North Campus,

plaintiffs, in opposing the present motions, put forth that the problems identified at

North Campus in the audits would likely not have been surprising to ZBH and its

upper management. This is because Zimmer, prior to the merger with Biomet, had a

long and troubled history with" keeping its facilities in compliance with FDA

regulations. [DE 108 at 8.] This history primarily relates to "Project Trident," a $250

million remediation project engaged in by Zimmer prior to the merger beginning in

2012 and continuing into 2016. [*Id.*][1] Plaintiffs point to ZBH's (or rather its precursor

---

[1] Defendants take some issue with plaintiffs' references to "Project Trident" in
opposing the motion to dismiss because "Project Trident" is not expressly referenced in
plaintiffs' amended complaint. But that does not mean I must completely ignore these

Zimmer's) experience with costly remediation of a manufacturing plant as proof that, at the time the audit reports were issued, ZBH would have appreciated the scope of the problem at North Campus and known that extensive (and expensive) remediation was a foregone conclusion.

ZBH planned a complete overhaul of the policies and procedures at North Campus in order to bring it up to snuff. But instead of starting the overhaul immediately in the spring of 2016, it kicked the can down the road to November 2016. Plaintiffs allege that this timing is a key aspect of defendants efforts to keep ZBH stock artificially inflated. Plaintiffs allege that had ZBH began to remediate North Campus to bring it into fully regulatory compliance, the company would have had to effectively shut the plant down, bringing production at this major facility to a halt. And without a steady supply of product, ZBH could not hit its sales targets for the third quarter.

Instead, ZBH engaged in some more minor remediation at North Campus in the immediate aftermath of the audits, something plaintiffs allege was akin to applying a tourniquet to slow down the bleeding, but putting off actually closing the wound at North Campus. Plaintiffs allege that ZBH likely hoped that beginning remediation would stave off any painful sanctions from the FDA and keep supply lines open so that

---

facts, which are plainly consistent with plaintiffs' overall allegations, for purposes of this motion. "Materials or elaborations in [plaintiff's] brief opposing dismissal may be considered, so long as those materials or elaborations are 'consistent with the pleadings.'" *Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017) (citation omitted); *Defender Security Co. v. First Mercy Ins. Co.*, 803 F.3d 327, 335 (7th Cir. 2015).

ZBH could hit the third quarter and annual revenue growth projections it continued to tout.

**B.    Regulatory Inspection at North Campus.**

The FDA's inspection of North Campus began on September 12, 2016. [DE 60 ¶ 161.] In all likelihood, ZBH would have had five days notice of the inspection. [DE 60 at 58, n. 7].  The FDA immediately began to identify deficiencies in the quality systems and internal controls at the facility, especially as they related to the sterilization of final product to be shipped out from North Campus. [*Id.* at ¶ 162.] Those problems were so bad that roughly two weeks later, on September 29, 2016, ZBH voluntarily issued a complete hold on all products coming out of the North Campus facility. [*Id.* at ¶ 163.] According to plaintiffs, this embargo out of the North Campus facility at the very end of the third quarter "devastated" ZBH's supply of products as well as third quarter revenue. [*Id.* at ¶ 164.]

But the problems did not stop there. The FDA inspection continued throughout October and continued to cause additional disruptions in ZBH's supply of product and thus its financial performance in the fourth quarter. [*Id.* At ¶ 165.] And the company's "safety stock" (*i.e.* product reserves) was insufficient to meet demand, and so sales were not realized.

**C.    Alleged Coverup By ZBH Senior Management**.

In the midst of the FDA's 2016 inspection, ZBH's third fiscal quarter came to a close at the end of September 2016. On October 31, 2016, during an investor call, ZBH

announced its third quarter financial results and reported a drop in growth that quarter, reduced projected revenue guidance for the fourth quarter, and revised its total growth for 2016 to reflect no improvement for the entire year. [DE 60 ¶ 151.] These financial reports and projections were surprising to many and stood in contrast to statements made by ZBH in the months leading up to the close of the third quarter—but more on that later. During the October 31st call, Dvorak, ZBH's CEO, stated that the lower revenue, both past and projected, were related, in part, to "unanticipated supply constraints, related to our transitioning supply chain infrastructure" as well as "[efforts to] harmonize and optimize [ZBH's] sourcing, manufacturing and quality management systems." [*Id.* at ¶ 153.]

According to plaintiffs, this explanation for the third quarter miss was complete hogwash. It wasn't a case of mistaken information or carelessness by ZBH's management in learning the truth, but instead an intentional effort to conceal the true cause of the company's woes. To support this coverup theory, Plaintiffs rely heavily on allegations and facts relating to Robin Barney, a former senior vice president at ZBH and member of ZBH's executive leadership team.

In a separate lawsuit pending in this district, Ms. Barney has alleged that she was effectively fired from her job at ZBH around the same time and that she was forced to resign for refusing to go along with ZBH's scheme to conceal the problems at North Campus. She has alleged that ZBH Management, specifically defendants Florin and Dvorak, instructed her to "commit securities fraud" and help "concoct a story" relating

to North Campus and the company's third quarter miss. [*Id.* at ¶¶ 219-220.] As part of this alleged coverup, Barney was to pretextually fire individuals at North Campus, an allegation that is further found in (and corroborate by) allegations of yet another lawsuit filed by another ex-employee named Terry Martin. [*Id.* at ¶ 234] Martin was the Senior Director of Facility and Maintenance for ZBH. [*Id.* at ¶¶ 236-237.] Barney alleges that she refused to follow the order to terminate certain employees, and consequently was forced to resign. [*Id.* at ¶ 221.] Nevertheless, according to plaintiffs, ZBH went ahead with the plan, and they posit that the reasons given on the October 31, 2016 conference call for the company's unexpected revenue miss were materially misleading, because ZBH's Management was by then fully aware as to what the real cause of its problems were — the same problems the company had been alerted to months earlier via its own internal audit of North Campus.

**D.    ZBH's Stock's Plummets in October and November 2016**.

After the announcement on October 31, 2016, things began to fall apart. Investors reacted immediately to the news of ZBH's under performance and began unloading ZBH's stock. The stock plummeted by $17.15 per share that day and closed at $105.40 — a 14% drop. [*Id.* at 154.] This resulted in the sudden evaporation of approximately $3.4 billion in ZBH's market capitalization. [*Id.* at ¶ 154.] As one investment analyst at Suntrust stated, ZBH's announcement "blindsided investors" by reporting that organic sales growth declined to 1.6% thus wiping out all of the projected revenue gains for 2016. [*Id.* at ¶ 151.]

Speculation loomed large as to what caused this seemingly unexpected turn at ZBH, with some analysts questioning the reasons given by ZBH on the October 31st call. That same day, analysts at BMO Capital Markets issued a report expressing disbelief that supply chain issues could have been such an unexpected surprise for ZBH Management, or in their words, "to say this was a surprise is an understatement." [*Id.* at ¶ 227.] J.P. Morgan likewise questioned "why didn't [ZBH management] see this coming and how could management have been so bullish on 3Q as late as the September investor conferences and an NDR [non-deal roadshow] in Boston on September 28th?" [*Id.* at ¶ 229.]

Then, Northcoast Research downgraded its recommendation of ZBH's stock from "buy" to "neutral" based upon "conversations with industry contacts" stating that ZBH had been experiencing problems at its Warsaw, Indiana facilities, *i.e.*, North Campus. [*Id.* at ¶ 156-157.] Analysts at Northcoast noted that while they were "initially willing to give ZBH the benefit of the doubt regarding its explanation behind unanticipated product supply issues on its 3Q16 earnings call . . . following our conversations with industry contacts, we are concerned there is more to the story." [*Id.* at ¶ 156.] Specifically, Northcoast "worr[ied] future acknowledgment of manufacturing issues at [North Campus] (either by the company or in FDA Form 483 observations) could lead to additional investor concern and limit upside potential for the stock." [*Id.*] According to plaintiffs, Northcoast's report effectively "foiled" the coverup and supply chain story that ZBH Management had attempted to sell to investors. [*Id.* at ¶ 232.]

On November 8, 2016, ZBH made additional disclosures through its quarterly From 10-Q filed with the SEC and a press release. Through the 10-Q and press release, ZBH disclosed "(i) that the true cause of the supply shortages in Q3'16 was the disruption being caused by a disastrous FDA inspection of the North Campus; (ii) that there were regulatory deficiencies with the [quality systems] at the North Campus; and (iii) that ZBH lacked the ability to meet demand for its products while remediating the regulatory deficiencies at the North Campus." [DE 60 at ¶ 159.] These revelations caused another significant drop in ZBH's stock price; it fell by another $2.62 which represented a drop of approximately $500 million in market capitalization. [*Id.* at ¶ 160.]. While this information was all new to investors, plaintiffs allege that this information, and the reasons why ZBH missed (and would miss) its third quarter revenue goals, were long known to ZBH, as it would later admit to the FDA.

## E. FDA Inspection Concludes With a 483 Warning Letter.

The FDA concluded its inspection of North Campus on November 22, 2016. [DE 60 ¶ 166.] The results were stark. Through a 57-page Form 483 Warning Letter the FDA listed out its numerous findings and deficiencies at North Campus. These included 14 observations of process and procedure deficiencies at North Campus. Specifically, the FDA noted:

> (1) A process whose results cannot be fully verified by subsequent inspection and test has not been adequately validated according to established procedures;
> (2) Procedures to control environmental conditions have not been adequately established;

(3) Procedures have not been adequately established to control product that does not conform to specified requirements;
(4) Procedures for design control have not been established;
(5) Procedures for corrective and preventative action have not been adequately established;
(5) Process control procedures that describe any process controls necessary to ensure conformance to specifications have not been adequately established;
(7) Procedures for monitoring and control of process parameters for a validated process have not been adequately established;
(9) Procedures for acceptance activities have not been adequately established;
(10) Buildings are not of suitable design to perform necessary operations;
(11) Sampling plans are not based on valid statistical rationale;
(12) Procedures for rework of nonconforming products have not been adequately established;
(13) Procedures to ensure that all purchased or otherwise received product and services conform to specified requirements have not been adequately established; and
(14) Document control procedures have not been adequately established.

[*Id.* at ¶ 167.] In other words, the FDA's audit revealed severe deficiencies at North Campus across a wide variety of compliance areas which required large-scale remediation at North Campus.

In response to the FDA's letter, ZBH acknowledged the deficiencies the FDA had identified via a letter to the FDA on December 21, 2016. [*Id.* at ¶179.] In this letter, ZBH admitted that "corporate management" was aware of "systemic issues" at North Campus as a result of the internal audits. [*Id.*] Specifically these "systematic issues" included "self-identified major compliance-related issues in areas such as design controls, sterile packaging, complaint handling, nonconforming material, and CAMAS." [*Id.* at ¶ 180.] According to plaintiffs, the problems identified by the FDA "effectively mirrored the issues" which had been identified in the internal audits from

months earlier, with ZBH acknowledging in its December letter that its audits had identified issues relating to 7 of the 14 observations noted in the FDA's Form 483 letter. [*Id.* at ¶ 181.] Plaintiffs say these statements are proof of ZBH's scheme throughout 2016 to conceal issues at North Campus in the hopes of beating the clock and keeping its revenue growth in line with expectations before having to engage in full-scale remediation at North Campus.

### F.    Alleged Misrepresentations Throughout the Class Period.

So here's where we're at so far: (1) ZBH discovered compliance and manufacturing problems at its North Campus facility; (2) then, the FDA likewise discovered many of the same compliance and manufacturing irregularities at North Campus which led to a product hold; and (3) ZBH then revealed those compliance and manufacturing problems to investors in the fall of 2016.  But securities fraud requires more than the release of bad news and a subsequent drop in the stock price. There must be false or misleading statements made regarding the issues, not simply that ZBH had problems that it kept quiet about or did not bring to light until later.

Shah alleges actionable false and misleading statements by defendants during the class period beginning on June 7, 2016 and concluding on November 7, 2016. In particular, Shah alleges that defendants made false and misleading statements that ZBH's "organic revenue growth was accelerating and that organic revenue growth would continue to accelerate above market level in the second half of 2016 due to cross-selling opportunities." [DE 60 at ¶ 265.] Likewise, Shah alleges that ZBH falsely and

14

misleadingly understated its known and potential risks given what it knew about its plants' operations and that it failed to disclose risks that "had in fact actually occurred or were very likely to occur" including that integration of the two companies was going to be much more difficult than planned, that an "imminent" FDA inspection would result in negative consequences given the known quality systems issues, and that ZBH could not possibly remediate North Campus and continue to manufacture there simultaneously. [*Id.* at ¶ 267.] Shah alleges that these statements were all false and misleading because they omitted known facts relating to the quality systems deficiencies at North Campus, ZBH's inability to meet product demand while remediating these issues, and the FDA compliance issues that were attendant to this. [*See id.* at ¶¶ 265-268.]

These statements were made in a variety of different contexts, by different members of the ZBH Management, as well as the company itself, across the class period. In particular Shah alleges that materially false or misleading statements were made in or during:

- A June 7, 2016 investor conference call relating to ZBH's announcement of an acquisition of another company, LDR, by defendant Dvorak on behalf of ZBH. [*Id.* at ¶¶ 269-270.]

- The June 2016 Prospectus, Registration Statement and Preliminary Prospectus (together the "June 2016 SPO Materials") relating to the Private Equity Defendants' sale of their ZBH stock at this time. The June 2016 SPO Materials incorporated by reference other SEC filings, including ZBH's 2015 Form 10-K, and ZBH's first quarter 2016 Form 10-Q, which were false or misleading as of June 2016. [*Id.* at ¶¶ 271-293.]

- A June 28, 2016 press release entitled "Zimmer Biomet Reports Second Quarter 2016 Financial Results" and investor conference call discussing ZBH's financial results in which defendants Dvorak and Florin both made statements. [*Id.* at ¶¶ 294-308.]

- The August 8, 2016 Quarterly Form 10-Q Report. [*Id.* at ¶¶ 309-314.]

- The August 9, 2016, Registration Statement, Preliminary Prospectus and the August 11, 2016 Prospectus (together the "August 2016 SPO Materials), relating to a second round of stock sales by the Private Equity Defendants. [*Id.* at ¶¶ 315-322.]

- Statements made during a September 7, 2016 Wells Fargo Securities Healthcare Conference by defendant Marshall. [*Id.* at ¶¶ 323-326.]

- Statements made during a September 12, 2106 Morgan Stanley Global Healthcare Conference by defendants Dvorak and Florin. [*Id.* at ¶¶ 327-341.]

In addition, Shah claims that the reasons for the third quarter miss given during the October 31, 2016 earnings call were not only misleading by omission of material facts, but intentionally affirmatively misleading statements, made to try and mask the North Campus debacle. [*Id.* at ¶¶ 342-347.]

**G.      Stock Sales by the Private Equity Defendants**.

The final piece of story is the role played by the Private Equity Defendants who so far have gone almost unmentioned. Shah alleges that the concealment of the quality systems issues at North Campus, along with ZBH's misleading rosy statements concerning expected revenue growth, allowed the Private Equity Defendants to profit immensely and knowingly sell their stock at a falsely inflated price throughout the summer of 2016.

Specifically, Shah alleges that at the beginning of the class period, the Private Equity Defendants owned approximately 18.5 million shares of ZBH, accounting for just under 10% of the company's outstanding stock. [DE 60 ¶ 6.] In June and August of 2016, a few months after the results of ZBH's internal audits were gathered, but months before their conclusions or the FDA's conclusions as a result of its own investigation into North Campus, the Private Equity Defendants sold their entire stake in ZBH. These sales resulted into proceeds of approximately $2.25 billion. [*Id.* at ¶ 6, 391.]

According to Shah, the timing of these sales was not simply fortuitous or coincidence. Instead, Shah alleges that the Private Equity Defendants, by virtue of their ownership of Biomet prior to the merger had secured for themselves a powerful position within the combined company. Specifically, the Private Equity Defendants (or at least two of the three) secured as part of the merger, the right to designate two board members to the ZBH Board of Directors. [DE 60 ¶ 376.] In addition to these directors having the usual customary rights, such as receiving information presented to the board, the Private Equity Defendants had an additional contractual right which allowed for the private equity board members (defendants Michelson and Rhodes) to share information they learned via their positions with the Private Equity Defendants (and their affiliates) themselves, who otherwise would not have access to such potential insider information. [*Id.* at ¶¶ 381-82.] Plaintiffs allege that defendants Michelson and Rhodes must have shared the audit reports concerning North Campus with the Private

Equity Defendants and that this explains the timing of their sales of their remaining

stakes in ZBH. [*Id.* at ¶¶ 389-391.]

## Discussion

Presently before me are four motions to dismiss filed by the defendants pursuant

to Federal Rule of Civil Procedure 12(b)(6). In order to withstand defendants' motions,

the complaint must state "allegations plausibly suggesting (not merely consistent with)"

an "entitle[ment] to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (citation

omitted). Thus a plaintiff need only plead "enough facts to state a claim to relief that is

plausible on its face." *Id.* at 570. But where a complaint only arises to claims at "the

speculative level," dismissal is warranted. *Id.* at 555. In making this determination, I

"must accept as true all of the factual allegations contained in the complaint."

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, n.1 (2002).

Because this is a securities fraud case, however, the oft-repeated standard used to

determine whether an ordinary civil complaint sufficiently states a claim is only part of

the standard at play. The Private Securities Litigation Reform Act ("PSLRA") provides a

heightened standard that plaintiffs must meet in order to survive a motion to dismiss.

The PSLRA mandates that "securities fraud complaints 'specify' each misleading

statement; set forth the facts 'on which [a] belief' that a statement is misleading was

'formed'; and 'state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind.'" *Dura Pharm. Inc. v. Broudo*, 544 U.S.

336, 345 (2005) (citation omitted and alternations in original); 15 U.S.C. § 78u-4(b)(2)(A).

Here, the required state of mind that must be pled is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). And in determining whether a "strong inference" of scienter has been sufficiently alleged, the Supreme Court has made clear that I may not draw only on "inferences urged by the plaintiff" but must engage in a "comparative evaluation" and thus examine and consider "competing inferences [in defendants' favor] drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) ("*Tellabs II*"[2]). Shah must convince me that his allegations show not just that scienter is "plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

Layered on top of all this is Federal Rule of Civil Procedure Rule 9(b) and its particularity requirement. It too applies to plaintiffs' claims to the extent they sound in fraud. While the focus throughout this opinion will be on the PSLRA's pleading requirements—as those are the most stringent at play and likewise require pleading with particularity—plaintiffs still have the burden under Rule 9(b) to "state with

---

[2] In *Telllabs II*, the Supreme Court reversed the Seventh Circuit's opinion in *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006) ("*Tellabs I*"). The parties (and many other courts discussing this trio of seminal securities law cases) refer to these cases as *Tellabs I* (the Seventh Circuit's first opinion), *Tellabs II* (the Supreme Court's opinion reversing *Tellabs I*), and *Tellabs III* (the Seventh Circuit's opinion on remand from the Supreme Court). As such, this opinion adopts these naming conventions despite not otherwise citing the *Tellabs I* decision in this opinion.

particularity" "the who, what, when, where, and how" of their fraud claims. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citation omitted).

The Second Amended Complaint [DE 60] alleges ten separate counts against the defendants. Counts I and II assert securities fraud claims for violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and of SEC Rule 10b-5, against ZBH and the ZBH Management. Counts III and IV assert insider trading claims under Section 20(a) of the Exchange Act against the Private Equity Defendants. Lastly, Counts V through X assert strict liability and negligence claims against various combinations of the defendants for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") relating to false statements contained within documents relating to offerings of securities in June and August 2016.

Before tackling these individual claims, there is a preliminary issue to be decided related to how to treat the allegations contained in the lawsuits brought by former employees Ms. Barney and Mr. Martin described above. So that's where I will begin.

## I.     Allegations Based Upon Complaints in Other Pending Cases.

Because the sufficiency of Shah's legal claims rest upon how robust his factual allegations are, I must first address an aspect of defendants' (primarily ZBH's) motion which asks that I either strike pursuant to Rule 12(f) or disregard certain allegations made by Shah which are based upon allegations from other pending lawsuits. Specifically, Shah has incorporated allegations from two lawsuits filed by former employees of ZBH which have been filed in this district but are not before me. Those

cases are: (1) *Barney v. Zimmer Biomet Holdings, Inc.*, No. 3:17-cv-616-JD-MGG (N.D. Ind.); and (2) *Martin v. Zimmer Biomet Inc., et al.*, No. 3:17-cv-615-JD-MGG (N.D. Ind.).

Recall that Robin Barney is ZBH's former Senior Vice President of Global Operations and Logistics and one of 12 members of ZBH's "Executive Management Team." [DE 60 at 24.] Terry Martin is the former Vice President of Manufacture Engineering at North Campus from 2007 until the ZBH merger closed in 2015, at which point he became the Senior Director of Facilities and Maintenance and worked out of ZBH's West Campus. [DE 60 at ¶ 235.] Both of these individuals have sued ZBH claiming that they were wrongfully terminated and allege facts relating to their termination which bear on the substantive allegations in this case. Shah relies on the allegations of these complaints to bolster his claims that defendants engaged in a "cover up" and misled investors as to the real causes of ZBH's lackluster sales during the third quarter of 2016. [DE 60 ¶¶ 213-239.] These allegations thus go directly to the hotly contested issue of whether Shah's complaint sufficiently alleges the necessary level of scienter—*i.e.*, whether or not defendants had a fraudulent intent when making their statements to the investing public.

In support of their argument, defendants rely upon *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2nd Cir. 1976) and subsequent case law interpreting it to limit the ability of a plaintiff to use allegations from pleadings in unrelated cases. Defendants put more weight on *Lipsky* than it can bear. As explained more fully below, a better reading of *Lipsky* is that factual allegations in a complaint are to be taken as true

at this stage of the proceeding, and that simply because they are facts which are alleged in other pleadings, does not mean they should be stricken.

In defendants' eyes, allegations which are cribbed from other lawsuits are "*per se* immaterial and should be stricken from the complaint." [DE 95 at 38.] Notably, the Seventh Circuit has not addressed this issue. It is true that some district courts have embraced defendants' position. *E.g., In re Rough Rice commodity Litig.*, No. 11 C 618, 2012 WL 473091, at *4 (N.D. Ill. Feb. 9, 2012) (embracing *Lipsky* as "well-establish precedent 'that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f)") (citation omitted). But other district courts have taken the opposite view. *E.g., Marvin H. Maurras Revocable Tr. V. Bronfman*, Nos. 12 C 3395, 12 C 6019, 2013 WL 5348357, at *15-17 (N.D. Ill. Sept. 24, 2013) (disagreeing with *Rough Rice* and questioning whether a broad reading of *Lipsky* is at all well-established); *In re Fannie Mae Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) ("*Lipsky* does not, as defendants argue, stand for the proposition that any factual allegation derived from a government investigation or pleading must be stricken from a private plaintiff's complaint.").

It is not unreasonable to say that, read broadly, *Lipsky* could support a *per se* rule, but my reading of the case is not so broad. Instead, I agree with the reasoning articulated in *In re Herbal Supplements and Sales Practices Litig.*, No. 15-cv-570, 2017 WL 2215025 (N.D. Ill. May 19, 2017) ("*Herbal Supplements*"). In an opinion which thoroughly

analyzes the relevant case law (much of which has been cited by the parties here), the court in *Herbal Supplements* ruled that *Lipsky* does not stand for a categorical rule barring a plaintiff from including allegations from another lawsuit on the basis that the other lawsuit has not been adjudicated. 2017 WL 2215025, at *6. Indeed, as noted in *Lipsky* itself, the Second Circuit made clear that its holding was a limited one given the specifics at issue. 551 F.2d at 893. As the court stated, we "hold that neither a complaint nor references to a complaint which results in a consent judgment may properly be cited in the pleadings *under the facts of this case*." *Id.* (emphasis added).

The clincher to me is the fact that the underlying case in *Lipsky* involved a consent judgment in which no liability was admitted to and all parties agreed it would be inadmissible under then Federal Rule of Evidence Rule 410 prohibiting "pleas of nolo contendere from being later used against the party who so pleaded." *Lipsky*, 551 F.2d at 893. Further central to the court's reasoning was that striking references to the complaint itself would, in the end, be harmless, as it reversed the district court's dismissal, and the plaintiff would be able to use the underlying facts and evidence on the subject at any eventual trial. *Id.* at 894 ("Quite frankly, we do not understand how Darin is harmed by the elimination of the SEC references. If the trial judge finds that testimony or documents from the SEC are admissible on the 'best efforts' question, surely Darin need not allude to this evidence in his complaint as a condition for its admission."). The takeaway is that *Lipsky* does not stand for a categorical rule of law

(and certainly none which is binding precedent upon me) which prohibits a plaintiff from relying on a pleading in another case to bolster their own allegations.

This lack of legal authority, coupled with the fact that "motions to strike are disfavored and courts should grant them only when the allegations at issue are 'so unrelated to the party's claims as to be devoid of merit and unworthy of any consideration' as well as unduly prejudicial" counsels against striking the allegations from the Barney and Martin cases. *Herbal Supplements*, 2017 WL 2215025, at *6 (citation omitted). Defendants cannot (and do not) argue that these allegations are not relevant to the allegations of fraud, nor do they suggest any reason why they would be prejudicial, let alone unduly prejudicial (beyond the prejudice of having to defend this lawsuit of course). Thus, while at trial or summary judgment plaintiffs will certainly need ***evidence*** and not just allegations from other lawsuits in order to prevail, I will deny defendants' motion to strike pursuant to Rule 12(f) and consider the allegations of the Barney and Martin suits in determining whether or not plaintiffs have sufficiently alleged scienter as to their fraud claims.

## II.    Alleged Violations of the Exchange Act Against ZBH, the ZBH Management and the ZBH Directors.

There are six elements to a securities fraud claim under Section 10(b) of the Exchange Act: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

Defendants move to dismiss primarily based upon what they say is Shah's alleged failure to adequately plead the first two elements, and thus I will focus on those.

## A. Allegations Concerning Material Misrepresentations or Omissions.

ZBH, the ZBH Directors and the ZBH Management challenge all of plaintiffs' claims (both under the Securities Act and the Exchange Act) on the basis that plaintiffs have failed to allege any actionable fraudulent statements on their part. This argument is principally two-fold, with a third argument applicable to a subset of the allegedly misleading statements. First, these defendants argue that there was no duty to disclose imposed by affirmative law and thus there can be no liability. Second, defendants argue that even if a duty to disclose could be inferred, there was nothing "material" to disclose at any point prior to the end of the class period. Third, defendants argue that a subset of the statements at issue cannot be the basis for liability under the securities laws because they are protected by the PSLRA's safe harbor provision, applicable to forward-looking statements made by companies which contain necessary cautionary language.

### 1. Was There a Duty to Disclose?

At issue is ZBH's decision not to disclose the results of its internal audits at North Campus which plaintiffs allege uncovered the very problems which eventually (and inevitably) led to regulatory action and stunted growth. Of course, ZBH's discovery of bad news via its audits by itself did not trigger a duty to disclose that information to the investing public. Otherwise, this would be an open-and-shut case, as

25

no one disputes that ZBH did not release its internal audit findings to the public until well after the FDA's inspection, the quarantine of North Campus, and the precipitous drop in ZBH's stock. Instead, the question is whether ZBH had a duty to disclose, as "firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose." *Gallagher v. Abbott Labs., Inc.*, 269 F.3d 806, 808 (7th Cir. 2001).

Plaintiffs allege that the duty to disclose was triggered under Item 303 of Regulation S-K which requires any issuer of securities to disclose or describe in its registration statements "any known trends or uncertainties that have had or that the [issuer] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" as well as "events that will cause a material change in the relationship between costs and revenues." 17 C.F.R. § 229.303(a)(3)(ii). This "reasonably expects" language has not been defined by the Seventh Circuit, but district courts in other circuits and the SEC have stated it requires more than a remote possibility but something less than more-likely-than-not. *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 88 (S.D.N.Y. 2017) ("[T]here must [be] a fairly substantial probability that the known risk at issue will materialize and have a material impact—if not a more-likely-than-not standard, then something not too much below that."); *id.* ("The interpretive guidance, in turn, uses the similarly high standards 'likely to come to fruition' and 'reasonably likely to occur[.]'"); Commissioner Statement About Management's Discussion and Analysis of Financial Condition and Results of

Operations, Release Nos. 33-806, 34-45321, 2002 WL 77153, at *4 (Jan. 22, 2002).

Expressing these risks only in the vaguest terms or as a hypothetical when they have already come to fruition, in whole or in part, can be a basis for liability under the securities laws. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1172 (9th Cir. 2009), *aff'd sub nom. Matrixx Initiatives v. Siracusano*, 563 U.S. 27 (2011); *In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013).

Plaintiffs thus allege that the duty was violated when ZBH made statements which were false in light of what ZBH knew from its internal audits. According to the complaint, those audit findings were completely anathema to the growth and success ZBH was telegraphing to the markets because it would be nearly impossible for ZBH to achieve those goals while fully remediating the known issues at North Campus. This is because full remediation of North Campus would bring production at that location effectively to a halt (as it eventually did). Plaintiffs allege that ZBH's knowledge of this likely result stemmed not just from the issues present in the audits, but also based upon ZBH's knowledge of past remediation at West Campus and Project Trident, and that the FDA was closely scrutinizing the company. If true, this can be a basis for liability under Rule 10-b and the Securities Act. *See Ind. Pub. Ret. Sys. v. SAIC*, 818 F.3d 85, 94 n.7 (2d Cir. 2016); *In re Next Level Sys., Inc.*, 1999 WL 387446, at *8 (N.D. Ill. Mar. 31, 1999).

ZBH frames Item 303's disclosure requirements as only relating to the FDA's regulatory oversight of ZBH and thus argue that because the June and August 2016 SPO Materials were created **before** the FDA began its inspection, uncovered issues, or issued

the 483 warning letter to ZBH regarding North Campus, there was no known trend or uncertainty to disclose. [DE 95 at 23.] But this framing is far too narrow and misconstrues plaintiffs' allegations. Instead, the known trend or uncertainty at issue is more properly framed as quality systems failures at North Campus, which plaintiffs allege were uncovered by ZBH via internal audits well in advanced of the June 2016 SPO Materials. Plaintiffs allege that the issues uncovered by the audits were pervasive and if known by the FDA would surely result in regulatory action.

Nothing in *Gallagher,* a case relied heavily on by ZBH, dictates a different result. In that case, the Seventh Circuit held that Item 303's disclosure requirements were inapplicable to the FDA 483 letter at issue because the allegedly misleading statement (made in a Form 10-K disclosure) occurred ***before*** the day the 483 letter was issued which in that case was the date the class period began. *Gallagher*, 269 F.3d at 810 ("The 10-K report was filed on March 9, 1999, and the FDA's letter is dated March 17, eight days later. Unless Abbott had a time machine, it could not have described on March 9 a letter that had yet to be written."). The focus in *Gallagher* was entirely on what the FDA was doing and the company there did not make any false or misleading statements concerning what the FDA was doing. *Id.* at 808 ("What sinks plaintiffs' position is their inability to identify any false statement—or for that matter any truthful statement made misleading by the omission of news about the FDA's demands."). And because the statements in the 10-K were not false *at the time they were made* and there was no duty to update, there could be no liability. *Id.*

28

This case as alleged by plaintiffs, however, is much broader and not as strictly tied to the timing of the FDA's 483 letter. Here, plaintiffs allege that the misleading disclosures were made *after* ZBH was made aware of quality systems issues at North Campus in spring 2016 through its own internal audits of North Campus. On the heels of what had just happened at West Campus, plaintiffs allege that it was entirely predictable to the powers that be at ZBH that North Campus would almost certainly face the same problems in the form of a 483 letter from the FDA when any inspection came, and furthermore this would mean that ZBH could not simultaneously bring North Campus into compliance (and thus maybe avoiding FDA action) while maintaining the output necessary to meet sales and revenue goals the company was projecting. Thus, while *Gallagher* rightly stands for the proposition that there is no general duty to disclose bad news, plaintiffs allege that ZBH made statements while in possession of information that it knew would make them misleading, which is distinct from what occurred in *Gallagher*.

ZBH next argues that even if the relevant question focuses more broadly on the quality systems issues at North Campus, they still do not fall within Item 303's ambit. This argument is unconvincing for a number of reasons. ZBH relies a series of securities cases relating, coincidentally, to a different affair at the legacy Zimmer[3] company. It is

---

[3] These cases are a district court opinion dismissing a securities class action, its opinion denying leave to amend the complaint as futile and the Seventh Circuit's opinion affirming the dismissal and denial to amend. *Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings*, *Inc.*, 673 F. Supp.2d 718 (S.D. Ind. 2009) "*Zimmer I*"; *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,

true that in one of those cases, the Seventh Circuit said that routine quality systems issues cannot by law be known trends or uncertainness because "[q]uality-control issues at pharmaceutical and medical-device producers are endemic." *Zimmer III*, 679 F.3d at 956. But while routine quality control or quality systems issues may be pervasive in the industry, plaintiffs have alleged much more than run-of-the-mill concerns. Instead, as plaintiffs note throughout their complaint, the issues at North Campus were "systemic" and resulted in dramatic consequences for ZBH. [DE 60 ¶¶ 180, 256.] What's more, these systemic issues were not speculation, but were confirmed through the company's own audits of North Campus, concealed from the investing public, and all the while ZBH continued to make its optimistic statements regarding its operations and revenue. This is in contrast to the situation in *Zimmer III*, where there was nothing so definitive as to the extent of the problems or any statements which were misleading on this point. As the court stated, the "best evidence" of any fraudulent statement by the company was "a truthful answer" of "[w]e don't have any warning letters at this point" in response to the "compound question" asking whether the company had any FDA warning letters or 483 letters. *Zimmer III*, 679 F.3d at 955-56. "The worst one could say about Zimmer's answer is that it was evasive, which is short of fraudulent." *Id.* at 956 (citation omitted).

I do not read *Zimmer III* as standing for the proposition, as defendants would seem to have it, that as a general matter quality systems and quality control-related

No. 1:08-CV-01041-SEB-DM, 2011 WL 338865, at *1 (S.D. Ind. Jan. 28, 2011) "*Zimmer II*"; and *Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952 (7th Cir. 2012) "*Zimmer III*".

issues can never be the basis for liability under the securities laws simply because they occur regularly at medical device companies. An analogy to another industry perhaps best illustrates this point. It is common knowledge and somewhat expected that all car manufacturers will probably issue recalls related to their vehicles at some point in time. But it is an entirely different thing if a car company knows that it is making cars which are unreasonably dangerous and will need to be recalled but continues to do so because they have sales goals to meet that they promised shareholders that they continue to say will be met. So too would dismissal in this case on this principle be inappropriate.

Likewise, I cannot accept ZBH's argument that Shah's complaint fails because the product shut down of North Campus did not occur until the very end of the third quarter. [DE 95 at 27.] The argument is that a shut down so late in the quarter could not, as a matter of law, materially impact sales. [*Id.*] But as plaintiffs allege, those final days of the quarter are key shipping dates within ZBH's business and thus, even a few days of quarantine at that time period could have an adverse material effect on ZBH's bottom line. And given that the issues at North Campus were alleged to be known and systemic in nature, it is not a stretch to think that absent full-remediation a product hold was inevitable. In any event, plaintiffs have alleged enough, and while defendants may disagree and present a factual dispute, resolution of that dispute must wait for another day, after plaintiffs have had an opportunity to conduct discovery.

## 2.    Have Plaintiffs Sufficiently Alleged Materiality?

Having found that plaintiffs have plausibly alleged that there was a duty to disclose the North Campus audit results (and their likely consequences) as a result of the otherwise rosy statements defendants were making about the company, I must next address the attendant argument as to whether such information would have been material to investors. A specific piece of information is material when there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Matrixx Initiatives,* 563 U.S. at 38 (citations omitted). Not surprisingly then, determining the materiality of a statement is quite fact intensive and as such the "materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997). "[T]hese assessments are peculiarly ones for the trier of fact." *Id.*

So too here. It would be inappropriate to find that the quality systems issues identified at North Campus, which were eventually subject to the FDA's inspection, and the product hold were not material. Defendants argue that plaintiffs cannot definitively say that the revenue hit created by the product hold (which occurred near the final days of the third quarter) and other snafus at North Campus were the sole cause of the revenue miss and attendant stock fall. But defendants seek to hold plaintiff to too high a standard in this instance—plaintiffs need not allege that defendants' misconduct was responsible for the entirety of the revenue miss and stock price decline. The materiality

standard is not so rigid, especially at the pleading stage. And given the intense investor

analyst focus and large dip in ZBH's stock once news relating to North Campus's

quality systems issues hit the market, even before the FDA had released its formal Form

483 letter, I would look askance at a claim that this information was immaterial *as a*

*matter of law.*

###### B.     Application of the PSLRA'S Safe Harbor Provision.

ZBH further argues that its financial guidance statements, discussed above, are

not actionable as securities fraud because they fall within the so-called safe harbor

provision of the PSLRA. [DE 95 at 30-33]. The safe harbor protects statements from

liability under the securities laws, so long as certain conditions are met. Namely, the

statements must be (1) forward-looking statements; (2) identified as such; and (3) either

immaterial or "accompanied by meaningful cautionary statements identifying

important factors that could cause actual results to differ materially from those in the

forward-looking statement." 15 U.S.C. § 77z-2(c)(1). In addition, statements made with

actual knowledge of their falsity are not protected by the safe harbor, or otherwise the

statute would legalize knowing intentional misconduct. *Id.*  "Cautionary language is

meaningful 'if it puts an investor on notice of the danger of the investment to make an

intelligent decision about it according to her own preferences for risk and reward.'

Cautionary language must therefore be 'substantive and tailored to the specific

predictions made in the allegedly misleading statement'" *Desai v. Gen. Growth Properties,*

*Inc.*, 654 F. Supp. 2d 836, 844–45 (N.D. Ill. 2009) (citations omitted).

The twelve statements here at issue were made during various conference calls by Defendants Dvorak and Florin, or contained with ZBH's 10-Q filing. [*See* DE 60 at ¶¶ 269, 298, 300, 302, 304, 307, 311, 331, 333, and 336.] ZBH contends that all of them are statements that relate to revenue guidance and sales growth which are, by definition, forward-looking. What's more, ZBH tells me that the statements were accompanied by sufficient cautionary language so as to come within the safe harbor. Plaintiffs say this is nonsense and that the cautionary language put forth by ZBH is nothing more than boilerplate which cannot by law innoculate statements from liability, particularly where a defendant makes a statement with knowledge of its falsity. In addition, plaintiffs argue that the cautionary language ZBH points to, contained in its 2015 10-K, cannot save it because that information "remained fixed even as the risks changed." [DE [Pl Br] at 52 (quoting *Asher v. Baxter Intern., Inc.*, 377 F.3d 727, 734 (7th Cir. 2004). In other words, plaintiffs convincingly argue that ZBH cannot avail itself of cautionary language made in late 2015 because that language cannot possibly have incorporated the information allegedly learned by ZBH and its management through audits in early to mid-2016. It is this last argument that I think is persuasive in showing why the safe harbor cannot save ZBH in this instance.

*Asher* is instructive. In that case the Seventh Circuit reversed the district court's dismissal of a securities class action on the basis that the allegedly misleading statements were protected under the safe harbor. The court found that the safe harbor was not available when defendants pointed to cautionary language which was issued

prior to the illegally concealed facts and remained unchanged despite material changes in the company's condition. *Asher*, 377 F.3d at 730–31 ("[T]he cautionary statement did not follow the firm's fortunes: plants closed but the cautionary statement remained the same; sterilization failures occurred but the cautionary statement remained the same[.]").  Same here. The plaintiffs allege that in the first half of 2016, ZBH and the ZBH Management learned of massive problems at North Campus via its internal audit reports that would inevitably derail ZBH's financial forecasts. But instead of altering the forecasts, the cautionary language stayed the same.

Nor can ZBH save itself by pointing to the fact that their cautionary language noted that "Interruption of our manufacturing operations could adversely affect our business . . . [C]ompliance concerns relating to the Quality System regulation and Good Manufacturing Practice requirements, . . . could adversely affect our ability to manufacture our products." [DE 95 at 33 (quoting 2015 ZBH 10-K).] While this cautionary language mentions manufacturing interruptions and quality system regulation and their potential adverse impacts on ZBH, such generic categorical statements of risk cannot inoculate otherwise misleading statements, especially when ZBH was alleged to have known the specific facts relating to the quality system issues at its major North Campus plant which would inevitably be a regulatory disaster. Or as another district court colorfully put it, this is "akin to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with

near certainty that the Grand Canyon lies one foot away." *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013).

Of course that doesn't mean that ZBH's failure to update its cautionary language itself constitutes securities fraud. That would be absurd. To hold otherwise would mandate prescience on the part of corporate executives. In other words, "an unexpected turn of events cannot demonstrate a securities problem at all, as there cannot be 'fraud by hindsight.'" *Asher*, 377 F.3d at 730 (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978 (Friendly, J.)). Instead, it merely means that ZBH cannot, at least at the motion to dismiss stage, avail itself of the safe harbor provision in the PSLRA to insulate statements and conditions which post-date the cautionary language at issue. In the end, discovery may reveal that there was no need for ZBH to update the language and that it still accurately described the situation, but that is a question of fact I cannot answer at the motion to dismiss stage. *Id.* at 734 ("[T]his complaint could not be dismissed under the safe harbor, though we cannot exclude the possibility that if after discovery Baxter establishes that the cautions did reveal what were, ex ante, the major risks, the safe harbor may yet carry the day.").

### C. The Adequacy of Plaintiffs' Allegations of Scienter.

The next hurdle for Shah to clear under the PSLRA is the requirement that a plaintiff must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). The concept of scienter is a bit elusive but here's the Seventh Circuit's attempt to put some meat on the bone: it's "an intent to deceive, demonstrated

by knowledge of the statement's falsity or reckless disregard" towards the statement's veracity. *Higginbotham*, 495 F.3d at 756. Defendants argue, like nearly all defendants in these cases, that Shah's claims do not give rise to a strong inference of scienter.

To sort this out, my task is to conduct a balancing test of the allegations and weigh inferences in favor of plaintiffs against any possible inferences of "plausible non-culpable explanations for the defendants' conduct." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("*Tellabs III*"). If the weighing is in equipoise then the complaint survives dismissal. As the Supreme Court put it, it is only when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged" that a complaint will survive dismissal. *Telllabs II*, 511 U.S. at 324. In making this determination, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326. "While it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference . . . the absence of a motive allegation is not fatal." *Id.* at 325.

ZBH characterizes Shah's scienter allegations as six inferences "stacked" upon one another "so that the failure of any one of them means the theory falls apart." [DE 95 at 35.]. While plaintiffs do not disagree with defendants as to what the six key allegations of scienter are, they dispute defendants' argument that an infirmity in any of the six means that the entirety of plaintiffs' theory fails. Instead, plaintiffs argue that these are not "stacked inferences" but instead "stacked facts" which, taken together,

show a strong inference of scienter. *In re Cabletron Sys., Inc.,* 311 F.3d 11, 40 (1st Cir. 2002) ("Each individual fact about scienter may only provide a brushstroke, but the resulting portrait [may satisfy] the requirement for a strong inference of scienter under the PSLRA.").

Whether these six points are "stacked inferences" or "stacked facts" is just silly wordplay. I will endeavor to look at them together and come to a judgment as to whether scienter can be inferred. Here are the categories of scienter as alleged by the plaintiffs:

> (1) [Defendants] were privy to audit reports in the first half of 2016 showing that North Campus was not in substantial compliance with the FDA as a result of 'systemic' quality and compliance issues; (2) they knew an FDA inspection was imminent and there was not time to fix the problems before that inspection; (3) the FDA was carefully scrutinizing Zimmer's manufacturing facilities, as evidenced by their critical inspections of other facilities; (4) despite this knowledge, Defendants were not promptly remediating the quality and compliance issues and continued distributing products produced at the North Campus; (5) [ZBH] would be unable to meet demand while remediating the issues; and (6) then, when the FDA inspection caused the product hold at the North Campus, Defendants Dvorak and Florin 'crafted a plan to further cover up these issues' by falsely blaming the cause of the Q3 shortfalls on supply chain issues.

[DE 95 at 34-35.] I will address each in turn.

First, ZBH argues that plaintiffs allege "no facts about the magnitude of the issues in the audit reports" and fails to adequately allege that the issues identified in the audit reports were the same ones identified by the FDA and which resulted in North

Campus's temporary shut down and other regulatory action. [DE 95 at 35.] But plaintiffs allege throughout their complaint, quoting ZBH's own response to the FDA's Form 483 letter, that the issues identified by the audits at North Campus were "systemic" and were "major compliance-related issues" including in key areas like sterile packaging and nonconforming materials. [DE 60 at ¶ 181.] These allegations show the magnitude of the problems and defendants seek to impose too high a burden on plaintiffs in seeking to require (at the pleading stage no less) complete and definitive overlap between the audit issues and the FDA's observations.

Second, concerning the allegations that ZBH knew an FDA inspection of North Campus was "imminent" and that there would be insufficient time to remediate prior to that inspection (the second through fourth inferences), ZBH argues that plaintiffs are seeking to impose a "fraud by hindsight" theory and hold ZBH to a "crystal ball" standard. [DE 95 at 35-36.] Defendants point to the fact that ZBH did undertake some remediation after the audit reports were complete, "working earnestly and honestly to fix the problems." [*Id.* at 36.]

In order to overcome this inference, plaintiffs direct me to allegations in their complaint which come from the knowledge of two confidential witnesses. Confidential witnesses (usually current or former employees) in securities litigation are potentially problematic because they may "have axes to grind. Perhaps they are lying." *Higginbotham*, 495 F.3d at 757. But a presumption to disregard confidential witness allegations was squarely rejected by the Seventh Circuit in *Telllabs III*, and district

courts, including this one, have credited confidential witnesses when sufficient detail as

to the basis for their knowledge is alleged. *See Tellabs III*, 513 F.3d at 712 ("The

information that the confidential informants are reported to have obtained is set forth in

convincing detail, with some of the information, moreover, corroborated by multiple

sources. . . . [T]he absence of proper names does not invalidate the drawing of a strong

inference from informants' assertions."); *Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira,

Inc.*, 2013 WL 566805, at *17 (N.D. Ill. Feb. 3, 2013) (allegations from confidential

witnesses are more believable when the complaint provides their "job title, duration of

employment . . . , and a description of employee responsibilities"); *In re Supreme Indus.,

Inc. Sec. Litig.*, No. 3:17CV143PPS-MGG, 2018 WL 2364931, at *9 (N.D. Ind. May 23,

2018) ("The Seventh Circuit has approved of confidential sources as providing an

inference of scienter and has identified several factors which strengthen the inference,

including a large number of confidential witnesses, descriptions of their jobs that

indicate they had first-hand knowledge of the facts to which they are testifying,

corroboration by other sources, and the inclusion of their real names.").

Here, plaintiffs offer the job titles, dates of employment and responsibilities of

CW1 and CW2 and sufficient facts which show that these witnesses have first hand

knowledge of the facts ascribed to them. [*See* DE 60 at ¶¶ 193-207.] And while a greater

number of confidential witnesses would be better, their accounts are partially

corroborated by one another, as well as other evidence, including the allegations from

the Martin case and the Barney case.

The substantive allegations from CW1 and CW2 paint a combined picture that ZBH had plans to overhaul North Campus over a six to eight month period beginning in November 2016. [*Id.* at ¶ 194.] CW2 further states that Biomet, which operated North Campus prior to the merger, "was quite profitable and it was suspected at the time of the merger that the high profitability might have been because Biomet took shortcuts." [*Id.* at ¶ 207.] Likewise, within ZBH it was "common knowledge [that] there were cleanliness and quality issues at [North Campus]" and that the FDA regulatory action as a result of an inspection was a simply question of when, not if. [*Id.*] And while CW2 worked primarily at West Campus and not North Campus, plaintiffs allege facts showing that he would have had knowledge regarding what was happening at North Campus given the interplay between the two facilities during the time period and ZBH's reporting structure. [*Id.* at ¶¶ 202-207.] These allegations show that ZBH was planning to do an overhaul of North Campus because it recognized that such an overhaul was necessary because the deficiencies were so extensive, and that the time line was expedited once the FDA began its inspection. This provides support for plaintiffs' scienter theory.

Defendants' proffered inference—effectively, that ZBH was doing the best it could under the circumstances and sought to address issues on a reasonable basis — is certainly not implausible. But the inference in plaintiffs' favor, bolstered by allegations from two reasonably well-described and seemingly-knowledgeable confidential witnesses, strikes me as at least equally strong. And a tie goes to the plaintiff at this

stage in the litigation.  *See ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008).

The next chapter of the scienter story is that ZBH knew it could never simultaneously remediate North Campus and meet the demand necessary to achieve its growth goals. According to plaintiffs, ZBH's goal was to delay implementation of changes at North Campus until midway through the fourth quarter, so that ZBH could continue to manufacture from North Campus at full capacity, and hit its growth and revenue targets. Defendants characterize this as requiring "giant inferential leaps" because plaintiffs do not allege that ZBH could know that any problems at North Campus would require such large-scale remediation, product holds, or that the company's safety stock could not satisfy demand during remediation. [DE 95 at 37-38.] But plaintiffs put forth particularized facts which suggest ZBH would have appreciated the size and scope of the problem, namely its prior experience and "lessons learned" from Project Trident which involved large-scale facility remediation and its associated costs. [DE 60 at ¶¶ 126-137.] Barney further stated, in her resignation email, that ZBH first learned of Biomet's inadequate processes "soon after" the close of the merger (in June 2015) and which were confirmed via audits which were completed in June 2016.

Concerning safety stock, defendants present a cogent theory that they reasonably could have expected this product to cover any loss in production as a result of remediation. But I cannot say this theory is ***more cogent*** than plaintiffs', given the allegations of what ZBH knew as a result of its "lessons learned" from Project Trident as

to the disruptive effect and cost of a large-scale overhaul of a major facility. Moreover, any determination as to whether ZBH reasonably believed its safety stock could bridge the gap caused by remediation is a factual issue incapable of being resolved at the motion to dismiss stage, even in a securities fraud case.

Finally, defendants challenge plaintiffs' allegations of scienter as to the "coverup" and intentional misrepresentations allegedly made on the October 31, 2016 investor call as to why ZBH had missed its revenue growth projections. Defendants claim plaintiffs' theory is farfetched and "completely illogical." [DE 95 at 38.] But it does not require much of an inferential leap to surmise that ZBH may have held out hope yet that the FDA's seemingly inevitable Form 483 letter would not be that bad and that the extent of the problems could be kept under wraps. Of course, things didn't work out that way for ZBH. But failing to succeed at fraud does not obviate the fact there may have been fraudulent intent. *Tellabs III*, 513 F.3d at 710 ("The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing."). ZBH only revealed the extent of the problems *after* Northcoast published its report, based upon its "industry contacts" that previewed the story ZBH would subsequently reveal. And given that the allegations of the Martin and Barney complaints may be considered, there are direct allegations of a coverup orchestrated by Dvorak and Florin.

Defendants further argue that any inference of scienter as to the alleged intentional misrepresentations is severely undercut by the fact that during the class period neither ZBH or any of the ZBH Management sold any of their securities. And according to defendants, without allegations of motive, there is no strong inference of scienter. Plaintiffs curiously respond by noting that the Private Equity Defendants sold stock during this time period, but fail to show why that is at all relevant to the inquiry. It is unclear why ZBH and the ZBH Management would take the risk of committing securities fraud to benefit the Private Equity Defendants absent some sort of additional conspiracy or kickbacks—none of which is alleged here. Importantly, however, the law does not require plaintiffs to plead allegations of motive in order to sufficiently allege a strong inference of scienter. *Tellabs II*, 551 U.S. at 325 ("absence of a motive allegation" is "not fatal"); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 685 (5th Cir. 2014) ("Although motive allegations might meaningfully enhance the strength of the inference of scienter, a strong inference of scienter does not necessarily depend on such an enhancement."). So too here. I do not think the absence of a direct pecuniary motive is fatal to plaintiffs' scienter allegations or claims.

Thus, plaintiffs' scienter allegations each on their own raise some inference that ZBH acted with the requisite scienter when it made the allegedly misleading statements. But even if these scienter allegations are each plausible, defendants argue that the non-culpable inferences from the alleged facts, taken as a whole, are stronger. According to defendants, "the audits raised issues with Biomet's legacy procedures at

North Campus and [ZBH] took prompt actions, including approving funding, to address them. To the extent [ZBH] did not have time to remediate all of the issues before the FDA inspection, Defendants reasonably believed based on past experience that they could resolve any issues that the FDA identified without materially affecting ZBH's revenues." [DE 95 at 39.] Undoubtedly, this story is somewhat plausible, but it fails to account for many specific allegations to the contrary which plaintiffs have alleged. Critically, defendants' characterization of the overall story ignores the intentional misrepresentations plaintiffs have alleged took place during the October 31, 2016 conference call and the import those allegations have on the overall scienter determination.

While there may be no fraud by hindsight, the reasons put forth on October 31 for ZBH's revenue misses had to be quickly corrected by ZBH, and only after it seems Northcoast, the investment analysis firm, published a report which revealed the truth. This apparent about-face by the company, coupled with the cover-up story as alleged in the Barney case and corroborated by the Martin case allegations, as well as plaintiffs' confidential witnesses, supplies enough facts which outweigh defendants' nonculpatory story.

## II. Allegations of Violations of Section 11 and Section 12(a)(2) of the Securities Act of 1933 Against ZBH, the ZBH Directors and Defendants Dvorak, Florin and Collins.

The parties strongly disagree as to whether or not plaintiffs' Securities Act claims sound in fraud, and thus whether or not they are subject to Rule 9(b)'s heightened

pleading standards. What the parties do agree on, however, is that the Seventh Circuit has not squarely addressed this issue, and thus they direct me to district court opinions within the Seventh Circuit, out-of-circuit precedent, as well as Seventh Circuit case law on other sections of the securities law.

I need not answer this question definitively, as I have already found that plaintiffs have adequately pleaded materially misleading statements under Section 10(b) of the Exchange Act which are without question subject to heightened pleading standards. As defendants note in their briefing, "[t]he test for whether a statement is materially misleading under Section 12(a)(2) is identical to that under Section 10(b) and Section 11[.]" (DE 95 at 14 (quoting *Rombach v. Chang*, 355 F.3d 164, 178, n.11 (2d Cir. 2004)).] Having found above that Shah has put forth sufficient allegations that defendants' statements were plausibly materially misleading as to the Exchange Act Section 10(b) claims against ZBH, Shah likewise satisfies that standard for purposes of the Section 12(a)(2) claim against ZBH and the Section 11 claims against ZBH, as well as against defendants Dvorak, Florin and Collins, each of whom is alleged to have signed the statements at issue.[4]

---

[4]    While Section 12(a)(2), discussed *infra* with regard to the Private Equity Defendants, requires that a defendant be a statutory seller and effectively in privity with a plaintiff in order for liability to possibly attach, Section 11 of the Securities Act has no such standing requirement. "[T]o establish standing under § 11 at the motion to dismiss stage, Plaintiffs need only assert that they purchased shares issued pursuant to, or traceable to the public offerings." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 746 (S.D.N.Y. 2015) (citations and internal quotation marks omitted). Plaintiffs have done that here. [*See* DE 60 at ¶¶ 47-50; *see also* DE 30, 16-2.] Consequently the Section 11

**III.    Allegations of Securities Fraud by the Private Equity Defendants**.

**A.    Securities Act Section 12(a)(2) Claims.**

Section 12(a)(2) of the Securities Act imposes liability upon those who sell or offer to sell securities through means of a prospectus or oral communication which contains any materially untrue or materially misleading statement. Importantly, a plaintiff need not plead (or prove) scienter or reliance in the context of a Section 12 claim. *See Fed. Hous. Fin. Agency for Fed. Nat'l Motrg. Ass'n v. Numura Holding Am., Inc.*, 873 F.3d 85, 96 (2d Cir. 2017). But the law is equally clear that this provision of the securities laws only applies to persons who are "sellers," as that term is defined under the statute and attendant case law. Specifically, Section 12 liability attaches only to a person who "offers or sells" a security, and that person is liable only to those persons "purchasing such security from him." 15 U.S.C. § 77l(a)(2). The Supreme Court has made the categorically narrow nature of Section 12 liability clear and limited it only to "the buyer's immediate seller; remote purchases are precluded from bringing actions against remote sellers." *Pinter v. Dahl*, 486 U.S. 622, 643, n.21 (1988) (citation omitted). In order to survive the Private Equity Defendants' motion to dismiss, Shah must sufficiently allege such a relationship. He has failed to do so.

---

claims cannot be dismissed on this basis.

Furthermore, ZBH has contested plaintiffs' Section 12(a)(2) claims solely on the basis that plaintiffs fail to plead any materially misleading statements. ZBH has not argued it was not a statutory seller for purposes of Section 12(a)(2).

Shah's allegations and his opposition point to the fact that the Secondary

Offering Registration Statements associated with the Private Equity Defendants' sale of

their securities refers to them as "selling stockholders."[*See* DE 60 at ¶¶ 271, 315.] The

Private Equity Defendants do not dispute that they sold their shares during the June

and August 2016 Offerings. But selling to just anyone is not enough. In order to plead a

plausible Section 12 claim, a plaintiff must allege that the defendant sold to plaintiffs,

and that has not been alleged.

Instead, the offering statements make clear that the Private Equity Defendants

sold their stock to underwriters who then marketed and sold those securities to the

investing public. Plaintiffs did not attach the offering materials to their complaint, but

make reference throughout to "the June 2016 SPO Materials" and "August 2016 SPO

Materials" and defendants included them with their motions. Thus these materials can

be seen as being incorporated by reference into the complaint and thus may be

considered, as public filings, at the motion to dismiss stage. *Olson v. Bemis Co.*, 800 F.3d

296, 305 (7th Cir. 2015); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an

exhibit to a pleading is a part of the pleading for all purposes.").

The documents I am describing make clear that "the seller stockholders", *i.e.* the

Private Equity Defendants, have agreed to sell **to the underwriters**. [ZBH June 2016

Final Prospectus, at S-15; ZBH August 2016 Final Prospectus, at S-13.] The documents

go on to state that the underwriters then "propose[d] to offer the shares ... to the public"

as they eventually did. [*Id.*] Thus, plaintiffs did not purchase their stock directly from

the Private Equity Defendants but instead from the underwriters and thus the Private Equity Defendants cannot be held liable under section 12. Nor have plaintiffs adequately pled that the Private Equity Defendants directly communicated with any plaintiff, encouraging them to purchase any ZBH stock. Thus, plaintiffs have not plausibly alleged a Section 12 claim based upon solicitation of sales either. *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) ("To count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer."); *see also Daniels v. Blount Parrish & Co., Inc.*, 113 F. App'x 174, 175 (7th Cir. 2004) (holding that underwriter who sold bonds at issue to broker-dealers who in turn sold to the plaintiff could not be held liable under Section 12 because there was no relationship between the underwriter and plaintiff).

Because Shah does not allege that he (or any of his co-plaintiffs) purchased any securities directly from any of the Private Equity Defendants (as opposed to their non-party affiliates) or that any of the Private Equity Defendants solicited plaintiffs' purchase of any security, the Private Equity Defendants are not alleged to be statutory sellers of any of the securities in question. Plaintiffs' Section 12 claims therefore will be dismissed.

### B.  The Exchange Act Section 20A Claims for Insider Trading.

Plaintiffs have also alleged insider trading-based claims against the Private Equity Defendants. The theory is that the those defendants unloaded their remaining stakes in ZBH in the June 2016 and August 2016 offerings knowing full-well of the then-

undisclosed quality systems issues which were plaguing the North Campus manufacturing center. The Private Equity Defendants make arguments similar to the ZBH defendants regarding the immateriality of the quality systems audit findings and any issues at West Campus which predated the FDA's actual inspection, but I find those arguments similarly unavailing as to the Private Equity Defendants.

But the other component of the Private Equity Defendants' argument is much more persuasive. In order to qualify as unlawful insider trading, a plaintiff must allege (and ultimately prove) that a defendant who trades in the securities at issue actually possessed material non-public information. *E.g.*, *Abrams v. Prudential Sec., Inc.*, No 99 C 3884, 2000 WL 390494, at *3-4 (N.D. Ill. Mar. 21, 2000). This is where Shah's allegations fall short.

Shah alleges that I may make an inference that the Private Equity Defendants (none of whom have been alleged to be involved in the management of ZBH) knew about the litany of problems at the North Campus by virtue of the presence of Rhodes and Michelson on ZBH's Board of Directors. Shah alleges that these directors were controlled by the KKR Funds and the TPG Funds by virtue of the Shareholders Agreement entered into in connection with the 2015 merger which allowed TPG and KKR to appoint two members to the Board and likewise share information they learned via those positions with the Private Equity Defendants.

But there is no allegation that any information relating to problems at North Campus was in fact shared with the Private Equity Defendants, whether in this instance

50

or any others.  In essence, Shah has alleged nothing more than that the Private Equity

Defendants had *potential* access to insider information. But "[a]ccess to information is

not the same as actually possessing the specific information and knowing it[.]" *Zimmer*

*II*, 2011 WL 338865, at *21; *see also Higginbotham*, 495 F.3d at 758 ("Although the

complaint asserts that managers at Baxter's headquarters knew about the contracts

reported by the Brazilian subsidiary—they appeared in a computerized database

available throughout the firm—there is a big difference between knowing about the

reports from Brazil and knowing that the reports are false. The complaint documents

the former but not the latter."). In short, Shah must, within the confines of Rule 11, be

able to allege actual knowledge on the part of the Private Equity Defendants, and Shah

has come up short. *Zimmer I*, 673 F. Supp. 2d at 747 ("Plaintiff must allege actual

knowledge by the defendant, not some second-hand belief that such knowledge

existed.").

Plaintiffs' allegations as to the Goldman Funds are even more deficient on this

front, as there is no allegation that any of the Goldman Funds were affiliated with any

of ZBH's Board of Directors. Nor is there any allegation that any representative of any

of the Goldman Funds otherwise participated in the management of ZBH or attended

meetings of ZBH's Board of Directors. Without such an allegation of a plausible basis by

which the Goldman Funds had access to the alleged material nonpublic information, let

alone actual knowledge beyond pure conjecture, the Section 20(a) claims against the

Goldman Funds must be dismissed. *See In re Cobalt Int'l Energy, Inc. Securities Litig.*, No.

CV H-14-3428, 2017 WL 2599327 (S.D. Tex. June 15, 2017). If discovery reveals facts to the contrary, showing actual knowledge, then plaintiffs may seek leave to amend their complaint subject to the normal constraints of Federal Rule of Civil Procedure 15.

**IV.     Control Person Liability of the Individual Defendants.**

The final issue to address are plaintiffs' claims that certain individual defendants are liable as "control persons." In Count II, plaintiffs allege that the ZBH Management (*i.e.* defendants Dvorak, Florin, Collins and Marshall) are liable for violations of Section 10(b) of the Exchange Act pursuant to Section 20(a) of the Exchange Act. In Counts VII and X, plaintiffs allege that the ZBH Directors as well as a subset of the ZBH Management (defendants Dvorak, Florin and Collins) are liable for violations of Section 11 and Section 12(a)(2) of the Securities Act.

"Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), and Section 15 of the 1933 Act, 15 U.S.C. § 77o, both set out 'control person' liability—providing a vehicle to hold one defendant vicariously liable for the securities violations committed by another." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir. 1994). There are three elements to such a claim: (1) a primary violation of the securities laws; (2) the exercising of general control over the operations of the company; and (3) possession of "the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir.1992).

Concerning Count II and liability under Section 20(a) for violations of Section 10(b) of the Exchange Act, the ZBH Management defendants' sole argument is that plaintiffs have failed to adequately allege a primary violation of the Exchange Act. [DE 95 at 40.] As discussed above, I disagree, and find that plaintiffs have met the necessary pleading requirements that ZBH violated Section 10(b) of the Exchange Act. Consequently, the ZBH Management defendants' motion to dismiss this claim must be denied.[5]

Counts VII and X are claims for control person liability under Section 15 of the Securities Act, relating to the statements contained within the June 2016 SPO Materials and August SPO Materials. It is not enough to merely allege that an individual controlled the acts of a company by virtue of his or her position. *Craig v. First Am. Capital Res., Inc.*, 740 F. Supp. 530, 537 (N.D. Ill. 1990). A control person claim is properly dismissed where a plaintiff "presents nothing to support his claim that the individual defendants were control persons other than his sweeping and self-serving statement that the defendants should be liable solely by virtue of shareholder status or directorships. Such allegations are insufficient to state a claim for control person

---

[5] The ZBH Management are also named as defendants as to Count I for the primary violation of Section 10(b) of the Exchange Act. In the event the ZBH Management Defendants are found liable for this primary violation, they cannot also be held liable as "control persons" for their own conduct even though such alternative theories of liability may be allowed at the pleading stage. *See In re BioScrip,* 95 F. Supp. 3d at 747 n.8; *In re Parmalat Sec. Litig.*, 375 F.Supp.2d 278, 310 (S.D.N.Y.2005) ("Although a defendant ultimately may not be held liable as both a primary violator and a controlling person, such alternative theories of liability are permissible here.").

liability[.]" *Starr v. !Hey, Inc.*, No. 01 C 6087, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003).

Defendants contend that plaintiffs have alleged nothing more than that as to the ZBH Directors, and defendants Dvorak, Florin and Collins. But while plaintiffs have not alleged much more than that, they have alleged more than simply defendants' positions and that is sufficient to survive a motion to dismiss. Specifically, plaintiffs have alleged that Dvorak, Florin and Collins "had direct involvement in the day-to-day operations of the Company" and "were also directly involved in providing false information and certifying and/or approving the false and/or misleading statements disseminated by ZBH during the Class Period." [DE 60 at ¶ 471.] Likewise these same defendants, as well as the ZBH Directors, "each signed the Registration Statement in connection with" the June and August 2016 stock offerings. [*Id.* at ¶¶ 472, 494-495.] Plaintiffs further allege that these individual defendants all were provided with information concerning ZBH's problems at North Campus but failed to disclose this information in the June and August 2016 offering materials. [*Id.* at ¶ 5, 18, 359-60.] Control person liability does not require any heightened pleading standard or scienter. *Chu v. Sabratek Corp.*, 100 F. Supp.2d 827, 843 (N.D. Ill. 2000). While these allegations are not abundant, they are sufficient at this stage of the litigation. *In re First Merch. Acceptance Corp. Sec. Litig.*, No. 97 C. 2715, 1998 WL 781118, *12-13 (N.D. Ill. Nov.4, 1998) (denying motion to dismiss of directors who allegedly could have, but had not, prevented the dissemination of misleading information).

Finally, any doubts as to whether or not dismissal is warranted is resolved in plaintiffs' favor because "[d]etermination of whether an individual defendant is a 'controlling person' under § 20(a) is a question of fact that cannot be determined at the pleading stage." *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (citation omitted).

## Conclusion

Based on the foregoing, defendants' motions are granted in part and denied in part.

Defendants' Motion to Strike pursuant to Rule 12(f) is DENIED.

ZBH's Motion to Dismiss [DE 94] is DENIED.

The ZBH Management's and ZBH Director's Motions to Dismiss [DE 94] are likewise DENIED.

The Private Equity Defendants' Motion to Dismiss [DE 96, 98, and 99] is GRANTED, without prejudice, as to Count III and Count IV for insider trading in violation of Section 20(A) of the Exchange Act. At present, it does not seem that Shah will be able to satisfactorily allege the necessary scienter as to the Private Equity Defendants on these counts. That may change, however, now that Shah will have the ability to conduct formal discovery in this matter because I have allowed the case to proceed, albeit in a slightly narrowed form. But Shah and his co-plaintiffs are cautioned that any subsequent motion for leave to amend will be given the appropriate scrutiny by the court and that he should only seek leave to amend after he and his attorneys are

satisfied that amended pleadings will successfully clear the PSLRA's pleading requirements that Shah has thus far been unable to meet as to the Private Equity Defendants.

The Private Equity Defendants' Motion to Dismiss is GRANTED [DE 96, 98, and 99] , with prejudice, as to Count VI and Count IX for violations of Section 12(a)(2) of the Securities Act. Dismissal is with prejudice because there do not appear to be any facts under which plaintiffs will be able to satisfy Section 12(a)(2) of the Securities Act's statutory seller requirement and thus amendment will be futile. *Tribble v. Evangelides*, 670 F.3d 753, 761 (7th Cir.2012) ("District courts have broad discretion to deny leave to amend ... where the amendment would be futile.").

So ORDERED on September 26, 2018.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT