UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| RAJESH M. SHAH, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 3:16-cv-815-PPS-MGG |
| | ) | |
| ZIMMER BIOMET HOLDINGS, INC., | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

After nearly four years of complex and contested litigation, this securities class action has settled. Before me are Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation [DE 254] and Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses [DE 256.] I previously granted preliminary approval of the settlement and certified a class for settlement purposes. [DE 251; *Shah v. Zimmer Biomet Holdings, Inc.*, 2020 WL 2570050 (N.D. Ind. May 21, 2020).] The parties then sent notice of the settlement to the class and allowed class members to make claims, opt-out, or object to the proposal.

On September 3, 2020, I held a telephonic final fairness hearing in which any objectors or other members of the public could attend. I also heard from both plaintiffs' class counsel and defendants' counsel. It is clear that the settlement has been well-received by the class, and I stated on the record the reasons why I found the proposed settlement to be plainly fair, adequate and reasonable. This opinion elaborates on those

-1-

findings and reduces them to writing. It further grants the requested reimbursements of

costs and expenses to class counsel and lead plaintiffs. Lastly, while I reserved

judgment on class counsel's motion for attorneys' fees at the hearing, I will now grant

that motion as well, albeit in part. While I think counsel has done a tremendous job

litigating this case on behalf of the class, the requested 33.3% is simply beyond the

"market rate" for this case and a reduced percentage fee will be awarded.

## Background

Plaintiffs filed this lawsuit against a multitude of defendants, both corporate and

individual, affiliated with Zimmer Biomet Holdings, Inc. (ZBH for short). ZBH is a

multi-billion-dollar medical device manufacturer headquartered in Warsaw, Indiana. It

came into existence in June 2015 after two cross-town rivals (Zimmer Holdings, Inc. and

Biomet, Inc.) merged with one another. At its core, the complaint alleged that, from June

7, 2016 to November 7, 2016, ZBH and its senior leadership misled investors and

concealed material information from the market in violation of various federal

securities laws. Plaintiffs sought to represent a class of all persons who traded in shares

of ZBH during the relevant time period and harmed as a result.

Although the substance of the complaint is not all that integral to the motions

presently before me, it's worth summarizing what this lawsuit was about, as alleged by

plaintiffs (but of course not admitted to by ZBH). At issue was a major ZBH

manufacturing facility known as "North Campus." By spring 2016, ZBH knew that

North Campus was badly out of compliance with federal regulations and has serious

issues with its quality systems. ZBH learned this after conducting a series of internal

audits. Those audits were conducted in response to systemic regulatory problems with the FDA over non-compliance and quality control issues at a different facility, known as West Campus, the year before. North Campus was in such a state that it would likely need to be completely overhauled to bring it up to snuff and would likely be shut down in the process. This, of course, would have a dramatic effect on production and thus ZBH's sales.

Plaintiffs allege that given ZBH's experience with West Campus and other then-recent remediations (specifically one known as "Project Trident"), the company knew how costly and extensive the remediation of North Campus was going to be and that the FDA had the company under a microscope. Plaintiffs say ZBH was under a duty to disclose the problems at North Campus pursuant to the requirements of Item 303 of SEC Regulation S-K which requires companies to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).

But even knowing what it knew about North Campus, ZBH was issuing investor guidance which contained ambitious revenue and sales targets. Those statements were made during investor calls and conferences, two prospectuses relating to stock offerings in June and August 2016, and regular SEC filings. Plaintiffs contend that in order to meet the targets the company was announcing and committing itself to, ZBH needed North Campus to be running at full capacity. But full capacity was mutually exclusive with doing the necessary remediation at North Campus. So instead ZBH took a chance,

telling the market it was on track to hit its revenue and sales targets and engaging in a few quick-fixes at North Campus in the hopes that everything would work out with anticipated FDA inspections of North Campus later in 2016.

Things didn't work out as planned. The FDA's inspection of North Campus began on September 16, 2016 and the issues at North Campus were immediately evident. This led to a complete and almost immediate hold on all products being manufactured out of North Campus. This devasted ZBH's product supply and therefore its revenue. When ZBH announced its third quarter financial results during an October 31, 2016 investor call, they weren't great. The company announced a drop in growth, and it reduced its projected revenue guidance for both the fourth quarter and the year. During the call, ZBH's CEO stated that the revenue misses were the result of unanticipated supply constraints related to the company's ongoing efforts to merge its two predecessor entities' operations. But there was no mention of North Campus's problems or the FDA's ongoing inspection of the facility. Investors and analysts were apparently blindsided by the news, and the company's stock fell 14%.

Plaintiffs allege that the reasons given on the October 31 call were knowingly false and an effort by ZBH to concoct a coverup for the issues at North Campus. Former senior employees at ZBH have stated as much, saying there were directives from the top to create a different story to explain the company's performance. Regardless, it didn't work. In the days following the October 31 investor call, analysts learned of and began reporting on the ongoing FDA inspection at North Campus and the problems

being encountered. Plaintiffs say it was this which forced ZBH to finally come clean about its problems.

On November 8, 2016, ZBH disclosed what plaintiffs say were the true cause of the company's problems in its quarterly SEC filings and a press release. This caused another drop in the company's stock price. Later that month, much of the scope of the issues were confirmed when the FDA concluded its audit and issued a letter to ZBH which plaintiffs say mirror what ZBH already knew from its own audits. As mentioned, plaintiffs say the concealment of the problems at North Campus were fraudulent because ZBH had a duty to disclose this information pursuant to Item 303 of SEC Regulation S-K. Plaintiffs further allege that the problems needed to be disclosed because ZBH knew North Campus was going to be audited by the FDA after what had happened at West Campus. They further state that the statements made during the October 31 call were flat out falsehoods.

After several amendments to the complaint, four motions to dismiss were filed and I granted them in part. I dismissed some defendants and claims but left the primary case against ZBH and its senior management in place. [DE 119; *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 821 (N.D. Ind. 2019).] Simply put, there was enough factual matter alleged in the complaint to overcome the substantial pleading hurdles in securities fraud cases. ZBH sought an interlocutory appeal of that decision because the Seventh Circuit had not ruled before on the issue of whether claims premised on a duty to disclose under Item 303 of SEC Regulation S-K were actionable under Section 10(b) of the Securities Exchange Act of 1934. While I agreed that the Seventh Circuit had not

specifically addressed this issue, that was not reason enough to grant an interlocutory

appeal. [DE 183; *Shah v. Zimmer Biomet Holdings, Inc.*, 2019 WL 762510 (N.D. Ind. Feb. 20,

2019.] The case then proceeded to discovery.

   While plaintiffs' motion for class certification was pending, the parties alerted

the Court that they had reached a proposed settlement of the case. The settlement was

the result of a mediation conducted by the Hon. Daniel Weinstein (Ret.) and Jed

Melnick, two highly respected and experienced mediators who have mediated several

other large securities class actions. [DE 258-1.]

   On May 13, 2020, I held a hearing on plaintiffs' motion for preliminary approval

of the proposed settlement. [DE 250.] At bottom, the proposed settlement set aside

$50,000,000 to be divided up amongst class members who make valid claims. Plaintiffs'

counsel also indicated that they would seek an award of attorneys' fees equal to 33.3%

of the settlement fund and reimbursement of up to $1.9 million in costs and expenses.

On May 21, 2020, I granted preliminary approval of the proposed settlement, finding

that it was well within the range of what is fair, adequate and reasonable and that the

proposed plan to give notice to potential class members was sufficient. [DE 251; *Shah*,

2020 WL 2570050.]

   After preliminary approval was granted, notice packets containing information

about the proposed settlement and how to make a claim were sent out. A summary

notice was further published in *Investor's Business Daily* and transmitted over the *PR

Newswire*. Class members were then allowed to make claims by submitting a claim to an

administrator. As of August 25, 2020, 1,655 claims have been made. [DE 260-1.] In

addition, the claims administrator received eight opt-outs from class members who requested to be excluded from the proposed settlement. [*Id.*] But there was only one objection to the proposed settlement. [DE 259.] On July 30, 2020, the plaintiffs filed their Motion for Final Approval and Application for Fees and Expenses. No opposition to those motions or additional objections were received by the August 13, 2020 deadline. On September 3, 2020, I held a final fairness hearing in which I heard from counsel for the plaintiffs and defendants. [DE 264.] Due to the ongoing COVID-19 pandemic, an in-person hearing on the motion was not safe or feasible and the hearing in this matter was held telephonically using a conference line listed on the docket and which members of the class and the public at large were able to call into. No objectors appeared for the hearing.

## Discussion

### A. The Proposed Settlement Class Satisfies Rule 23(a) and Rule 23(b)(3).

Federal Rule of Civil Procedure 23 is the starting place for almost anything class action related. Rule 23(a) has four specific requirements that must be met before a class may be certified. Those are commonly referred to as (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a). In addition, the class must also satisfy one of the subsections in Rule 23(b). Here that's subsection 23(b)(3).

-7-

As stated in my preliminary approval order, Rule 23(a)'s requirements are clearly satisfied in this case. *First*, numerosity is practically a foregone conclusion in a large securities class action like this. "The issue ordinarily receives only summary treatment … and often is uncontested." Rubenstein, William B., Ed., Newberg on Class Actions § 3:12 (5th ed. 2019); *id.* ("[I]n class actions involving nationally traded securities, courts generally presume that the numerosity requirement is met."); *see also Teachers' Ret. Sys. of La. V. ACLN Ltd.*, 2004 2997957, at *3 (S.D.N.Y. Dec. 27, 2004).

*Second*, there are numerous common questions of law and fact common to the class. The primary substantive issues in this case were what legal duties ZBH had to disclose, what it disclosed, and whether those disclosures were misleading. Those are all common to the class and thus commonality is satisfied. *Schleicher v. Wendt*, 618 F.3d 679, 681 (7th Cir. 2010) ("Whether statements are false is one common question. Whether the falsehoods are intentional (*i.e.*, whether each defendant acted with the required state of mind) is another. Whether the falsehoods affect the stock's price is a third.").

*Third*, typicality is satisfied, as each of the named plaintiffs traded in ZBH shares during the class period. And trading in ZBH shares during the class period is the *sine quo non* of the class.

*Fourth*, I must be sure the named plaintiffs have "fairly and adequately protect the interests of the class" in their representative capacity. Fed. R. Civ. P. 23(a)(4). This requirement is satisfied so long as the class representatives do not have clear conflicts of interest with the absent class members and have shown a willingness to vigorously

pursue the litigation on behalf of the class. There was no evidence or argument of a

conflict mentioned in the opposition to the motion for class certification. Nothing else

has come to light since either. Likewise, the named plaintiffs pursued the case

diligently, although obviously class counsel were the ones doing the lion's share of the

work.

With all four of Rule 23(a)'s requirements satisfied, it is time to move on to Rule

23(b)(3) and it's predominance and superiority requirements. Fed. R. Civ. P. 23(b)(3)

(requiring "questions of law or fact common to class members predominate over any

questions affecting only individual members" and a finding that "a class action is

superior to other available methods for fairly and efficiently adjudicating the

controversy"). I'll start with superiority because it's easy to satisfy in a case like this.

Securities fraud cases are something of a prototypical class action. You generally have a

group of thousands of people, all of whom were allegedly harmed by the same activity

and for the same reasons. But most of them were only harmed in small dollar amounts.

As Judge Posner once quipped, "only a lunatic or a fanatic sues for $30." *Carnegie v.

Household Int'l*, 376 F.3d 656, 661 (7th Cir. 2004). And no lawyer is going to take a case

worth so little on a contingency fee basis either. But multiply that times several

thousand and you've got yourself something, both for the plaintiffs and the lawyers. *Id.*

("The *realistic* alternative to a class action is not 17 million individual suits, but zero

individuals suits[.]") (italics in original). Furthermore, while in some instances concerns

over trial management might weigh against a class action being truly superior, I need

not concern myself with that here. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620

(1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried would present intractable management problems for the proposal is that there be no trial.").

The common questions of law and fact further predominate over individual ones. "The predominance inquiry focuses on whether a proposed class is sufficiently cohesive to warrant adjudication by representation. It is akin to, but ultimately a more demanding criterion than, the commonality inquiry under Rule 23(a)." *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) (citations and quotation marks omitted). The main issue in the case is whether statements made by ZBH to the investing public were fraudulent. It is common to all members of the class. Furthermore, plaintiffs may use the fraud-on-the-market theory to show reliance on class-wide basis and thus overcome individual reliance issues. *See generally Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Finally, while individualized damages are inevitable in a securities class action, plaintiffs' allocation model prevents them from "predominating" over the common questions of law and fact. The allocation model accounts for the price, date of a trade, and other factors relevant to determining the harmed suffered by each plaintiff and thus each class member's recovery. As such, the twin requirements of Rule 23(b)(3) are satisfied.

**B. The Proposed Settlement is Fair, Adequate and Reasonable.**

Having found that the requirements to certify a settlement class are met here, it's time to get to the heart of the matter: whether the substance of the settlement is fair, reasonable and adequate. This standard is candidly a bit mushy, but there are some factors that help to guide the decision-making process. "(1) the strength of the case for

plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014) (citations omitted); Fed. R. Civ. P. 23(e)(2) (enumerating factors for courts to consider in determining whether a settlement is fair, reasonable and adequate).

To be blunt, I think the $50 million settlement fund represents a superb result for the class. Plaintiffs' retained expert calculated the class's maximum potential recovery at $625 million. But, of course, that's a pie in the sky, best case scenario. It's the *potential* result only if plaintiffs survived summary judgment on all of their claims and theories of liability, took the case to trial, won on liability, had the jury agree to award them their full claimed damages, and finally had the verdict upheld on appeal. That was going to be perilous journey, to say the least. *See Great Neck Capital Appreciation Inv. Partnership, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 409 (E.D. Wis. 2002) ("Shareholder class actions are difficult and unpredictable, and skepticism about optimist forecasts of recovery is warranted."). I'm not casting doubt on the substance of plaintiffs' claims, just remarking on the reality of litigation.

The settlement amount thus represents roughly 8% of plaintiffs' maximum possible damages. But again, that's only if the case crossed the finish line fully intact and the plaintiffs hit the proverbial grand slam at trial. In addition to the possibility of plaintiffs losing outright at summary judgment or at trial, there were clear ways in

which their recovery could have been cabined. For example, there were potential problems with plaintiffs' case relating to loss causation stemming from ZBH's October 31, 2016 disclosures about the cause of the company's revenue misses—although obviously plaintiffs don't concede the issue. If plaintiffs failed to prove loss causation as to those statements, according to their own experts, potential damages would plummet by 85% to $95 million. In that scenario, the proposed settlement would represent more than 50% of the potential maximum recovery.

If an 8% recovery was a good result for the class, settling for 50 cents on the dollar at this still relatively early stage in the litigation would be a phenomenal deal. That much is true when the result is compared against the median percentage recovery in securities fraud class action lawsuits. According to a report from a firm called Cornerstone Research, in 2019 the median percentage recovery in securities class action settlements was 4.8%: with cases alleging $500-$999 million settling at a median of 3.3% and cases alleging $75-$149 million settling at a median of 9.4%. [DE 246-2.] With that in mind, the 8% recovery scenario is at the high end of the spectrum and it's more than double the median amount of recent cases which share a price bracket with this case. If I valued this case at $95 million, then the settlement here would be nearly nine times the median amount. In either case, it's beyond doubt that $50 million is a terrific result for the class.

The raw numbers only tell part of the story, but the remainder is a tale of a hard-fought result on behalf of the class. Both plaintiffs' and defendants' counsel are experienced securities class action litigators. That experience and expertise was brought

to bear in all three of the major contested motions in this case. That they reached this settlement at arms' length supports the notion that it is fair and reasonable. *See, e.g.,* *Mangone v. First USA Bank*, 206 F.R.D. 222, 226 (S.D. Ill. 2001). Lastly, the settlement was the product of two lengthy mediation sessions which were conducted by two of the leading mediators in this field, Jed Melnick and the Hon. Daniel Weinstein (Ret.). They both believe the settlement "represents a fair and reasonable resolution of this complex and uncertain litigation." [DE 258-1 at ¶ 5.] "A strong presumption of fairness attaches to a settlement agreement when it is the result of this type of negotiation." *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002) (citing *Anderson v. Torrington Co.*, 755 F. Supp. 834, 838 (N.D. Ind. 1991)); *Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2018 WL 6606079, at *3 (S.D. Ill. Dec. 16, 2018) (same).

The plan of allocation in this case is also fair and reasonable. *See Great Neck Capital*, 212 F.R.D. at 410 ("A plan of allocation of settlement proceeds in a class action must also be fair and reasonable."). "When formulated by competent and experienced counsel, a plan for allocation of net settlement proceeds 'need have only a reasonable, rational basis" in order to be fair and reasonable. *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012) (citation and quotation marks omitted). Here, the settlement proceeds are not disbursed purely on a pro rata basis, as that would make little sense given the securities at issue were traded at different times and at different prices over the course of many months. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 590 (N.D. Ill. 2011) ("The way in which the settlement allocates benefits is fair because it

recognizes these important differences among Class Members. What would be arbitrary, unreasonable and unfair would be to distribute 72% of the settlement fund to the 7% of Class Members who have the weakest claims.") (cleaned up). Instead, what each individual class member receives is determined by an allocation model devised by plaintiffs' counsel and their retained experts. [DE 246-1 at 75-82.] The allocation model is admittedly complex but was explained in detail in the notice that went out to class members. [*Id.*] Each settlement class member will have a "recognized loss" calculated which takes into account factors such as when they purchased or sold ZBH shares, the type of ZBH shares purchased or sold, the price of ZBH shares purchased or sold, as well as the "artificial inflation or deflation" of the price at the time of the trade. [*Id.*; *see also* DE 255 at 20-21.] Finally, there have been no objections to the allocation model in particular, which supports it being reasonable on top of the generally deferential nature courts have towards the nitty gritty of settlement allocation. *See In re IMAX Sec. Litig.* 283 F.R.D. at 192.

### C.   Notice to the Class Was Sufficient and the Class's Reaction to the Settlement Has Been Overwhelmingly Positive.

Because this is a class certified pursuant to Rule 23(b)(3), class members must receive "the best notice that is practicable under the circumstances" including notice to all individual class members that can reasonably be identified. This is to give class members the ability to opt out if they would rather pursue their claims individually and not settle with the lot. *See* Fed. R. Civ. P. 23(c)(2)(B). Plaintiffs provided notice primarily through a physical mailing to class members (both individuals and institutions) who

traded in ZBH stock during the relevant period. Class members were identified based on records from ZBH, brokerage firms and other nominees for beneficial purchasers of securities. As a backstop, the notice appeared on a settlement website and the shorter summary notice was published in *Investor's Business Daily* and transmitted over the *PR Newswire*. Additional information was available on the website and the claims administrator has operated a toll-free telephone number to help address any inquiries. This type of notice meets the all the applicable requirements.

Thus far, more than 1650 claims have been submitted. While this is a relatively small number compared to the more than 156,000 notice packets mailed, in the world of class actions it isn't an unreasonable "take-rate." What's more, the time for individual class members to make claims has not yet expired. Both the settlement administrator and class counsel both have stated that in their experience, large institutional investors, who are quite likely to be some of the major shareholders here, tend to not make their claims until closer to the end of the deadline. [DE 260-1 at ¶ 10 ("a significant number of claims are submitted on, or near, the claim filing deadline, which is October 19, 2020.).] Since there's nothing to indicate that isn't true, I can only assume the number of claims will continue to climb.

The number of claims looks even better though compared to the number of class members who have opted out. Only seven class members timely submitted forms requesting to be excluded from the settlement. [DE 260-1 at ¶ 7.] Another request for exclusion was received after the cut-off date. Of those eight opt-outs, three of them did not contain the necessary information allowing the claims administrator to confirm the

individuals were actually members of the class. In other words, they did not provide the necessary proof to show they purchased or sold ZBH securities. Thus, there were only five timely filed and sufficiently completed opt-outs to the class action filed compared to 1655 claims and a total of more than 156,000 notice packets sent. [*See id.* at ¶¶ 2, 10-11.]

The number of objections to the settlement is even smaller. The Court received only a single objection from Joseph R. Sahid. [DE 259.] Mr. Sahid's objection is perfunctory at best. In the objection, he states that the reason for his objection is that "[t]he instructions sent me [*sic*] were useless." This appears to relate to instructions in the notice packet not to contact the Court with questions concerning the substance of the settlement (the notice packet stated those should be directed to counsel) and to other instructions which stated that any objections must be filed with the Court (so that they may be considered). I'm not sure I fully understand Mr. Sahid's supposed confusion, it's straightforward and unambiguous. In any event, reading two unrelated passages in a document, separated by 25 pages as being in conflict to create an alleged ambiguity is a very lawyerly thing for Mr. Sahid to do, but that doesn't mean it has any merit. These are standard instructions for large, complex class actions such as this.

He next states that the time for him to object was insufficient and then questions whether this "rush" was "so that objectors do not have the time to understand the proposal?" It was of course ample time for him to file his objection and there is no indication it was insufficient time for any other would be-objector. The deadline to mail the notice was June 19, 2020, and objections were due on August 13, 2020. [DE 251 at

16.] That was a period of 55 days and nearly two months. Even if it took a few weeks for

Mr. Sahid or others to receive their notice that was more than enough time to review the

notice and file objections. Additionally, there were two weeks between the date of the

filing of class counsel's motion for attorneys' fees (July 30, 2020) and the deadline to

object (August 13, 2020). *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th

Cir. 2010) (holding that Fed. R. Civ. P. 23(h) and due process mandates that deadline to

object come after the date for the filing of the motion for attorneys' fees); *see also In re AT*

*& T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 969 (N.D. Ill. 2011)

(applying *In re Mercury* and finding one week sufficient time to objection). This

provided enough time and opportunity to file an objection if a class member wanted to.

Mr. Sahid then appeals to his own authority as a former partner at "a large Wall

Street law firm and at a plaintiff's class action firm" to say that the requested fees in this

case are "absurd" when compared to the per share recovery. [DE 259.] Evidently, Mr.

Sahid wants me to simply accept that fact based on who he is. But I like to decide things

based on reason. And Mr. Sahid has provided me no *reasons* as to why the settlement

here is unfair or inadequate. He just wants me to accept his conclusion that it is

"absurd." Thanks, but no thanks.

Finally, Mr. Sahid says that the settlement "will contribute to the widespread

believe [*sic*] that the Judges and the plaintiff's lawyers are in cahoots." [DE 259.] I'm not

sure what widespread belief he is referring to—presumably it is just his own. As an

experienced lawyer, Mr. Sahid should know better than to make these kinds of baseless

accusations. In any event, that is not a valid objection either. I was uninvolved in the

settlement discussions in this case. Those were handled by the parties at arms-length and with the assistance of experienced mediators whose resumes could choke a horse. At bottom, this objection reads as nothing more than axe grinding and not grounded in any specific substance related to this particular case.

Beyond the lack of substance, the objection can be set aside for a more fundamental reason. Mr. Sahid fails to show that he is a member of the class with standing to object. "Any class member has standing to object to a class settlement. Filing a proof of claim to the settlement fund is one way, but not the only way, for an objector to demonstrate that he is a member of the class." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 638–39 (5th Cir. 2012) (citing *Devlin v. Scardelletti,* 536 U.S. 1, 6–7 (2002)). Mr. Sahid not only fails to offer any proof that he is a member of the class, he doesn't even claim to be one. He states he received a notice packet, but the subset of people receiving notice packets is aimed to be over-inclusive. Without any indication that he actually bought or sold any share of ZBH, I cannot simply assume he is a member of the class. As such, the objection of Joseph Sahid to the settlement is overruled for both a lack of standing and a lack of merit.

### D. Lead Plaintiff Incentive Awards are Reasonable.

"[A] named plaintiff is an essential ingredient of any class action." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). Thus, courts in this circuit try to incentivize quality lead plaintiffs to participate in class actions. And we do that in the best way any of us know how, with cash. This is done with an incentive award on top of whatever the lead plaintiffs receive as members of the class. "To determine if an incentive award is

warranted, a district court evaluates 'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.'" *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 834 (7th Cir. 2018) (quoting *Cook*, 142 F.3d at 1016).

Each of the lead plaintiffs (Rajesh M. Shah, Matt Brierly, Steven Castillo, and Anthony G. Speelman on behalf of institutional plaintiff UFCW Local 1500) provided a declaration in support of their requests. [DE 258-4, 285-5, 258-6, and 258-7.] Frankly, the affidavits are a bit perfunctory. All four are nearly identical documents and affirm that each of these individuals generally participated in the case by speaking with counsel, reviewing pleadings, reviewing written discovery responses and collecting documents. [*Id.*] They then request and state they believe it is reasonable that they each receive $15,000 to compensate for time they would have otherwise spent on their jobs, or in Mr. Brierly's case his "investment activities." [*Id.*] But none of them tell me or even estimate how much time they spent on the lawsuit. That missing data and the obvious uniformity of each declaration make it difficult to evaluate these requests on any individual level.

But each of them did at least have to sit for a deposition in connection with discovery and class certification. That obviously involved several hours of unpleasantness and preparation in service of their fellow class members. And the case has been going for over three and a half years. While it is certainly my preference that lead plaintiffs provide *some* estimate of the actual time they spent on the case before

asking for $15,000, I think the excellent result for the class can justify the incentive awards here. Furthermore, courts have approved of similarly sized and even larger incentive awards in cases where both the individual and class recovery were much smaller than in this case. *E.g.*, *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 716 (7th Cir. 2015) (approving $15,000 incentive award for lead plaintiffs without conflicts of interest in coupon settlement class action); *Masters v. Wilhelmina Model Agency, Inc.*, 472 F.3d 423, 430 (2d Cir. 2007) (approving $25,000 incentive awards for lead plaintiffs who sat for depositions in case where settlement included a $22 million common fund). Thus, each of the four lead plaintiffs will receive their requested[1] $15,000 incentive awards.

**E. Class Counsel's Motion for Attorneys' Fees and Cost Reimbursement.**

With approval of the settlement complete, the final issue to address is class counsel's motion for attorneys' fees and reimbursement of costs. [DE 256.] In the motion for preliminary approval, class counsel stated that they would be seeking a fee of a third of the settlement fund and estimated their expenses at no greater than $1,900,000. [DE 244-45.] In the final motion for fees they now seek the full 33.3% and reimbursement of costs and expenses in the amount of $1,535,402.94.

---

[1] Mr. Brierley will be especially pleased with the result today. Because his affidavit (and the others) were so conclusory, I thought it would be prudent to read the depositions to get a flavor for what the lead plaintiffs had to do in working on the case. There I learned that when told that he would have to spend two or three weeks in Northwest Indiana for the trial, he declared it "the armpit of the world" and that he dreaded the possibility of having to travel here for trial. [DE 226-4.] It's enough to say that we are all pleased he was spared that "burden."

At first blush, I thought that seemed like an exceedingly high contingency fee. Excluding interest, that comes out to $16,650,000 for work in a case that settled before any decision on class certification, before discovery was completed, and obviously before summary judgment was briefed or decided. My gut instinct was that something in the range of 20-25% would represent a reasonable attorneys' fee in a case like this. As discussed below, after a review of a lot of data and caselaw, as well as the particular risks taken by counsel in this case, a fee roughly in the middle of what counsel requested and my initial instincts is appropriate and reasonable.

The Seventh Circuit has stated "[i]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price" in divining what the appropriate fee award should be. *In re Continental l Ill. Sec. Litig.*, 962 F.2d 566, 568 (7th Cir.1992). Instead, "[i]t is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order." *Id.* This is a difficult inquiry when I only have briefing from the party who wants their request approved. And candidly, calling it a market rate and then having district court judges, who are almost always untrained in economics and often even untrained in the private practice of law, come up with a number is only a step removed from St. Thomas Aquinas's just price endeavor. To put it plainly, all I have is myself and some brilliant law clerks to assist me. But the mandate is to do my best to ascertain a market rate. So that's what I'll attempt to do.

The factors or "benchmarks" to consider when setting the market rate ex post include: "(1) actual fee agreements; (2) data from large common fund cases where the

parties negotiated the fees privately, and (3) bids and results from class counsel auction cases for insight into the fee levels attorneys in competition were willing to accept." *Sutton v. Bernard*, 504 F.3d 688, 692, n.2 (7th Cir. 2007) (citing *In re Synthroid Mkgt. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001).

On the first benchmark, actual fee agreements, I'm at something of a loss. There is no fee agreement in the case before me and class counsel in this case have not included any fee agreements from other securities class actions in their motion.[2] But I think it's fair to say that if there were fee agreements in similar cases with a flat 33.3% fee, counsel would have included them with their briefing. Thus, their absence somewhat undercuts the requested amount. But at the same time, if the requested award of 33.3% was way out of line, I would also expect some legitimate opposition or objections to the proposed settlement, either from large institutional investors or a group like the Center for Class Action Fairness who pay attention to such things. *See* https://hlli.org/class-action-fairness. As discussed above, there was none of that in this case. I could order additional briefing on this point or conduct my own independent research to try and find such agreements, but I have my doubts that either of those would result in anything definitive. Thus, I really view this benchmark as not particularly relevant here.

That brings me to empirical data on the subject. Thankfully, there's something of an embarrassment of riches. I won't go into a detailed analysis of the methodology of

---

[2] Defendants have taken the approach common in class action settlements in which they express no view on the requested award, even if it is their money being distributed.

the studies in this subset of law and economics. I'm hardly qualified to do that. But I can report on and utilize the top-line findings from each study. While their conclusions are not uniform, they offer important touchstones that any judge taking their duty to ascertain a market rate for legal services seriously should consider.

The first frequently cited study in this field is one by Professors Theodore Eisenberg and Geoffrey Miller. They originally published their study in 2004 and then updated it in 2010. The updated study analyzed class action fee awards in cases from 1993 to 2008. Theodore Eisenberg & Geoffrey P. Miller, *Attorneys Fees in Class Action Settlements: 1993-2008,* 7 J. Empirical Legal Studies 248 (2010). While it analyzed all class actions, it broke out fee awards by case type. In securities class actions, fee awards had, as a percentage of the total settlement amount, a mean of 23% and a median of 25%. Those percentages translated into a mean fee of $14.78 million and median fee of $2.52 million across 268 cases. *Id.* at 262. Another study from 2010 concluded that there were similar ranges of fees awarded, with a mean and median hovering around 25% in securities class actions. *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studies 811, 835 (2010). For cases in which the settlement amount was $30 - $72.5 million, the mean award as a percentage was 22.3% and the median 24.9%. *Id.* at 839. It seems that studies consistently have found the mean and median fee awards in securities class actions to fall "between 20 percent and 30 percent of the settlement amount." *Id.* at 815 (discussing and summarizing prior research studies in the field). Thus, it seems that 25% is fairly standard in large securities class actions, and 30% is at the high end.

Another key aspect of these studies is their agreement on a "scaling effect" in which as the amount of the settlement increased, the percentage of the attorneys' fee award decreased. *See* Eisenberg & Miller, at 263-64 ("a substantial scaling effect existed in the 2003-2008 period, as well as in the earlier 1993-2002 period"); Fitzpatrick at 837 ("[F]ee percentages are strongly and inversely related to the size of the settlement both in securities fraud and other cases."). For example, in cases where the class recovery was $1.1 million or less, the mean attorney fee percentage was 37.9% and the median was 32.3%. Eisenberg & Miller at 265. For cases in the $38.3 – $69.6 million range (*i.e.*, this case), the mean was 22.1% and median 24.9%. *Id.* In the highest bracket, cases with recovery greater than $175.5 million, the mean was 12% and the median 10.2%. *Id.; see also In re Capital One Telephone Consumer Protection Act Litig.*, 80 F. Supp.3d 781, 797-799 (reviewing the same empirical data on fee awards in class actions). Thus, while a 33.3% fee may be common in personal injury cases or class actions where the recovery is "only" seven figures, that is simply not the case when dealing with much larger dollar amounts.

Likely anticipating this data, plaintiffs included with their motion a joint declaration from Professors Charles Silver and Brian Fitzpatrick—the same professor whose article is discussed above. [DE 258-2.] There are two broad points made in that declaration. First, while Professor Fitzpatrick states that his 2010 article on the subject is still "the most comprehensive examination of class action settlements and attorneys' fees that has ever been published" (*id.* at ¶ 10), they direct me to studies on contingency fee patent litigation and a narrower data set of "related pharmaceutical antitrust cases,

in which approximately 20 drug wholesalers sued drug manufacturers on a contingency fee basis." [DE 257 at 17-18.] In the patent cases, the mean rate of attorneys' fees was 38.6% of the recovery. In the large pharmaceutical direct purchaser antitrust cases, there were fee agreements of 33.3% supported by sophisticated class members. [*Id.*] But neither of those data sets relate to securities class actions, or even class actions. As discussed, there's an abundance of data on fee arrangements in securities class actions. Since I'm dealing with a securities class action, that's the more relevant data compared to patent or large pharmaceutical antitrust cases.

Second, Professors Fitzpatrick and Silver make another point in their declaration which I think has greater salience in the context of this case. Contrary to the conventional wisdom which embraces a sliding scale where the fee award percentage goes down as the total amount of recovery goes up, they posit that the better way to incentivize class counsel to get the best deal for the class is to have a scaling effect in the *opposite* direction. [DE 258-2 at ¶¶ 58-64.] That is, as the amount of the settlement increases, so should the percentage of the attorneys' fee. This provides a direct incentive for class counsel to push for a higher settlement figure, rather than accept the first good offer. The idea is that the last dollar is much harder to get than the first dollar is. Other courts have noted a similar concept. *Allahpattah Servs. Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) ("By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, [this] approach creates the perverse incentive for Class Counsel to settle too early for too little."); *In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 80 (S.D.N.Y. 2000) ("By adjusting downward the

percentage of the recovery awarded to counsel as plaintiffs' recovery increases, [downward sliding scale] arrangement arguably limits windfall attorney's fee awards. However, this method may give rise to an attorney incentive problem by creating declining marginal returns to effort for counsel.").

An analogy is perhaps in order. Imagine you're working with a real estate agent who gets 3% of the home's sale price as a commission. For them, the difference between selling a home for $250,000 today compared to waiting and working several more weeks to sell it for $300,000 is only $1,500 ($7,500 vs. $9,000). But for you the seller, the higher sale amount translates to $48,500 more. In such a situation, the seller's and their real estate agent's incentives begin to diverge because of decreasing marginal returns for the real estate agent's efforts, assuming you're not in a huge rush to sell.

So too in the class action settlement context, assuming everyone is behaving in their own self-interest. *See In re Sw. Airlines Voucher Litig.*, 799 F.3d at 711 ("Judicial scrutiny of class action fee awards and class settlements more generally is based on the assumption that class counsel behave as economically rational actors who seek to serve their own interests first and foremost, particularly in classes certified under Rule 23(b)(3) that seek primarily monetary relief."). Hypothetically, class counsel could settle at early stages of the case for $30,000,000 and get a 25% award (equally $7,500,000). Or they could spend two additional years slogging through discovery and motion practice (a cost counsel is "eating" in the meantime) and settle the case for $50,000,000. Then they might receive a 20% award (equaling $12,500,000). $5,000,000 isn't anything to scoff at, but when a case like this incurs several million dollars in legal fees and expenses

every year, rational class counsel is likely going to take the quick but still substantial settlement. In that situation, the class members (most of whom probably have no idea the case exists) lose because they missed out on an extra $15,000,00, after fees.

The third benchmark is insight from class counsel auctions. Some judges have had success in creating a market price in securities class actions ex ante by holding a competitive auction near the outset and awarding the case out to the lowest reasonable bid by a plaintiffs' firm. *See, e.g.*, *In re Auction Houses Antitrust Litig.*, 197 F.R.D. at 82 ("[T]his case is singularly appropriate for the use of an auction for several reasons."); *In re Comdisco Sec. Litig.*, 141 F. Supp.2d 951 (N.D. Ill. 2001) (ordering sealed bids to be filed by potential class counsel). Like many economic exercises, it works tremendously in theory but runs into a host of complications in the real world. Professors Fitzpatrick and Silver agree as much and state in their joint declaration that "[t]he obstacles are so severe that experimentation with auctions has ceased." [DE 258-2 at ¶ 40.] The case law seems to bear that out, as reported cases with auctions drop off dramatically after 2001. *See In re Capital One Telephone Consumer Protection Act Litig.*, 80 F. Supp.3d 781, 800-801 (N.D. Ill. 2015) ("As far as the court can tell, there are at least fourteen class action cases—twelve securities actions and two antitrust actions—where district court judges have selected lead counsel and negotiated a fee structure using a competitive process.") (collecting cases all predating 2002).

This case is a good example of how an auction likely wouldn't have done much good. There was no competition between plaintiffs' law firms to bring this case. As far as I can tell, this was the only lawsuit filed in relation to ZBH's 2016 stock price drops.

There was no publicly disclosed SEC investigation before or after the complaint was filed, and no copycat complaints filed either. No other firm (or group of firms) moved to try to represent the class at any point. It was thus a market of one, and monopolies and monopsonies aren't exactly famous for efficiency. Perhaps I could have announced an auction, and additional class counsel would have come knocking, but that's pure speculation. In all likelihood, an auction at the outset of the case wouldn't have helped much with figuring out a market rate for attorneys' fees in this case.

While the lack of competition amongst plaintiffs' lawyers may have made holding an auction impracticable or unhelpful, that fact can still help inform the market rate for a case like this. Precipitous stock price drops are blood in the water for securities class action firms. Lawsuits almost always follow, and there are frequently multiple competing lawsuits that must be consolidated, whether piecemeal or through the Judicial Panel on Multidistrict Litigation. But here, that didn't happen. This case was filed on December 2, 2016, four weeks after the relevant disclosures by ZBH and attendant drops in the company's stock price. Given ZBH's massive market capitalization, it was clear there would be hundreds of millions of dollars on the line. As such, I can only assume that if more entrepreneurial lawyers thought there was a viable case, they would have done their own investigations and filed their own lawsuits. But no one else did. That's probably because this was going to be a difficult case and one in which the chances of success were low. No litigation is a sure-fire win, but this one was riskier than the average lawsuit and certainly riskier than the average securities litigation class action. Any market-based fee award should take that into account.

After considering these benchmarks, I think some enhancement over the "standard" 25% fee award for large securities class actions makes sense in this case. By so doing, I've admittedly brought myself back into the realm of counting the number of angels that fit on the head of a pin or divining a just price for lawyers' fees, but there's no way out of it. Five specific facts or elements about this case justify an increase in the fee award: (1) substantial independent investigation on counsel's part was required (there were no regulatory actions to piggyback off of and numerous confidential witnesses were located, interviewed and relied upon to adequately plead the case); (2) the somewhat novel legal theory used in connection with the duty to disclose and the Section 10b claims (discussed at length in my prior opinion on the motion for interlocutory appeal, *see Shah*, 2019 WL 762510); (3) an incentive for being the first/only mover in the field where no other counsel sought to represent the class (a monopoly award something akin to a patent); (4) the fact settlement was achieved only after counsel did the work of creating a damages model, fully brief class certification, and multiple rounds with experienced mediators; and (5) that class counsel held out until there was a settlement offer well in excess  of what similar cases settle for in terms of a percentage of total possible recovery.[3]

---

[3] I think of this consideration as distinct from a result-oriented view of basing the fee percentage on the success or total size of the settlement award, an approach the Seventh Circuit has frowned upon multiple times. *See, e.g. Sullivan*, 504 F.3d at 693 ("The trouble we have with the district court's methodology is that the fee determination began and ended with the amount actually recovered for the class" which only accounted for the district court's "subjective judgment regarding [Counsel's] work[.]"). The point here is to properly incentivize class counsel to not have a diminishing marginal rate of return on the "last dollar" and instead work to maximize the amount recovered for the class.

Given these things, I think a fee award of 30% represents a reasonable market rate. That number could be thought of as a percentage point increase for each of the five elements listed above. And it likewise splits the baby between the requested 33.3% and large securities class action standard rate of 25%. Most importantly, it accurately takes into account the market forces that would be at play if sophisticated parties were negotiating a fee for this case at the outset. In particular, the risk of nonpayment to counsel and investment of millions of dollars' worth of attorney time taken on in advancing a novel legal theory in a case where there are some strong indications that no one else was willing to. It's less than counsel's requested award of 33.3% but is still indisputably at the high end of the spectrum of percentage of fund awards. In dollar amount, it comes out to $15,000,000 (excluding any additional amount for interest earned on the settlement fund). And for whatever value the lodestar crosscheck still has, *see In re Synthroid,* 325 F.3d at 979-80, the award is in line with the lodestar amount provided by counsel, which came out to $14,675,216.00. [DE 258 at ¶ 140.]

As for the requested amount of costs and expenses in this case, counsel's requested amount of $1,535,402.94 is reasonable. "It is well established that counsel who create a common fund like this one are entitled to the reimbursement of litigation costs and expenses, which includes such things as expert witness costs; computerized research; court reports; travel expense; copy, phone and facsimile expenses and mediation." *Beesley v. Int'l Paper Co.,* No. 3:06-CV-703-DRH-CJP, 2014 WL 375432, at *3 (S.D. Ill. Jan. 31, 2014). To be sure, it's a lot of costs, but that's the nature of high-stakes complex litigation like this. More than 80% of those costs ($1,237,009.78) related to

expert witness costs. [DE 258 at ¶ 160.] This case required consultation with many experts in fields of medical device regulation and accounting given the subject matter of the case and experts on economic damages, market efficiency, and loss causation given its nature as a securities class action. [*Id.*] As detailed in counsel's declaration, all of the costs and expenses sought are of the type and nature that a paying client and consumer of high-end legal services would be expected to pay in a case billed at an hourly rate. They are thus fully recoverable.

### Conclusion

For the reasons stated on the record during the final fairness hearing and in this opinion, Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation [DE 254] is GRANTED; and Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses [DE 256], is GRANTED, in part.

It is ORDERED that once final disbursement of the settlement fund is authorized, plaintiffs' counsel shall be paid attorneys' fees in the amount of 30% of the settlement fund as of that date; it is further ORDERED that plaintiffs' counsel be reimbursed costs and expenses from the settlement fund in the amount of $1,595,402.94; and it is further ORDERED that each of the lead plaintiffs, Rajesh M Shah, Matt Brierly, UFCW Local 1500, and Steven Castillo each be paid $15,000 from the settlement fund as incentive awards and reimbursement for serving as lead plaintiffs.

SO ORDERED on September 18, 2020.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT